**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| |
|---|
| ELI LILLY AND COMPANY, and LILLY USA, LLC |
|         Plaintiffs, |
|         v. |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, |
|         Defendants. |

No. 1:21-cv-81-SEB-MJD

# DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................2

I.      STATUTORY AND REGULATORY BACKGROUND ..............................................3

II.     PHARMACEUTICAL COMPANIES UNILATERALLY RESTRICT ACCESS
        TO 340B DISCOUNTS FOR SAFETY-NET PROVIDERS..........................................9

III.    PHARMACEUTICAL COMPANIES SUE TO PREVENT HHS's
        ENFORCEMENT OF THE 340B STATUTE..............................................................11

STANDARD OF REVIEW.................................................................................................12

ARGUMENT.......................................................................................................................13

I.      THE GENERAL COUNSEL'S LEGAL ADVICE IS NOT REVIEWABLE...................14

        A.      The Advisory Opinion Does Not Constitute Final Agency Action ...............14

        B.      Lilly's Attempt to Upend the Settled Operation of the 340B Program is
                Time-Barred ................................................................................................17

II.     EVEN IF THE GENERAL COUNSEL'S LEGAL ADVICE WAS
        REVIEWABLE, LILLY'S CLAIMS FAIL...................................................................22

        A.      Notice-and-Comment Rulemaking is Not Required Because the Advisory
                Opinion Is An Interpretive Rule....................................................................22

        B.      Lilly Fails To State A Claim On The Merits Because Lilly's Obligation to
                Offer Discounted Drugs To Covered Entities Is Imposed By the 340B
                Statute Itself ................................................................................................24

        C.      The General Counsel's Legal Advice Was Neither Arbitrary Nor Capricious ...........28

        D.      Lilly's Takings Claims Fail As A Matter of Law.............................................29

                1.      Lilly Fails to State a Private-Regulatory-Takings Claim ........................30

                        i.      Lilly's Voluntary Participation in the 340B Program
                                Forecloses its Private-Regulatory-Takings Claim....................30

                        ii.     The Challenged Obligation, Even if a Taking, is
                                Constitutionally Justified by a Public Purpose........................32

                2.      Lilly Fails to State an Unconstitutional-Conditions Claim....................34

III.    THE ADMINISTRATIVE-DISPUTE RESOLUTION MECHANISM
        MANDATED BY CONGRESS WAS LAWFULLY ESTABLISHED....................37

        A.      ADR Board Members Are Lawfully Appointed Inferior Officers....................37

i

B. The ADR Process Does Not Infringe the Power of the Judiciary ................................. 43

C. The Secretary Fully Complied with Notice-And-Comment Requirements in Promulgating the ADR Rule ........................................................................................... 50

 1. HHS did not terminate the ADR Rulemaking in advance of issuing the final rule. ............................................................................................... 50

 2. The ADR Rule is a logical outgrowth of the NPRM ........................... 54

D. The ADR Rule is Substantively Compliant with the APA .................................... 56

CONCLUSION ............................................................................................................................. 60

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. PCI Gaming Auth.*,
  801 F.3d 1278 (11th Cir. 2015) ..................................................................17

*Allegheny Def. Proj., Inc. v. U.S. Forest Serv.*,
  423 F.3d 215 (3d Cir. 2005) ......................................................................58

*Alto Dairy v. Veneman*,
  336 F.3d 560 (7th Cir. 2003) ...............................................................55, 56

*Am. Hosp. Ass'n v. Dep't of Health & Hum. Servs.*,
  2021 WL 616323 (N.D. Cal. Feb. 17, 2021) ..................................10, 33

*Am. Med. Ass'n v. United States*,
  887 F.2d 760 (7th Cir. 1989) .........................................................54, 55, 56

*Amundsen v. Chi. Park Dist.*,
  218 F.3d 712 (7th Cir. 2000) ....................................................................57

*Ark. Hospice, Inc. v. Burwell*,
  815 F.3d 448 (8th Cir. 2016) ....................................................................31

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
  941 F.3d 1320 (Fed. Cir. 2019) ................................................................43

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................12

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
  821 F.3d 19 (D.C. Cir. 2016)....................................................................42

*Astra USA, Inc. v. Santa Clara Cty.*,
  563 U.S. 110 (2011)..............................................................................6, 49

*Baker Cty. Med. Servs., Inc. v. U.S. Att'y Gen.*,
  763 F.3d 1274 (11th Cir. 2014) ...............................................................31

*Bank of N. Shore v. Fed. Deposit Ins. Corp.*,
  743 F.2d 1178 (7th Cir. 1984) ..................................................................56

*Baptist Hosp. E. v. Sec. of Health & Hum. Servs.*,
  802 F.2d 860 (6th Cir. 1986) ....................................................................31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................12

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................14, 17

*Berman v. Parker*,
    348 U.S. 26 (1954) ............................................................................33, 34

*Biggerstaff v. FCC*,
    511 F.3d 178 (D.C. Cir. 2007) ............................................................19

*Burditt v. U.S. Dep't of Health & Hum. Servs.*,
    934 F.2d 1362 (5th Cir. 1991) ............................................................31

*Burgess v. Lowery*,
    201 F.3d 942 (7th Cir. 2000) ..............................................................37

*California Coastal Commission*,
    483 U.S. 825 (1987) ............................................................................36

*CFTC v. Schor*,
    478 U.S. 833 (1986) ........................................................................48, 49

*Cierco v. Lew*,
    190 F. Supp. 3d 16 (D.D.C. 2016) ......................................................51

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
    526 U.S. 687 (1999) ............................................................................36

*City of Portland v. EPA*,
    507 F.3d 706 (D.C. Cir. 2007) ............................................................58

*Clayton Cty., Ga. v. FAA*,
    887 F.3d 1262 (11th Cir. 2018) ..........................................................15

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................57

*Commonwealth of Pennsylvania v. HHS*,
    80 F.3d 796 (3rd Cir. 1996) ................................................................39

*Crowell v. Benson*,
    285 U.S. 22 (1932) ..............................................................................49

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    710 F.2d 842 (D.C. Cir. 1983) ............................................................51

*Daniels v. Area Plan Comm'n of Allen Cty.*,
    306 F.3d 445 (7th Cir. 2002) ..........................................................33, 34

*Diliberti v. United States,*
    817 F.2d 1259 (7th Cir. 1987) ........................................................17, 18

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ..........................................................................36

*Edison Elec. Inst. v. OSHA,*
    411 F.3d 272 (D.C. Cir. 2005) ............................................................19

*Edmond v. United States,*
    520 U.S. 651 (1997) ..................................................................*passim*

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..........................................................................28

*FCC v. Prometheus Radio Proj.,*
    (*Prometheus*), 141 S. Ct. 1150 (2021) ........................................28, 56

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) ....................................................................12, 13

*Franklin Mem'l Hosp. v. Harvey,*
    575 F.3d 121 (1st Cir. 2009) ..............................................................31

*Free Enter. Fund v. Pub. Co. Acc't Oversight Bd.,*
    561 U.S. 477 (2010) ..........................................................38, 42, 43

*Freedom Ordnance Mfg., Inc. v. Brandon,*
    No. 3:16-cv-00243, 2018 WL 7142127 (S.D. Ind. March 27, 2018) ......12

*Freytag v. Comm'r of Internal Revenue,*
    501 U.S. 868 (1991) ..........................................................................56

*Garelick v. Sullivan,*
    987 F.2d 913 (2d Cir. 1993) ........................................................31, 32

*General Motors Corp. v. EPA,*
    363 F.3d 442 (D.C. Cir. 2004) ......................................................18, 19

*Golden and Zimmerman, LLC v. Domenech,*
    599 F.3d 426 (4th Cir. 2010) ........................................................15, 16

*Haw. Hous. Auth. v. Midkiff,*
    467 U.S. 229 (1984) ....................................................................33, 34

*Horne v. Dep't of Agric.,*
    576 U.S. 350 ..............................................................................30, 35

*In re Grand Jury Invest.*,
  916 F.3d 1047 (D.C. Cir. 2019) ......................................................... 40, 41, 43

*Indep. Equip. Dealers Ass'n ("IEDA") v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ........................................................*passim*

*Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*,
  67 F. Supp. 3d 373 (D.D.C. 2014) ...........................................................59

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  684 F.3d 1332 (D.C. Cir. 2012) ........................................................40, 43

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*,
  358 F.3d 40 (D.C. Cir. 2004) ....................................................................51

*Kalaris v. Donovan*,
  697 F.2d 376 (1983)........................................................42, 48, 49, 50

*Kelo v. City of New London*,
  545 U.S. 469 (2005)............................................................................30, 33

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ................................................................... 30, 35, 36

*Lehman v. Nakshian*,
  453 U.S. 156 (1981)...................................................................................18

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) .................................................................. 29, 32, 36

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
  140 S.Ct. 2367 (2020) ...............................................................................52

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ..................................................................................56

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ........................................................................56, 57

*Managed Pharmacy Care v. Sebelius*,
  716 F.3d 1235 (9th Cir. 2013) .................................................................31

*Menominee Indian Tribe of Wisconsin v. EPA*,
  947 F.3d 1065 (7th Cir. 2020) ...........................................................15, 16

*Metro. Sch. Dist. of Wayne Tp., Marion Cty., Indiana v. Davila*,
  969 F.2d 485 (7th Cir. 1992) .......................................................*passim*

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare,*
   742 F.2d 442 (8th Cir. 1984) ................................................................................32

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
   498 U.S. 211 (1991) .....................................................................................59, 60

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
   59 U.S. 272 (1855) ............................................................................................46

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   (*NFIB*), 567 U.S. 519 (2012) ...........................................................................32

*Nat'l Ass'n of Mfrs. v. Dep. of Def.,*
   138 S. Ct. 617 (2018) ........................................................................................17

*Nat'l Lifeline Ass'n v. FCC,*
   983 F.3d 498 (D.C. Cir. 2020) ..........................................................................31

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.,*
   116 F.3d 520 (D.C. Cir. 1997) .....................................................................58, 59

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
   138 S. Ct. 1365 (2018) ...........................................................................45, 46, 47

*Penn Central Transp. Co. v. City of New York,*
   438 U.S. 104 (1978) ..........................................................................................32

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ............................................................................................22

*Peri & Sons Farms, Inc. v. Acosta,*
   374 F. Supp. 3d 63 (D.D.C. 2019) ....................................................................19

*Pipeline Const. Co. v. Marathon Pipe Line Co.,*
   458 U.S. 50 (1982) ............................................................................................46

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,*
   699 F.3d 962 (7th Cir. 2012) ......................................................................34, 35

*Post Acute Med. at Hammond, LLC v. Azar,*
   311 F. Supp. 3d 176 (D.D.C. 2018) ..................................................................55

*Pub. Citizen v. Nuclear Reg. Comm'n,*
   901 F.2d 147 (D.C. Cir. 1990) ..........................................................................19

*Rancho de Calistoga v. City of Calistoga,*
   800 F.3d 1083 (9th Cir. 2015) .....................................................................30, 32

*Ritter v. Thigpen*,
    828 F.2d 662 (11th Cir. 1987) ...................................................................57

*Ruckelshaus v. Monsanto Co.*,
    (*Monsanto*), 467 U.S. 986 (1984) ................................................ 30, 35, 36

*Rumsfeld v. Forum For Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ....................................................................................35

*Schwab v. Sec'y, Dep't of Corr.*,
    507 F.3d 1297 (11th Cir. 2007) ............................................................57, 58

*Shalala v. Guernsey Mem. Hosp.*,
    514 U.S. 87 (1995) ....................................................................................23

*Sierra Club v. Marita*,
    46 F.3d 606 (7th Cir. 1995) ...............................................................12, 13

*Singer v. City of New York*,
    417 F. Supp. 3d 297 (S.D.N.Y. 2019) .......................................................35

*St. Francis Hosp. Ctr. v. Heckler*,
    714 F.2d 872 (7th Cir. 1983) ................................................... 30, 31, 32

*St. James Hosp. v. Heckler*,
    760 F.2d 1460 (7th Cir. 1985) ...........................................................58, 59

*Stern v. Marshall*,
    564 U.S. 462 (2011) ............................................................................46, 47

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ............................................................................47, 48

*Toledo, Peoria & W. Ry. v. Surface Transp. Bd.*,
    462 F.3d 734 (7th Cir. 2006) .....................................................................56

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ....................................................................................56

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,
    435 U.S. 519 (1978) ..................................................................................51

**Statutes**

5 U.S.C. § 553 ...................................................................................... 22, 50, 52

5 U.S.C. § 701 ..............................................................................................49

5 U.S.C. § 702 ..............................................................................................14

5 U.S.C. § 706(2) ....................................................................................24, 29

28 U.S.C. § 2401(a) ......................................................................................17

42 U.S.C. § 256b ...................................................................................*passim*

42 U.S.C. § 1396r-8(a)(1) .........................................................................3, 34

44 U.S.C. § 1507 ..........................................................................................52

Patient Protection and Affordable Care Act ("ACA"),
    Pub. L. No. 111-148, 124 Stat. 119 (2010) ...........................................6

Veterans Health Care Act of 1992,
    Pub. L. No. 102-585, 106 Stat. 4943 (1992), *codified at* § 340B, Public Health Service Act ... 3

U.S. Const. art. II.....................................................................................2, 37

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .................................................12

Federal Rule of Civil Procedure 56..........................................................12

**Regulations**

340B Drug Pricing Program Administrative Dispute Resolution Process,
    75 Fed. Reg. 57,233 (Sept. 20, 2010) ...............................................7, 50

340B Drug Pricing Program; Administrative Dispute Resolution,
    81 Fed. Reg. 53,381 (Aug. 12, 2016) ...............................................7, 50

340B Drug Pricing Program: Administrative Dispute Resolution,
    85 Fed. Reg. 80,632 (Dec. 14, 2020) ..........................................*passim*

40 C.F.R. § 10.24 ..................................................................................*passim*

42 C.F.R. § 10.11 ...................................................................................6, 60

42 C.F.R. § 10.20 ..................................................................................*passim*

42 C.F.R. § 10.21 ..........................................................................................44

42 C.F.R. § 10.23 ...................................................................................8, 55

42 C.F.R. § 10.24 ..................................................................................*passim*

42 C.F.R. § 10.3 ...............................................................................8, 41, 47

78 Fed. Reg. 12,702-01 (Feb. 25, 2013) .............................................................................51

82 Fed. Reg. 1,210 (Jan. 5, 2017) ......................................................................................27

Food Labeling; Gluten-Free Labelling of Fermented or Hydrolyzed Foods,
    85 Fed. Reg. 49,240 (Aug. 13, 2020) ........................................................................50

Memorandum for the Heads of Executive Departments and Agencies ("Regulatory Freeze
    Memorandum"),
    74 Fed. Reg. 4,435 (Jan. 26, 2009) ...........................................................................53

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services,
    75 Fed. Reg. 10,272-01 (Mar. 5, 2010) ....................................................................... 5

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy
    Services,
    61 Fed. Reg. 43,549-01 (Aug. 23, 1996) ............................................... 3, 4, 13, 19

Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity
    Eligibility,
    61 Fed. Reg. 55,156 (Oct. 24, 1996) .........................................................................60

**Other Authorities**

*About the Unified Agenda*,
    https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_About.myjsp
    (last visited Feb. 16, 2021 ..........................................................................................52

*Administrative Agencies Are Just Like Legislatures and Courts-Except When They're Not*,
    59 Admin. L. Rev. 79 (2007) ....................................................................................51

*Agency Rulemaking and Political Transitions*,
    105 Nw. U. L. Rev. 471 (2011) .................................................................................59

Historical Unified Agenda and Regulatory Plan,
    https://www.reginfo.gov/public/do/eAgendaHistory (last visited Feb. 16, 2021)...................53

How to Use the Unified Agenda,
    https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_HowTo.myjsp#rin..............52

H.R. Rep. No. 102-384, pt. 2 (1992) ........................................................................ 3, 32, 44

https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/P-R/PhRMA-
    Petition-for-340B-ADR-Rulemaking_November-2020.pdf....................................................60

Novartis 340B Policy Changes,
    https://www.novartis.us/news/statements/new-policy-related-340b-program........................10

This case, which—most unusually—challenges two discrete agency issuances on every conceivable ground, culminates a brazen strategy by a cohort of large, highly profitable pharmaceutical companies unilaterally to upend the decades-old, settled operation of a statutory program that provides discounted medications to safety-net healthcare providers and their uninsured and underinsured patients. Nearly thirty years ago Congress struck a bargain with drug companies by creating the "340B Program": Participating manufacturers gain valuable access to coverage for their products under Medicaid and Medicare Part B in exchange for providing discounted drugs (at or below a statutory ceiling price) to certain safety-net healthcare providers. The providers, in turn, can generate much-needed revenue through sale of those medications (particularly to patients who are insured) or pass along the discounts directly to patients. The 340B Program has served a crucial role in facilitating healthcare for vulnerable patients ever since.

But late in 2020 Plaintiff Eli Lilly and several of its peers, clearly dissatisfied with the scope of the 340B Program, unilaterally imposed onerous and non-statutory restrictions on providers' access to 340B discounted drugs. Specifically, the manufacturers announced that no longer will they honor (or honor without significant restrictions) discounted-drug orders placed by eligible healthcare providers but shipped to, and dispensed by, outside pharmacies. These outside-pharmacy arrangements (called "contract pharmacies") have been an integral part of the 340B Program's operation for decades, since the vast majority of 340B-eligible providers do not operate an in-house pharmacy and thus rely on contract pharmacies to serve patients. Lilly and other manufacturers' abruptly announced changes—impacting healthcare entities serving the country's most vulnerable patients, in the midst of a global pandemic—have upended the settled operation of the 340B Program and spawned a raft of litigation against the Department of Health and Human Services ("HHS"), the agency to which Congress delegated oversight and implementation of the 340B Program.

Lilly's ultimate goal in this suit is manifestly clear in its complaint: It seeks to have this Court sanction Lilly's rewrite of its statutory obligations in a way that would drastically restrict many providers' access to discounted drugs (and, in so doing, boost Lilly's profits). Lilly seeks to advance that goal by first asking this Court to declare unlawful and set aside a reiteration by HHS's General

Counsel of the agency's consistent, twenty-four-plus-year interpretation of the 340B statute—an interpretation with which Lilly and its peers had complied, without challenge or question, for decades. In addition to that stunning request, Lilly further asks this Court permanently to block implementation of a new rulemaking that establishes a straightforward, statutorily mandated administrative dispute-resolution mechanism Congress devised to resolve disputes over 340B Program violations. In other words, Lilly seeks to head off resolution by HHS of the legality of its recent, industry disrupting changes by asking this Court to enjoin the agency's newly available adjudication system—a system established by statute and modeled on numerous other administrative bodies.

There is no cause for this Court to grant either request because Lilly's claims uniformly lack merit. This Court cannot opine on the merits of the General Counsel's legal advice because its issuance is not a final agency action and because Lilly's challenge is time-barred, since the analysis broke no new ground and merely reiterated the agency's consistent position since at least 1996. Moreover, even if Lilly's challenge to the General Counsel's opinion were justiciable, it still would fail on the merits because the opinion imposes no new requirements on manufacturers and instead only confirms obligations imposed when Congress created the 340B Program, and because voluntary participation in a regulated government program cannot constitute a "taking," as Lilly insists. Lilly's attacks on the administrative-dispute resolution rule are equally flawed. Because decision-makers are supervised by, and can be removed at will by, the HHS Secretary, they constitute inferior officers properly appointed under Article II of the U.S. Constitution. Lilly's Article III challenge fails because it rests on false premises regarding the Board's powers and the claims it may hear. And Lilly's claims under the Administrative Procedure Act cannot carry the day; HHS followed statutory notice-and-comment procedures and, as the Supreme Court repeatedly has confirmed, it is reversible error to impose additional requirements on the agency under the guise of facilitating "notice" to the public. Finally, the Secretary fully explained the reasonable choices made in designing the new dispute resolution system, satisfying substantive APA requirements.

The Court should dismiss each of Lilly's claims or grant summary judgment to HHS.

**BACKGROUND**

I.    **STATUTORY AND REGULATORY BACKGROUND**

In 1992 Congress created a program, administered by the Secretary of Health and Human Services ("HHS"), through which certain safety-net healthcare providers, including hospitals, community health centers, and other federally funded entities (collectively known as "covered entities") serving low-income patients could receive drug discounts. *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967-71 (1992), *codified at* § 340B, Public Health Service Act, 42 U.S.C. § 256b (1992). The program has dual benefits: Drug discounts "enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services," H.R. Rep. No. 102-384, pt. 2, at 12 (1992) (conf. report), and also may benefit uninsured and underinsured patients, when covered entities opt to pass along the discounts by helping patients afford costly medications. Congress expressly conditioned drug makers' access to an incredibly valuable federal benefit—coverage of their products under Medicaid and Medicare Part B—on manufacturers' choice to participate in this drug-discount scheme, known as the "340B Program." 42 U.S.C. § 1396r-8(a)(1); 42 U.S.C. § 256b(a). Pharmaceutical companies thus may opt out of providing discounted drugs to safety-net healthcare providers and their low-income patients, but then lose access to "billions of dollars in revenue" annually through drug coverage in federal health-insurance programs. *See* Am. Compl. ("Compl.") at ¶ 157, ECF No. 17.

During the early years of the 340B Program, it became clear that fewer than five percent of the covered entities statutorily eligible to participate in the 340B Program operated in-house pharmacies; instead, the vast majority of safety-net providers relied on arrangements with outside pharmacies, called "contract pharmacies," to dispense prescriptions to patients. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549-01, 43,550 (Aug. 23, 1996) (hereinafter "1996 Guidance"). And because "covered entities provide medical care for many individuals and families with incomes well below 200% of the Federal poverty level and subsidize prescription drugs for many of their patients, it was essential for them to access 340B pricing." *Id.* at 43,549. Covered entities participating in the 340B Program thus began

3

relying on these contract pharmacies to take delivery from manufacturers of drugs purchased by the covered entity and then to dispense those drugs to the covered entities' low-income patients. *Id.*

In 1996 HHS issued interpretive guidance to aid covered entities in best practices for the use of contract pharmacies. 61 Fed. Reg. 43,549. HHS explained that "[i]t would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate," because "[o]therwise, they would be faced with the untenable dilemma of having either to expend precious resources to develop their own in-house pharmacies (which for many would be impossible) or forego participation in the program altogether." *Id.* at 43,550. Rather than imposing any new requirements on manufacturers not found in the 340B statute, the 1996 guidance confirmed: "*It has been the Department's position* that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price," and that, "[i]f the entity directs the drug shipment to its contract pharmacy," that in no way "exempts the manufacturer from statutory compliance." *Id.* at 43,549 (emphasis added). Thus twenty-five years ago HHS interpreted the statute to preclude manufacturers from denying purchases by covered entities using contract pharmacies, and *nothing* in the guidance suggested that the agency viewed this statutory obligation as voluntary on the part of drug makers. HHS explained the policy rationale for this interpretation—restricting covered entities' access to 340B discounts to those operating an *in-house* pharmacy would not be "within the interest of the covered entities, [or] the patients they serve, [or] consistent with the intent of the law." *Id.* at 43,550. Critically, the agency explicitly rejected the argument, suggested in comments to the proposed guidance, that the use of contract pharmacies constitutes an unauthorized expansion of the 340B Program: "The statute is silent as to permissible drug distribution systems," and contains "no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself." *Id.* at 43,549. On the contrary, "[i]t is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." *Id.*

Consistent with HHS's interpretation of the 340B statute and its 1996 guidance implementing its terms, covered entities have for decades relied on contracts with outside pharmacies to serve their

patients and access the discounts Congress provided. Indeed, these arrangements proved so pivotal to covered entities' and their patients' access to drug discounts that, in 2010, HHS issued additional guidance specifying that covered entities need not be limited to a single contract pharmacy. *See* Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272-01 (Mar. 5, 2010) ("2010 Guidance"). After issuing notice and soliciting comments, the agency agreed with commenters that "[i]t would be a significant benefit to patients to allow the use of more easily accessible, multiple contract pharmacy arrangements by covered entities" and that, because "some patients currently face transportation barriers or other obstacles that limit their ability to fill their prescriptions," more-flexible use of contract pharmacies "would permit covered entities to more effectively utilize the 340B program and create wider patient access." *Id.* The 2010 Guidance includes "essential elements" to prevent unlawful duplicate discounts or diversion of 340B drugs: a "covered entity will purchase the drug, maintain title to the drug and assume responsibility for establishing its price"; "[a] 'ship to, bill to' procedure [will be] used in which the covered entity purchases the drug; the manufacturer/wholesaler must bill the covered entity … but ships the drug directly to the contract pharmacy"; "[b]oth the covered entity and the contract pharmacy are aware of the potential for civil or criminal penalties" for violations; and both the covered entity and contract pharmacy must maintain auditable records, track prescriptions to prevent diversion, and verify patient eligibility. *Id.* at 10,278. The guidance makes plain that a covered entity bears full responsibility to ensure adherence to 340B Program requirements and can lose eligibility if violations occur. *Id.*

Most importantly for the present case, the 2010 Guidance again confirmed HHS's earlier interpretation that, "if a covered entity using contract pharmacy services requests to purchase a covered outpatient drug from a participating manufacturer, *the statute directs the manufacturer to sell the drug at a price not to exceed the statutory 340B discount price*," regardless whether the covered entity "directs the drug shipment to its contract pharmacy." *Id.* (emphasis added). As before, that interpretation was framed in mandatory terms—the guidance made no suggestion, and in no way supports, the position that manufacturers can choose whether or not to honor 340B purchases by a covered entity that relies on contract-pharmacy arrangements. HHS also explained that the guidance neither created new

5

obligations on manufacturers nor new rights for covered entities because it merely interpreted the 340B statute itself "to create a working framework for its interpretation," rather than promulgating "a substantive rulemaking under the APA." *Id.* Not only were there *no* legal challenges from pharmaceutical manufacturers or trade associations to the substance of the 2010 Guidance but, for more than a decade, *all* participating pharmaceutical manufacturers have complied with the guidance by honoring orders placed by covered entities regardless of the dispensing mechanism chosen.

Also in 2010, Congress opted "to strengthen and formalize [HHS's] enforcement authority" over the 340B program. *See Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 121-22 (2011). Specifically, Congress included provisions in the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), to amend the 340B Program to "Improve[] … program integrity" related to manufacturer and covered-entity compliance. For example, the Secretary was granted authority to issue new regulations imposing civil monetary penalties on manufacturers that knowingly and intentionally overcharge covered entities. *See* 42 U.S.C. § 256b(d)(1). Relying on that authority, the Secretary issued a regulation allowing the imposition of monetary penalties, including up to $5,000 for each knowing and intentional instance of overcharging by a drug manufacturer. 42 C.F.R. § 10.11(a).

A neighboring provision also instructed the Secretary to establish a 340B Program administrative dispute-resolution process ("ADR process") for covered entities and manufacturers:

> [T]he Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under this section, and claims by manufacturers … of violations [of provisions prohibiting diversion of drugs and duplicate discounts], including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described [herein].

42 U.S.C. § 256b(d)(3)(A). Congress included several directives regarding the new dispute-resolution mechanism, but largely granted the Secretary discretion to devise a workable system. The Secretary is granted authority to "designate or establish a decision-making official or decision-making body within [HHS] to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices" above the statutory ceiling price, as well as "claims by manufacturers that

6

violations" of prohibitions on duplicate discounts or improper drug diversion have occurred. *Id.* § 256b(d)(3)(B)(i). The Secretary may "establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously," and may "establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim." *Id.* § 256b(d)(3)(B)(ii),(iii). Congress mandated a restriction on claims by manufacturers against covered entities, however; such claims require, "as a prerequisite to initiating" proceedings, that a drug maker first audit a covered entity. *Id.* § 256b(d)(3)(B)(iv). Finally, the statute confirms that ADR decisions "shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." *Id.* § 256b(d)(3)(C).

The Secretary began work to establish that process several months later by issuing an advanced notice of proposed rulemaking to request comments on the development of an ADR process. *See* 340B Drug Pricing Program Administrative Dispute Resolution Process, 75 Fed. Reg. 57,233 (Sep. 20, 2010). The agency received only about a dozen comments in response. *See* 340B Drug Pricing Program; Administrative Dispute Resolution, 81 Fed. Reg. 53,381, 53,382 (Aug. 12, 2016). A Notice of Proposed Rulemaking ("NPRM") then followed, which included proposed ADR regulations establishing a panel within the agency to adjudicate disputes between drug manufacturers and covered entities. *Id.* at 53,381-82. The agency received 31 public comments on that proposal. *See* 340B Drug Pricing Program: Administrative Dispute Resolution Regulation, 85 Fed. Reg. 80,632, 80,633 (Dec. 14, 2020) (codified at 42 C.F.R. pt. 10). HHS finalized the 340B ADR Rule late last year. In drafting the final Rule, it considered the comments received on the 2016 NPRM and adjusted its proposal in response to several comments. The final ADR Rule was published in the Federal Register on December 14, 2020, and became effective on January 13, 2021. *See* 85 Fed. Reg. 80,632.

The ADR Rule creates a mechanism to resolve before the agency disputes arising under the 340B Program. *See* 85 Fed. Reg. at 80,644. The Rule created "a decision-making body within the Department that, acting on an express, written delegation of authority from the Secretary of HHS, reviews and makes a precedential and binding decision for a claim brought under the ADR Process."

*Id.*, codified at 42 C.F.R. § 10.3. The Secretary selects at least six members to serve on an ADR Board, consisting of individuals selected in equal numbers from the Health Resources and Service Administration ("HRSA", an HHS component to which implementation of the 340B Program has been delegated), the Centers for Medicare and Medicaid Services, and HHS's Office of General Counsel (plus a non-voting member from the Office of Pharmacy Affairs). 85 Fed. Reg. 80,644. When a particular claim is presented, the HRSA Administrator then selects three members from the Board to serve on a 340B ADR Panel and, "pursuant to authority expressly delegated through this rule by the Secretary, [] to make precedential and binding final agency decisions." *Id.* The diversity of experience among the members of each panel ensures "relevant expertise and experience in drug pricing or drug distribution" and "in handling complex litigation."

Importantly, the Rule places no restrictions whatsoever on the Secretary's authority to remove a Board member at any time, with or without cause. Nor does it purport to grant any defined term to any Board member. The HRSA Administrator, however, has authority to remove a particular employee from a particular panel for cause, where necessary, and to substitute that panel member for another member of the Board. *Id.*

ADR proceedings are governed by the Federal Rules of Civil Procedure, including the procedural mechanisms established therein. *Id.* at 80,644-45, 42 C.F.R. § 10.23(b). ADR Panels are granted considerable discretion during the pendency of a claim to "permit a covered entity limited discovery," to "[r]eview and evaluate documents and other information" as needed to evaluate a claim, and to "determine, in its own discretion, the most efficient and practical form of the ADR proceeding," including through conducting an evidentiary hearing. *Id.* at 80,644-45, 42 C.F.R. §§ 10.20(c)(1), 10.22(a), 10.23(a).

Critically, the Rule does *not* render decisions of a Panel self-executing. *Id.* at 80,646. On the contrary, while claims may be brought "for monetary damages or equitable relief [above a $25,000 threshold] against a manufacturer or covered entity," *id.* at 80,644, the Panels are instructed to "submit the final agency decision to all parties, *and to HRSA for appropriate action regarding refunds, penalties, removal, or referral to appropriate Federal authorities.*" *Id.* at 80,646 (emphasis added), 42 C.F.R. § 10.24(e). In other

words, the Secretary has delegated to ADR Panels authority to issue binding decisions, while retaining authority within HRSA to execute those decisions. Any dissatisfied party may seek judicial review under the APA. *Id.* at 80,641, 42 C.F.R. § 10.24(d).

## II.   PHARMACEUTICAL COMPANIES UNILATERALLY RESTRICT ACCESS TO 340B DISCOUNTS FOR SAFETY-NET PROVIDERS

During the latter half of 2020 several drug makers, led by Plaintiff Eli Lilly ("Lilly"), took unilateral actions to restrict access to their drugs by covered entities that rely on contract pharmacies to take delivery of, and dispense, medications to low-income patients. These actions began with a July 2020 notice by Lilly that, with certain caveats, it would not offer 340B pricing through contract-pharmacy arrangements for only one of its drugs—Cialis, a drug used to treat erectile dysfunction. Compl. ¶ 78. But only one month later, Lilly extended its new contract-pharmacy restrictions to *all* its covered drugs (with a self-imposed and administered "exception process" purporting to allow providers without an in-house pharmacy to contact Lilly to designate a single contract pharmacy). *See* Compl. Exh. G (notifying covered entities they "will not be eligible to purchase [Lilly] products at the 340B ceiling price *for shipment to a contract pharmacy*") (emphasis added). Lilly's changes purported to contain an exception for insulin—but conditioned it on novel, onerous restrictions found nowhere in the 340B statute, including that insurance not be billed for insulin, no markup or dispensing fee be charged to the patient, and that the covered entity provide Lilly detailed information demonstrating compliance with Lilly's conditions. *Id.* Nowhere does Lilly allege that, since September 2020, it has reversed course, and so it continues unilaterally to restrict access to 340B discounts through contract-pharmacy arrangements. Lilly also continues to impose its own restrictions on insulin purchases (although it is not restricting insulin to only a single contract pharmacy). Lilly's campaign also included a request that HHS rescind its 2010 Guidance on use of contract pharmacies to dispense drugs purchased by 340B covered entities, *see* Compl. Ex. E, Hakim Letter, despite the fact that Lilly had not previously challenged that guidance and had complied with its substance for more than a decade.

Although HRSA published on its official 340B website Lilly's original notice restricting access to Cialis, HRSA declined to post Lilly's later notice expanding the 340B restrictions, and told an

industry reporter that the agency "is considering whether manufacturer policies, including Lilly's, violate the 340B statute and whether sanctions may apply," including, "but not limited to, civil monetary penalties." AO Administrative Record ("ADVOP") at 1597. HRSA further warned that "manufacturers that refuse to honor contract pharmacy orders could significantly limit access to 340B-discounted drugs for many underserved and vulnerable populations who may be located in geographically isolated areas and rely on contract pharmacies"; the agency thus "continues to strongly encourage all manufacturers to sell 340B priced drugs … directly and through contract pharmacy arrangements." Lilly's restrictions were soon emulated, with certain modifications, by other large, global pharmaceutical companies.[1]

Unsurprisingly, the pharmaceutical manufacturers' abruptly announced, unilateral restrictions on 340B access caused upheaval to covered entities, prompting various safety-net providers to urge HHS to take action by filing emergency motions *against the agency* seeking to compel HHS to reverse the drug makers' changes. *See* Mot. for TRO and Prelim. Inj., *Ryan White Health Clinics for 340B Access v. Azar*, No. 20-cv-2906-KBJ (D.D.C. Nov. 23, 2020)), ECF No. 24-1; Mot. for Prelim. Inj., *Am. Hosp. Ass'n v. HHS*, No. 20-cv-8806 (N.D. Cal. Dec. 11, 2020), ECF No. 7. HHS moved to dismiss those suits while confirming that its investigation of the manufacturers' actions is ongoing. In February one court agreed with HHS that the legality of drug makers' new 340B restrictions must be decided, in the first instance, by the agency. "Congress made explicit that alleged 340B Program violations are to be first adjudicated by HHS through an established ADR process" and, though "[t]he judiciary has a prescribed role in this process," "its role comes *only after* the parties have participated in this ADR process." *See Am. Hosp. Ass'n,* 2021 WL 616323, at *6 (N.D. Cal. Feb. 17, 2021).

In response to the growing public outcry, HHS's General Counsel issued legal advice on December 30, 2020, confirming his view—in complete alignment with the agency's longstanding guidance—"that to the extent contract pharmacies are acting as agents of a covered entity, a drug

---

[1]   *See Sanofi-Aventis v. HHS*, No. 21-cv-634, ECF No. 17, Am. Compl., Exh. 1 (D. N.J.); *AstraZeneca Pharm. v. Azar*, No. 21-cv-27-LPS, ECF No. 13, Am. Compl. Exhs. A, C (D. Del.); Novartis 340B Policy Changes, https://www.novartis.us/news/statements/new-policy-related-340b-program; *Novo Nordisk v. Azar*, No. 21-cv-806-FLW-LHG, ECF No. 1, Compl. ¶¶ 56-58 (D.N.J.).

manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." HHS Gen. Counsel, Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (ADVOP_1, hereinafter "AO") at 1. The General Counsel opined that the 340B statute requires manufacturers, in exchange for access to Medicaid and Medicare Part B, to *offer* discounted drugs for *purchase by* covered entities, with no qualifications or restrictions on the distribution or dispensing arrangements selected by the covered entity. *Id.* at 2. And contract-pharmacy arrangements unequivocally involve purchase by a covered entity, the Advisory Opinion explained, regardless whether the purchased drugs are delivered to, and dispensed by, a pharmacist employed in-house by the covered entity or an outside, neighborhood pharmacy. *Id.* at 3. Moreover, the opinion continues, covered entities have relied on contract pharmacies for decades—and that system is wholly compatible with Congressional intent because "the Program is aimed at benefiting providers that are small, remote, resource-limited, receiving federal assistance, or serving disadvantaged populations," *i.e.*, "the poster children of providers that one would expect to lack an in-house pharmacy." *Id.* at 4. The General Counsel confirmed that this interpretation is compelled by the statute itself; as in 1996 and 2010, no rulemaking is required, and no expansion of the 340B Program has been effectuated, because Congress did not permit drug makers to condition access to discounted drugs on covered entities' operation of an in-house pharmacy to take physical delivery of drug purchases. AO at 2-4.

### III.   PHARMACEUTICAL COMPANIES SUE TO PREVENT HHS's ENFORCEMENT OF THE 340B STATUTE

The pharmaceutical companies' concerted actions to upend the 340B status quo continued in litigation. Three manufacturers filed suit on the same day challenging the General Counsel's Advisory Opinion. *Lilly*, No. 1:21-cv-81-SEB-MJD (Jan. 12, 2021), ECF No. 1; *Sanofi-Aventis*, No. 3:21-cv-634 (D.N.J. Jan. 12, 2021), ECF No. 1; *AstraZeneca*, No. 1:21-cv-27 (D. Del. Jan. 12, 2021), ECF No. 1. Two additional, similar suits were filed shortly thereafter. *See Novo Nordisk v. Azar*, No. 21-cv-00806-FLW (D.N.J. Jan. 15, 2021); *PhRMA v. Cochran*, No. 8:21-cv-198-GLR (D. Md. Jan. 22, 2021).

As for this action, notwithstanding the advisory nature of the General Counsel's legal opinion and the fact that it reiterated guidance the agency long ago had issued (and with which Lilly had complied, without challenge, for twenty-five years), Lilly now asks this Court to declare the advice unlawful and to bless Lilly's intention "*not to offer 340B price discounts to contract pharmacies.*" Compl., Prayer for Relief a, b, ECF No. 1 (emphasis added). In other words, Lilly asks this Court to sanction a substantially more-sweeping change to the 340B Program than the restrictions Lilly already imposed.

Two weeks after filing this suit, Lilly amended its complaint to add new claims related to the ADR Rule issued last December, *see* Am. Compl., ECF No. 17, and moved for preliminary injunctive relief challenging it on nearly every conceivable ground. *See* Mot. for Prelim. Inj. ("Mot.") 15-30, ECF No. 19. This Court ruled on March 16, 2021 that Lilly is likely to succeed on the merits of its claim "that a withdrawal of the NPRM was effected, thus requiring the agency to have engaged in notice-and-comment procedures before promulgating the final ADR Rule." ECF No. 81, Order Granting Prelim. Inj., at 23. The Court preliminarily enjoined application of the ADR Rule as to Lilly. *Id.*

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557)). And while the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as … factual allegation[s]" are not entitled to a "presumption of truth." *Id.* at 678, 681 (citation omitted).

In a case involving review of final agency action under the APA, summary judgment is not decided by the typical standards applicable under Federal Rule of Civil Procedure 56. *See, e.g.*, *Freedom Ordnance Mfg., Inc. v. Brandon*, No. 3:16-cv-00243, 2018 WL 7142127, at *4 (S.D. Ind. March 27, 2018). Instead, summary judgment is the vehicle by which a court decides, as a matter of law and based on

the administrative record compiled by the agency, whether the challenged action is consistent with applicable APA standards. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744–45 (1985). The party challenging an agency's action bears the burden of demonstrating a violation of the APA. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

## **ARGUMENT**

Lilly and its peers are engaged in a no-holds-barred strategy to effect a unilateral sea change in the settled operation of the 340B Program. Congress devised the program to provide affordable medications and much-needed revenue to vulnerable patients and safety-net healthcare providers, and expressly conditioned a valuable federal benefit, coverage of drug manufacturers' products in the nation's largest health-insurance programs, on the companies' agreement to provide deep discounts on *purchases by* covered entities. Now a cohort of large, highly profitable pharmaceutical companies seek to litigate out of the obligation to comply with their end of the bargain, by creating from whole cloth novel restrictions on covered entities' access to 340B discounts, including limitations on the dispensing mechanism chosen by the covered entity, and onerous reporting requirements with no basis in statute. Lilly's abruptly imposed restrictions have caused upheaval by severely curtailing access to the discounts to which covered entities are entitled. Any doubt as to Lilly's intent is dispelled by the fact that its complaint is larded with grievances about covered entities' use of contract-pharmacy arrangements—complaints which ignore their twenty-five-year reliance on such agreements.

Lilly's campaign to end reliance on contract-pharmacy dispensing models also mischaracterizes the transactions at issue by pretending pharmacies, not covered entities, purchase Lilly's discounted drugs. As the General Counsel explained, "covered entities enter into written agreements with pharmacies ('contract pharmacies') *to distribute* their covered outpatient drugs to the entities' patients. Under those agreements, the covered entity orders and pays for the 340B drugs, which are then shipped from the manufacturer to the contract pharmacy. Although the contract pharmacy has physical possession of the drug, it has been purchased by the covered entity." AO at 1. In other words, pharmacies *cannot*—under the Advisory Opinion or at any time in the history of the

340B Program—purchase 340B-discounted drugs. HHS explained in 1996: "The contract pharmacy does not purchase the drug. Title to the drugs passes to the covered entity." 61 Fed. Reg. 43,552.

Lilly refuses to confront these undeniable facts, instead relying on artful drafting to obfuscate and confuse the issues. For example, Lilly repeatedly claims that HHS newly is requiring it "to provide discounts to contract pharmacies," Compl. ¶ 34, that "the government [is] forc[ing] manufacturers to allow for-profit pharmacy chains like Walgreens and CVS to get in on the action," *id.* ¶ 55, and that, "[l]ike covered entities, contract pharmacies pay significantly discounted prices," *id.* ¶ 56. *See also id.* ¶ 58 ("contract pharmacies therefore may purchase prescription drugs at these same steep discounts from the manufacturer list prices … but then turn around and sell them for the full list price"). None of these statements is true. Again, contract pharmacies *cannot purchase* 340B-discounted drugs, but rather can only fill prescriptions written by covered entities for their own patients using 340B-discounted drugs *purchased by* the covered entities, and then pass along the profit generated back to the covered entities (less a fee for the service provided). That is as Congress designed the program. *See* Background § I. Lilly's misportrayal of these relationships permeates each of its claims. This Court should not condone Lilly's extra-statutory self-help efforts to rewrite the legislative scheme devised by Congress under the guise of "program integrity." *See* Compl. ¶¶ 52-53.

## I.  THE GENERAL COUNSEL'S LEGAL ADVICE IS NOT REVIEWABLE

### A.  THE ADVISORY OPINION DOES NOT CONSTITUTE FINAL AGENCY ACTION

Because the AO is not "final agency action" subject to review under the APA, *see* 5 U.S.C. § 702, Lilly's claims challenging it fail as a matter of law. Agency actions are final if two independent conditions are met: (1) the action "marks the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) the action is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Though failure to satisfy either condition is enough to deprive the court of jurisdiction, the AO fails to satisfy both conditions.

The AO is not an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). To the extent the agency

14

has reached the consummation of its decisionmaking process at all, it did so many years ago, as expressed in the 2010 Guidance. The AO merely restates the position expressed in that guidance, and thus "tread[s] no new ground." *Indep. Equip. Dealers Ass'n ("IEDA") v. EPA*, 372 F.3d 420 (D.C. Cir. 2004). "It left the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy." *Id.*

The 2010 Guidance made clear that covered entities may enter into "complex arrangements" that include contracts with "multiple pharmacies." 75 Fed. Reg. at 10,277. It also expressly stated that, "[u]nder section 340B, if a covered entity using contract pharmacy services requests to purchase a covered outpatient drug from a participating manufacturer, *the statute directs* the manufacturer to sell the drug at a price not to exceed the statutory 340B discount price." *Id.* at 10,278 (emphasis added). Thus, the 2010 Guidance in no uncertain terms reflected the agency's position that manufacturers had a statutory obligation to honor the ceiling price when covered entities utilized multiple contract pharmacies. The AO did not deviate from this prior position.[2] It concluded that "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." AO at 1.

When, as here, a later restatement of a prior interpretation is challenged, courts routinely hold that the restatement is not final agency action. *See, e.g. Menominee Indian Tribe of Wisconsin v. EPA*, 947 F.3d 1065 (7th Cir. 2020); *Clayton Cty., Ga. v. FAA*, 887 F.3d 1262 (11th Cir. 2018); *Golden and Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010); *IEDA*, 372 F.3d 420. For example, in *Menominee Indian Tribe*, the Seventh Circuit considered whether letters from the Environmental Protection Agency and Army Corps of Engineers were final agency action. 947 F.3d at 1068. The letters reiterated the agencies' positions as set forth in a 1984 document, and thus "did little but restate what the Tribe already knew." *Id.* at 1070. The court explained that each letter "imposes no

---

[2] To the extent Lilly argues that the language in the AO does not exactly track the 2010 guidance, such semantic differences are irrelevant for the purposes of the finality analysis. *See Clayton Cty., Ga. v. FAA*, 887 F.3d 1262 (11th Cir. 2018) (rejecting arguments that different text of a restatement was relevant when "the meaning was clear" and there was no ambiguity "when read in context").

obligations," "denies no relief," and carries no other "legal consequence." *Id.* Because the letters "only reiterated the status quo," there was "nothing for [the court] to review." *Id.*

The Fourth Circuit reached the same conclusion in a similar case, *Golden and Zimmerman, LLC.* 599 F.3d 426. In that case, plaintiffs sought review of a document published by Bureau of Alcohol, Tobacco, and Firearms ("ATF") designed to help firearm licensees comply with the law, arguing that the answer to one of the Frequently Asked Questions ("FAQ") was "inconsistent" with the Gun Control Act. *Id.* at 428. The trouble was that the FAQ merely restated ATF's interpretation published in a revenue ruling 40 years earlier. *Id.* Even though the FAQ did, in fact, "inform the regulated community of what violates the law," the court found that the FAQ did not "itself *determine* the law or the consequences of not following it." *Id.* at 433. "Its role, as stated in the publication, is simply to *inform* licensees of what the law, previously enacted or adopted, is, and its publication did not itself alter the legal landscape." *Id.* As the court explained, "if the ATF had never published [the FAQ]," it "would still have the authority to prosecute licensees for engaging in the conduct" described in the FAQ because "legal consequences" arise only from the statute and its implementing regulations." *Id.*

So too here. The AO informs the public that the General Counsel interprets the statute in the same manner as has the agency for the past twenty-five years, but it does not impose any consequence because it merely restates the earlier interpretations of the statute. In other words, the AO "did little but restate what [Lilly] already knew." *Menominee Indian Tribe*, 947 F.3d at 1070. Lilly alleges that the AO—"backed by the threat of massive sanctions—imposes direct and immediate burdens on Lilly." Compl. ¶ 154. But even if the AO had not been issued, Lilly's practices would still violate the agency's consistent interpretation of the 340B statute, set forth in two previous guidances, and covered entities would still be able to challenge Lilly's practices through the ADR process, 42 U.S.C. 256b(d)(3)(B)(i), and the authority to impose monetary penalties would still exist. *Id.* § 256b(d)(1)(B)(vi). Indeed, HRSA explicitly communicated to Lilly in August 2020—months before the General Counsel issued his legal advice—that the agency "is considering whether your new proposed policy constitutes a violation of section 340B and whether sanctions apply." ADVOP_1098-99. HHS plainly viewed Lilly's restrictions

as potentially violative of *the statute* before the AO was issued. Thus the "legal consequences" arise only from the statute, and not from the AO itself. *See Golden and Zimmerman, LLC.*, 599 F.3d at 433.

Lilly's allegations focus on the practical consequences of what it thinks will happen as a result of the AO. Compl. ¶ 154. But such "practical consequences," including "the threat of having to defend itself in an administrative hearing" are "insufficient" to render agency action final or reviewable. *IEDA*, 372 F.3d at 428. Where, as here, Lilly continues to operate its new distribution plan until some further action is taken, it cannot claim that the finality test is satisfied. [3] Lilly's challenge to the AO should be dismissed for lack of final agency action.

### B. LILLY'S ATTEMPT TO UPEND THE SETTLED OPERATION OF THE 340B PROGRAM IS TIME-BARRED

*Even if* Lilly were correct that the agency has imposed new obligations on manufacturers outside those imposed directly by the 340B statute—and it assuredly has not, *see infra* § II.B—Lilly's challenge to the General Counsel's legal advice still fails as a matter of law because it is barred by the six-year statute of limitations. After Lilly led several pharmaceutical companies in a self-serving attempt to upend the long-settled 340B status quo, the General Counsel issued the AO to reiterate the agency's established statutory interpretation, first published in the Federal Register in 1996 and reaffirmed in 2010, both after public comment—an interpretation with which Lilly and its peers had complied, without challenge, ever since. Lilly's failure to challenge the agency's statutory interpretation when it was published twenty-five years ago, and republished more than a decade ago, is fatal to its claim here. The General Counsel *repeated* the agency's longstanding position but did not *reopen* the previous interpretations and thus did not restart the six-year limitations clock.

"[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues," 28 U.S.C. § 2401(a), and this express limitation on the ability to sue the federal government applies with equal force to challenges to agency action brought under the APA. *Nat'l Ass'n of Mfrs. v. Dep. of Def.*, 138 S. Ct. 617, 626-27 (2018). In

---

[3] Lilly also fails to establish that the AO marks the "consummation of the agency's decisionmaking process" *Bennett*, 520 U.S. at 177-78, because the agency's position on the statutory question has not changed since the 1996 Guidance was issued. *See* Part I.B., *infra*.

APA suits, any claim accrues when the agency issues a decision giving rise to the claim. *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1292 (11th Cir. 2015). This restriction is not subject to waiver or tolling because the government enjoys sovereign immunity "save as it consents to be sued … and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Diliberti v. United States*, 817 F.2d 1259, 1261 (7th Cir. 1987) (citing *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981)). "Courts have consistently held that where the government's consent as sovereign to be sued is conditioned upon the filing of suit within a specified period of time, strict compliance with that condition is a jurisdictional prerequisite." *Id.*

An agency's reiteration or application of an earlier decision does not constitute a new decision subject to challenge or start the limitations clock anew. In *Independent Equipment Dealers Association*, 372 F.3d at 421-24, as in this case, the plaintiff challenged an agency's statement of its definitive legal interpretation, as set forth in an official letter from an EPA Director to regulated entities. The D.C. Circuit nonetheless explained that, because the most recent interpretation "reflects no change in the position announced" in earlier guidance, it was not a new agency action. *Id.* at 426; *id.* at 427 (the "Letter merely restated in an abstract setting—for the umpteenth [sic] time—EPA's longstanding interpretation of the" legal requirements and "neither announced a new interpretation of the regulations nor effected a change … The Letter was purely informational in nature"). The court explained that, under the "reopening doctrine," an agency's existing legal interpretations and regulations "are not newly reviewable" unless they have been reopened by agency action—*i.e.*, unless the administrative record evinces an intent by the agency to reevaluate and reconsider its earlier position, as opposed to merely explaining the earlier decision and applying it in a new context. *Id.* at 428. "Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual republication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated," because a contrary rule "would quickly muzzle any informal communications between agencies and their regulated entities." *Id.*

This holding repeatedly has been applied. In *General Motors Corp. v. EPA*, the court of appeals dismissed as untimely a challenge to an agency's legal interpretation, as embodied in official letters

reiterating the agency's earlier position. 363 F.3d 442, 451 (D.C. Cir. 2004). Because the letters did not announce any intention to reevaluate the earlier pronouncement and instead "stated that outstanding violations would have to be addressed on the basis of EPA's long-held interpretation," the agency had not reopened its earlier decision. *Id.* at 449-50. Even though the earlier "interpretation was not published in the Federal Register," the court explained, the agency "can inform those affected simply by posting its new guidance or memoranda or policy statement on its website." *Id.* at 451. And because the plaintiff had failed to challenge the agency's interpretation within the applicable period for judicial review, its later attempt to attack that same position when embodied in an official letter was time-barred. Indeed, a contrary rule "to permit review whenever [an agency] reiterates" an interpretation but "has not changed its position," "would allow [plaintiff] to avoid the consequences of its failure to adhere to the congressionally prescribed jurisdictional window" of the relevant statute. *Edison Elec. Inst. v. OSHA*, 411 F.3d 272, 277-78 (D.C. Cir. 2005); *see also Biggerstaff v. FCC*, 511 F.3d 178, 155-56 (D.C. Cir. 2007) (confirming that proper way to challenge a longstanding agency interpretation as violative of a statute is through petition for rulemaking and, in absence of such petition, plaintiff must demonstrate clear intent in administrative record to reopen earlier rulemaking); *Pub. Citizen v. Nuclear Reg. Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990) ; *Peri & Sons Farms, Inc. v. Acosta*, 374 F. Supp. 3d 63, 71-73 (D.D.C. 2019). Stated simply, the reopening doctrine confirms that a policy established in an earlier action is not subject to fresh challenge when reiterated or applied subsequently unless a plaintiff can show that the agency has reopened its previous position for renewed consideration—as distinguished from explication.

Lilly's challenge to the AO is an untimely collateral attack on the agency's consistent, twenty-five-year statutory interpretation. As explained *supra*, Background § I, in 1996 HHS concluded that the 340B statute does not allow manufacturers to refuse discounted-drug purchases by covered entities that rely on contract pharmacies. *See* 61 Fed. Reg. 43,549 (interpreting 340B statute to affirmatively require drug makers to honor purchases by covered entities, confirming if the "entity directs the drug shipment to its contract pharmacy," that in no way "exempts the manufacturer from statutory compliance"). There is nothing voluntary in that interpretation; on the contrary, the only voluntary

aspect of the 1996 guidance was the choice of covered entities whether to use contract-pharmacy arrangements, given that covered entities remain liable to prevent duplicate discounting and diversion regardless of the dispensing mechanism chosen for covered drugs. *See id.* at 43,549-50.

Again in 2010 HHS promulgated contract-pharmacy guidelines after issuing notice and providing a 60-day comment period for interested parties, such as Lilly, to participate. *See* 75 Fed. Reg. at 10,272. Once again HHS definitively set forth its statutory interpretation: "Under section 340B, if a covered entity using contract pharmacy services requests to purchase a covered outpatient drug from a participating manufacturer, *the statute directs the manufacturer to sell the drug* at a price not to exceed the statutory discount price." *Id.* at 10,278 (emphasis added). That mandatory language reiterated the agency's considered decision on what the 340B *statute* requires—not, as Lilly portrays, a suggestion from the agency that manufacturers may elect to follow or ignore. Compl. at 3. Indeed, HHS specifically explained that the 2010 Guidance does not "represent a substantive rulemaking under the APA" because it "neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law" and instead constitutes "interpretive guidance" of the statute itself. *Id.* at 10,273. And as in 1996, there was no ambiguity in the agency's view that manufacturers are obliged to honor purchases by covered entities regardless whether contract pharmacies are used; the guidance made no suggestion that pharmaceutical companies can reject purchases by covered entities that rely on contract pharmacies. True, the agency's interpretation of the obligation imposed on manufacturers was coupled with other voluntary guidance, advising covered entities on best practices to structure pharmacy agreements so as to prevent diversion or duplicate discounting. *See, e.g., id.* at 10,279 (outlining "suggested contract provisions … for illustrative purposes … not intended to be comprehensive, exhaustive or required"). But the coupling of HHS's interpretation of the statutory obligations on manufacturers with other, voluntary provisions advising covered entities in no way indicated that manufacturers had a choice unilaterally to opt out of providing 340B discounts whenever a covered entity serves its patients through outside pharmacies.

Had Lilly disagreed with the agency's decision that the 340B statute requires manufacturers to honor purchases from covered entities regardless whether a contract-pharmacy model is used, Lilly

should have brought suit challenging the 2010 Guidance (or the earlier, equally mandatory interpretation in 1996). Likewise, had Lilly contended that this obligation exceeded the 340B statute and thus must be imposed through legislative rulemaking, not an interpretive rule, Lilly could have mounted a procedural challenge to the 2010 or 1996 Guidance. But neither Lilly nor any other pharmaceutical manufacturer ever sued to challenge either of HHS's previous contract-pharmacy interpretations (or even petitioned the agency to revisit its interpretation). Instead, Lilly and other drug companies complied fully with HHS's interpretation for the past two and half decades—a timeframe in which covered entities have relied heavily on contract pharmacies to access 340B-discounted drugs.

Nor did the General Counsel's legal advice reopen those earlier interpretations. Far from presenting a "claim[] that things are different now" than when the 340B statute was enacted, as Lilly portrays (Compl. 1), the General Counsel simply reaffirmed the agency's "longstanding interpretation of the statute," AO at 4, in response to havoc wrought by Lilly's unilateral contract-pharmacy restrictions. The AO does not rely on changed circumstances or even assert that anything *has* changed in the operation of the 340B Program (aside from Lilly's disruptive restrictions). Equally false is Lilly's claim that HHS "did not require manufacturers to honor [contract-pharmacy] arrangements" under the 2010 Guidance "because nothing in the statute authorizes the government to impose such a requirement." Compl. 3; *see also* Compl. 4 (inaccurately claiming, without citation, that the 2010 Guidance held "that contract pharmacy arrangements are permissible but not enforceable"). On the contrary, the agency could hardly have been clearer in its mandatory phrasing regarding what the statute requires, 75 Fed. Reg. at 10,278, and Lilly points to nothing in the guidance to support its assertion that the interpretation was viewed as voluntary. Rather than break any new ground, the General Counsel's recent legal advice simply confirmed the agency's "consistent position over the past 24-plus years." AO at 4. That reiteration does not permit Lilly to launch an untimely collateral attack on HHS's 1996 and 2010 decisions interpreting the 340B statute; any claim Lilly might have had to challenge the substance or promulgation of the agency's contract-pharmacy interpretation became time barred on March 5, 2016, six years from publication of the 2010 Guidance in the Federal Register. *Id.* at 10,271 (publication date of March 5, 2010).

21

## II.   EVEN IF THE GENERAL COUNSEL'S LEGAL ADVICE WAS REVIEWABLE, LILLY'S CLAIMS FAIL

### A. NOTICE-AND-COMMENT RULEMAKING IS NOT REQUIRED BECAUSE THE ADVISORY OPINION IS AN INTERPRETIVE RULE

Even if the AO were final agency action, and Lilly's claims were not time-barred, its notice-and-comment claim would still fail for the additional reason that the AO is not a legislative rule. The AO is, at most, an interpretive rule that advises the public of HHS's interpretation of a statute, and is exempted from the APA's notice and comment requirements. *See* 5 U.S.C. § 553(b)(3)(A).

"[T]he critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted). These rules do not "create new law, rights, or duties" or have "effects completely independent of the statute." *Metro. Sch. Dist. of Wayne Tp., Marion Cty., Indiana v. Davila*, 969 F.2d 485, 489, 490 (7th Cir. 1992) (quotation omitted). Instead, they "state what the administrative agency thinks the underlying statute means, and only reminds affected parties of existing duties." *Id.* at 489 (quotation omitted).

The AO is a quintessential interpretive rule. It does not "create new law," *id.*, but rather explains the agency's interpretation of the statutory phrase "purchased by." The 340B statute requires the Secretary to enter into agreements with drug manufacturers "under which the amount required to be paid" for certain drugs "purchased by a covered entity" does not exceed the ceiling price on those drugs. 42 U.S.C. § 256b(a)(1). The AO interprets this unambiguous text to conclude that the phrase "purchased by a covered entity" includes scenarios where "contract pharmacies are acting as agents of a covered entity." AO 1-2. Noting that the textual analysis is dispositive "given the lack of ambiguity in the plain text of the statute," the AO explains that "neither the agency nor a private actor" is authorized to "add requirements" to the statute. *Id.* at 2. It goes on to explain how the purpose and history of the 340B Program support this conclusion, and how the contrary rationale of certain pharmaceutical manufacturers is unpersuasive. *Id.* at 3-8. Although Lilly attempts to paint a different picture, the statutory mandate was fully operative without the AO, and the legal advice exists only to "advise the public of the agency's construction of [the statute]." *Mortgage Bankers Ass'n*, 575 U.S. at 97.

Courts routinely identify agency guidance as interpretive rules in analogous circumstances. For example, in *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87 (1995), the Supreme Court considered whether the HHS Secretary's adoption of a Medicare Provider Reimbursement Manual was invalid for failure to comply with the APA's notice-and-comment requirements. *Id.* 91. The dispute arose when the Secretary relied on the manual to determine that a reimbursable loss by the challenging hospital should be amortized, rather than reimbursed at once. *Id.* at 97. In promulgating the relevant provision of the manual, the Secretary determined "that amortization is appropriate" to ensure compliance with a statutory prohibition on cross-subsidizing health services at one time that were rendered over a number of years. *Id.* 97-99. Though the court noted the apparent benefits of recognizing the loss at once, it explained that the Secretary's Manual requiring amortization was a "prototypical example of an interpretive rule" because it was simply an "application of the statutory ban on cross-subsidization and the regulatory requirement that only the actual cost of services rendered to beneficiaries during a given year be reimbursed." *Id.* at 99. The court also emphasized that the manual did not adopt "a new position inconsistent with any . . . existing regulations." *Id.* at 100. So too here. The AO simply applies the statutory requirement that drugs "purchased by" covered entities be reimbursed at a certain price; it does not adopt any "new position" inconsistent with the statute or existing regulations.

*Metropolitan School Dist. of Wayne Township, Marion County, Indiana v. Davila* is also instructive. 969 F.2d 485 (7th Cir. 1992). There, the court considered whether a letter from a U.S. Department of Education official regarding the Individuals with Disabilities Education Act was a legislative rule subject to the notice-and-comment procedures of the APA. *Id.* at 487. In concluding that the letter was an interpretive rule, the court emphasized that the letter "relie[d] upon the language of the statute and its legislative history" in reaching its determination, which the court referred to as "the paradigmatic case of an interpretive rule." *Id.* at 492. The court also noted that the letter was based on "specific statutory provisions" and "its validity stands or falls on the correctness of the agency's interpretation of the statute." *Id.* "In these circumstances," the court held, "it is clear that the rule is an interpretive one." *Id.* All of these statements from the court's opinion in *Metropolitan School District* are equally true here. The AO certainly relied upon the statutory text and history in reaching its

conclusion, and was based on the interpretation of a specific statutory provision. Moreover, if the Court concluded that the AO incorrectly interpreted that statutory provision (and it should not), the AO would be rendered invalid. The AO is thus a "paradigmatic" interpretive rule. *Id.*

Lilly's arguments to the contrary cannot be reconciled with this binding precedent or the language of the AO. Lilly alleges that the AO is a "legislative rule" because it "creates rights and obligations on manufacturers with which they must comply, on pain of civil sanction and expulsion from the 340B Program." Compl. ¶ 175. But the *AO* imposes no such requirements—the *statute* does. The AO concludes that 42 U.S.C. § 256b(a)(1) requires participating drug manufacturers to "deliver its covered outpatient drugs" and that no one, including the agency, is authorized "to add requirements to the statute." AO 1-2. Lilly surely disagrees with the General Counsel. But Lilly's disagreement does not render the statutory interpretation a legislative rule any more than the plaintiffs' disagreement with the interpretations set forth in interpretive rules in *Shalala* or *Metropolitan School District*.

## B. LILLY FAILS TO STATE A CLAIM ON THE MERITS BECAUSE LILLY'S OBLIGATION TO OFFER DISCOUNTED DRUGS TO COVERED ENTITIES IS IMPOSED BY THE 340B STATUTE ITSELF

Even if the AO contained any new decisionmaking—rather than simply a reiteration of longstanding agency position—Lilly still would fail to state a claim that the AO exceeded statutory authority. Compl. ¶¶ 180-87 (alleging that AO should be set aside under 5 U.S.C. § 706(2)(C)). Lilly's claims rely on false premises that HHS is obligating "drug manufacturers, on pain of penalty, to offer drugs to contract pharmacies at 340B prices," has "add[ed] [] contract pharmacies as a new category of recipients of covered outpatient drugs at 340B discount prices," and "broaden[ed] the scope of the 340B statute to effectively expand the statutory term 'covered entities' and extend it to contract pharmacies." *Id.* ¶¶ 182-83, 185. None of these claims finds any support in the AO. Nor does the General Counsel's advice "create … an exception to the prohibition on diversion to any entity that is not a patient of the 340B covered entity." Compl. ¶ 184. On the contrary, the AO merely confirms what would be true in the absence of its advice, and what has been true since the inception of the 340B Program: Manufacturers, including Lilly, *must offer* 340B discounted drugs to covered entities in order to remain eligible to participate in Medicaid and Medicare Part B, and any attempt unilaterally

to condition those sales to covered entities on particular dispensing models or onerous data demands runs afoul of manufacturers' statutory obligation. Because the AO simply confirms a straightforward application of the statute, it was not issued in excess of authority.

The General Counsel's advice hewed closely to the statutory text, which expressly conditions access to Medicaid and Medicare Part B on a manufacturer's agreement to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1) (analyzed at AO 2). The AO further noted that each participating manufacturer, including Lilly, has signed a contract with HHS embodying its agreement "to charge covered entities a price for each unit of the drug that does not exceed [the ceiling price]," and that "[t]his fundamental requirement is not qualified, restricted, or dependent on how the covered entity chooses to distribute the covered outpatient drugs," only "that the discounted drug be 'purchased by' a covered entity." *Id.* And just as HHS cannot add new requirements or obligations to the statute, the General Counsel explained, nor can manufacturers. "It is difficult to envision a less ambiguous phrase" than "purchased by," and "no amount of linguistic gymnastics" can rework the statutory language into authorization *for Lilly* to condition fulfillment of its obligation to make discounted sales on a covered entity's operation of an in-house pharmacy, selection of any particular drug-dispensing model, or agreement to provide detailed prescription-claims data. In short, the statute is unambiguous in mandating that Lilly make sales *to covered entities*, and Lilly cannot skirt that obligation by erecting hurdles that limit a safety-net provider's choice among lawful dispensing models to serve its own patients. *Id.*; *see also id.* at 3 ("the medications at issue are sold by the manufacturer to the covered entity…).

Although that "analysis is dispositive" in light of the total absence of ambiguity in the statute's command to honor *purchases by* covered entities, *id.*, the General Counsel went on to explain how it also fulfills Congress's purpose and comports with the decades-long operation of the 340B Program. When Congress created the program in 1992, only 500 out of 11,500 covered entities in existence operated an in-house pharmacy; the other 95+% relied on outside pharmacies to dispense medications to their patients. AO at 4 (citing 61 Fed. Reg. at 43,550). And because Congress created the 340B

Program for the express purpose of providing much-needed *revenue* to covered entities, it could not possibly have intended to require the overwhelming majority of safety-net healthcare providers to undertake the enormous expense of establishing and maintaining *a pharmacy* in order to access the discounted drugs to which they are statutorily entitled. *Id.* at 3-4 (citing H.R. Rept. No. 102-384(II), at 12 (1992)). Congress legislates against the backdrop of real-world facts and, the General Counsel noted, it directed 340B "at benefiting providers that are small, resource-limited, receiving federal assistance, or serving disadvantaged populations." *Id.* at 4. "To champion a policy" such as Lilly now urges, "ungrounded in the language of the statute, that would foreclose 340B discounts to 95 percent of covered entities and foreclose discounts to the neediest of this cohort is inconsistent with [the] purpose of the Program and common sense." *Id.* The General Counsel persuasively explained that, had Congress intended to require the overwhelming majority of covered entities to fundamentally overhaul the method by which they provide drugs to patients (abandoning use of outside pharmacies to obtain all the necessary licensure, controls, employees, etc. to dispense in-house), rather than for covered entities to benefit from discounted drugs *through existing dispensing models*, "it would have used language affirmatively precluding the use of contract pharmacies as arms in the distribution channel."

Importantly, the General Counsel also noted that HHS has interpreted the 340B statute to require drug makers "to offer ceiling prices even where contract pharmacies are used" "consistent[ly] [] over the past 24-plus years." AO at 4. Although in this suit Lilly inaccurately insists that HHS's previous stance was "nonbinding" and considered "contract pharmacy arrangements [] permissible but not enforceable," Compl. 4, the AO correctly notes that both the 1996 and 2010 contract-pharmacy guidances are plain that the use of such arrangements are voluntary *for covered entities*, who must structure their contracts to prevent duplicate discounting and diversion—but the obligation for drug companies to fill orders by covered entities is, and always has been, mandatory. *Id.* (citing 1996 guidance); *id.* (noting that "contract-pharmacy arrangements have been utilized, and honored by manufacturers, *since 1996 and earlier*") (emphasis added). The General Counsel also noted that judicial review of this longstanding position would take into account agency expertise interpreting the statute

it administers, the common practice of regulated entities operating under 340B for decades, and Congressional acquiescence in the agency's settled interpretation.

Finally, the General Counsel demonstrated the folly in certain manufacturers' newfound objection to the 24-plus-year status quo, as reflected in certain communications from manufacturers to the agency. First, Lilly and its cohort's "primary rationale offered for cutting off contract pharmacies," to prevent diversion and duplicate discounting, is an extra-statutory self-help mechanism that directly contravenes the express command of Congress. To the extent manufacturers' concerns are sincere (rather than a thinly veiled tactic to shrink the program), the 340B statute spells out precisely how suspected or actual diversion or duplicate discounting must be addressed: The manufacturer "must (1) conduct an audit, and (2) submit the claim to the [ADR] process." AO at 5 (citing 42 U.S.C. § 256b(a)(5)(A), (B) and (d)(3)(A)). No language in the statute, however, permits a manufacturer to deny a covered entity's discounted-drug order on the basis of the dispensing mechanism chosen, and the "manufacturers' … unilateral refusal to sell drugs through contract pharmacies is at odds with the structure and intended operation of the statute." *Id.* Second, HHS already has confirmed in a previous, duly promulgated regulation that "[m]anufacturers cannot condition sale of a 340B drug at the 340B ceiling price because they have concerns or specific evidence of possible non-compliance by a covered entity." *Id.* (citing 82 Fed. Reg. 1210, 1223 (Jan. 5, 2017)). Third, the suggestion (proffered by Lilly in its complaint, *e.g.,* ¶¶ 27, 67, 183-84) that covered entities' decades-old reliance on contract pharmacies constitutes "diversion" is specious. AO at 6. The statute provides that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the covered entity." *Id.* (citing 42 U.S.C. § 256b(a)(5)(B)). This language quite plainly means that covered entities may not resell discounted drugs to non-patients, nor transfer the drugs to other, non-covered healthcare providers for prescribing to their own patients. But it is "absurd" to suggest that this straightforward prohibition requires a safety-net provider to ensure that 340B drugs are physically dispensed—*i.e.*, individually *handed*—to its patients by a pharmacist employed by that covered entity. AO at 7. Nothing in the statute restricts commonplace, real-world supply-chain logistics or outlaws preexisting dispensing models employed by covered entities at the program's

inception, such as the use of outside pharmacies. Indeed, taken to its logical conclusion, Lilly's argument that use of contract pharmacies constitutes "diversion" would mean that, "if a covered entity uses a courier service" or mail-delivery service "to send discounted drugs to its patient, this, too, would [] be an illegal 'transfer' to the shipper." AO at 7. It also would mean that, for decades, covered entities have relied upon and manufacturers have acquiesced in a scheme that does violence to the statutory text. Such a radical reworking of the 340B Program's settled operation—driven by Lilly, and followed by a small cohort of its supposed competitors—finds no support in the statute. As the General Counsel concluded, "[l]arge portions of the current 340B Program" cannot be made to turn on "solely manufacturers' voluntary choice to offer the ceiling price," rather than "a statutory mandate"; thus, "manufacturers may not refuse to offer the ceiling price to covered entities, even where the latter use distribution systems involving contract pharmacies." AO at 7-8.

Because the General Counsel's analysis faithfully interprets the 340B statute, is grounded in Congressional intent, as expressed in its terms, and in no way "expands" the statute to require of manufacturers anything not already mandated by law, Lilly fails to state a claim that the General Counsel's legal advice exceeded statutory authority.

### C.   THE GENERAL COUNSEL'S LEGAL ADVICE WAS NEITHER ARBITRARY NOR CAPRICIOUS

Lilly alleges that the AO is arbitrary and capricious for a number of reasons, all of which are meritless. Compl. ¶¶ 192-195. "The APA's arbitrary-and-capricious standard requires [only] that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.* (*Prometheus*), 141 S. Ct. 1150, 1158 (2021). "Judicial review under [this] standard is deferential"; "a court may not substitute its own policy judgment for that of the agency," *id.*, and "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citations omitted). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus*, 141 S. Ct. at 1158.

Lilly's arguments that the AO is arbitrary and capricious overlap entirely with their statutory arguments. *See* Am. Compl. ¶¶ 192-195. For example, Lilly alleges that the AO "fails to give adequate consideration to the text of the statute" because the AO imposes an obligation on manufacturers to provide discounts to pharmacies, which are not covered entities under the statute. Compl. ¶ 192. But, as explained *supra* II.C, this allegation is based on a demonstrably false reading of the AO. Thus, Lilly's arbitrary and capricious claim fails for the same reasons that their statutory claim is meritless, *see supra.*

## D. LILLY'S TAKINGS CLAIMS FAIL AS A MATTER OF LAW

Lilly contends that the Advisory Opinion contravenes the Takings Clause of the Fifth Amendment, which prohibits private property from being "taken for public use, without just compensation." *See* Compl. ¶¶ 196–210; *see also* 5 U.S.C. § 706(2)(B). Lilly articulates two claims in this respect. *First*, it challenges the Advisory Opinion as effecting a "purely private" regulatory taking of property that no amount of compensation can justify. Compl. ¶¶ 202–05. In Lilly's view, the AO "forces" Lilly to transfer its personal property—*i.e.*, the drugs it manufactures—"to contract pharmacies at a devastating financial loss," and does so "solely" for the contract pharmacies' "private use and benefit." *Id.* ¶¶ 155, 202–04. *Second*, Lilly invokes the "unconstitutional conditions" doctrine in arguing that the AO requires Lilly to succumb to a private regulatory taking of property in order to obtain coverage of its drugs under Medicaid and Medicare Part B. *Id.* ¶¶ 206–09.

Both claims fail as a matter of law. The obligation that Lilly ship 340B discounted drugs to contract pharmacies that distribute those drugs on behalf of covered entities is an obligation imposed by the 340B statute, not the Advisory Opinion. *See supra* § II.B. Because it is not the Advisory Opinion that imposes the challenged obligation, Lilly's takings claims fail outright.

Were the Court to find that the Advisory Opinion (i) is a reviewable final agency action (ii) that imposes a new obligation on Lilly—not previously imposed by statute—to ship discounted drugs to contract pharmacies and (iii) is an otherwise lawful action,[4] Lilly's takings claims would be meritless nonetheless. *First*, with respect to its private-regulatory-takings claim, Lilly has alleged neither a

---

[4] A takings analysis presupposes that the underlying government action is otherwise valid. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

regulatory taking nor a taking without a justifying "public use." Lilly cannot base a takings claim on an obligation arising under a regulated government program like the 340B Program in which it voluntarily participates. *See, e.g.*, *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 875–76 (7th Cir. 1983) (per curiam); *Ruckelshaus v. Monsanto Co.* (*Monsanto*), 467 U.S. 986, 1007 (1984). And even if Lilly could demonstrate a taking under these circumstances, such a taking would easily satisfy the Fifth Amendment's "public use" requirement. *See, e.g.*, *Kelo v. City of New London*, 545 U.S. 469, 477–78 (2005). *Second*, not only does Lilly's failure to allege a viable takings claim defeat its unconstitutional-conditions claim *a fortiori*, *see, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013), but the Supreme Court has rejected the very theory underlying this claim, *Monsanto*, 467 U.S. at 1007.

1. **LILLY FAILS TO STATE A PRIVATE-REGULATORY-TAKINGS CLAIM**

i. **LILLY'S VOLUNTARY PARTICIPATION IN THE 340B PROGRAM FORECLOSES ITS PRIVATE-REGULATORY-TAKINGS CLAIM**

Lilly argues that having to transfer its property (*i.e.*, manufactured drugs) to private entities (*i.e.*, contract pharmacies) "solely" to serve those entities' private interests effects a private regulatory taking that no amount of compensation can authorize under the Fifth Amendment. Compl. ¶¶ 204–05. But an obligation arising under the 340B Program, in which Lilly voluntarily participates, cannot constitute a taking—this alone disposes of Lilly's private-regulatory-takings claim. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1089, 1093 (9th Cir. 2015).

In *Monsanto*, the Supreme Court rejected a regulatory-takings challenge to a federal statute requiring pesticide manufacturers to register their products before selling them domestically. 467 U.S. at 991–96, 1013. The challenged statutory provision obligated manufacturers, as a condition to registration, to submit certain trade secrets with the federal government, which was then authorized to publicly disclose that information. *Id.* at 990, 995–96. The Supreme Court held that, although trade secrets are constitutionally protected property that are destroyed by public disclosure, *id.* at 1003–04, a manufacturer's "voluntary" relinquishment of its property "in exchange for the economic advantages of a registration [could] hardly be called a taking," *id.* at 1007; *see also Horne v. Dep't of Agric.*, 576 U.S. 350, 365–66 (confirming that the "voluntary exchange" in *Monsanto* did not result in a taking).

30

Lower courts have similarly held that an obligation arising under a regulated government program conferring substantial benefits cannot effect a taking of a voluntary participant's property. *See, e.g., Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 515 (D.C. Cir. 2020). In fact, the courts of appeals have routinely relied on this basic principle in rejecting takings challenges to regulatory obligations affecting property that were imposed as conditions to Medicaid and Medicare Part B coverage. *See St. Francis Hosp. Ctr.*, 714 F.2d at 875–76; *Se. Ark. Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016); *Baker Cty. Med. Servs., Inc. v. U.S. Att'y Gen.*, 763 F.3d 1274, 1278–80 (11th Cir. 2014); *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 129–30 (1st Cir. 2009); *Garelick v. Sullivan*, 987 F.2d 913, 916–19 (2d Cir. 1993); *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991); *Baptist Hosp. E. v. Sec. of Health & Hum. Servs.*, 802 F.2d 860, 869–70 (6th Cir. 1986); *cf. Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1252 (9th Cir. 2013). As these cases acknowledge, government action must "legally compel[]" an obligation affecting property for it "to give rise to a taking." *Garelick*, 987 F.2d at 916. Where a property owner freely assumes an obligation by voluntarily participating in a regulated government program, there is no legal compulsion necessary to support a takings claim. *Id.*

Such is the case here. As Lilly admits, it is not "required to participate in the [340B] Program." Compl. 2. Instead, Lilly has presumably weighed the "billions of dollars in revenue" that it generates under Medicaid and Medicare Part B—revenue that is accessible because of its "participation in the 340B Program," Compl. ¶¶ 157, 208–09—against the cost of complying with the program's requirements. And in doing so, Lilly has determined that the substantial benefits it receives because it participates in the 340B Program justifies any attendant obligations. If that calculus were to change— that is, if Lilly were to conclude that the benefits of participating in the 340B Program do not outweigh the costs associated with the program's requirements—Lilly may terminate its participation in the 340B Program at any time and free itself from those regulatory burdens. *See* ADVOP_50.

Of course, Lilly casts its decision to participate in the 340B Program in a different light, claiming to have had "little practical choice but to 'opt in'" given the substantial revenues it would lose if it were to opt out. Compl. at 2. "[B]ut the fact that practicalities may in some cases dictate participation does not make participation involuntary." *St. Francis Hosp. Ctr.*, 714 F.2d at 875. Nor is

31

"economic hardship . . . equivalent to legal compulsion for purposes of [a] takings analysis." *Garelick*, 987 F.2d at 917. The realities of Lilly's circumstances do not alter the fact that it can discontinue its participation in the 340B Program whenever it believes the program no longer benefits it. Simply put, "[d]espite the strong financial inducement to participate in [the 340B Program], [Lilly's] decision to do so is nonetheless voluntary." *See Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984).[5]

In short, Lilly's voluntary participation in the 340B Program in exchange for the substantial economic benefits available under Medicaid and Medicare Part B is dispositive of its private-regulatory-takings claim.[6] Because the requirement that Lilly ship 340B discounted drugs to contract pharmacies "can hardly be called a taking," *see Ruckelshaus*, 467 U.S. at 1007; *accord St. Francis Hosp. Ctr.*, 714 F.2d at 875–76, Lilly has failed as a matter of law to allege a regulatory taking of property.

      ii.    THE CHALLENGED OBLIGATION, EVEN IF A TAKING, IS CONSTITUTIONALLY JUSTIFIED BY A PUBLIC PURPOSE

Because Lilly has not alleged a taking of property, "it is unnecessary to address whether the [Fifth Amendment's] public use requirement is met." *See Rancho de Calistoga*, 800 F.3d at 1093. However, were the Court to find a taking based on Lilly's obligation to ship 340B-discounted drugs

---

[5] Lilly's reliance on *National Federation of Independent Business v. Sebelius* (*NFIB*), 567 U.S. 519 (2012), in alleging that the 340B Program's "financial inducement" is tantamount to "a gun to the head" is wholly misplaced. Compl. ¶ 209. *NFIB* involved the alleged coercion of state governments to implement a federal program, which is not at issue here—indeed, Lilly's challenge presents no federalism concerns.

[6] Even if the Court were to evaluate Lilly's private-regulatory-takings claim under the factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978)—the character of the government action, its economic impact on the plaintiff, and the extent to which it interferes with distinct investment-backed expectations, *Lingle*, 544 U.S. at 538–39—these do not weigh in Lilly's favor. First, the requirement to ship 340B discounted drugs to contract pharmacies is not akin "to a physical invasion," but "instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Id.* at 539 (citation omitted). Regulations like this rarely constitute a taking. *Penn Central*, 438 U.S. at 124. Second, because Lilly has been aware of this requirement since at least 2010, there has been no interference with *reasonable* investment-back expectations. *See supra* § I.A. Lastly, although Lilly has not alleged facts sufficient to assess the economic impact of this requirement, it is not shy in citing the "billions of dollars in revenues" it generates under Medicaid and Medicare Part B, revenues that are accessible because of its participation in the 340B Program, Compl. ¶¶ 157, 208—a fact that surely cuts against a finding of deleterious economic effects.

to contract pharmacies, such a taking satisfies the "public use" requirement, notwithstanding that Lilly's property is transferred "to other private entities." *See* Compl. ¶¶ 204–05 (emphasis removed).

For well over a century, the Supreme Court has rejected claims that property must be "use[d] by the general public" to justify a taking. *See Kelo*, 545 U.S. at 480, 480 n.10. Instead, a taking satisfies the Fifth Amendment's "public use" requirement if it is "rationally related to a conceivable public purpose." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). And because "'[i]t is only the taking's purpose, and not its mechanics,' … that matters in determining public use," *Kelo*, 545 U.S. at 482 (citation omitted), "even takings that transfer property from one private person to another have been deemed valid as long as there is a public purpose underlying the transfer," *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 462 (7th Cir. 2002); *accord Berman v. Parker*, 348 U.S. 26, 33–34 (1954).

"[I]n reviewing a legislature's judgment of what constitutes a public use," a court's role "is 'an extremely narrow' one," *Midkiff*, 467 U.S. at 240 (citation omitted), and "the burden on the [government] is remarkably light," *Daniels*, 306 F.3d at 460. A court must "afford[] legislatures broad latitude in determining what public needs justify the use of the takings power," *Kelo*, 545 U.S. at 483, and it must not disturb a public-purpose determination unless found to be "palpably without reasonable foundation," *Daniels*, 306 F.3d at 460 (quoting *Midkiff*, 467 U.S. at 241); *see also Kelo*, 545 U.S. at 488 ("[D]ebates over the wisdom of takings … are not to be carried out in the federal courts.").

Here, Lilly challenges an obligation rooted in the 340B statute, which seeks to "benefit both [uninsured and under-insured] patients, by helping them to afford costly medications, and covered entities [serving those patients], which use the discounts [on drugs] to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients." *See Am. Hosp. Ass'n*, 2021 WL 616323, at *1; *see also* H.R. Rep. No. 102-384, pt. 2, at 12. The public benefits Congress sought to achieve through the 340B Program and its attendant obligations on manufacturers cannot be gainsaid, and "[i]t is not for [a court] to reappraise them." *See Berman*, 348 U.S. at 33. For it is far from being "palpably" unreasonable to suggest that requiring manufacturers to ship 340B-discounted drugs to contract pharmacies enables covered entities to stretch their scarce federal resources. *See Daniels*, 306 F.3d at 460 (citation omitted). And that Congress chose to achieve these public benefits by requiring

private entities to transfer their property to other private entities (in exchange for the benefits of participating in federal health insurance programs) is of no constitutional import under the Public Use Clause. *See Berman*, 348 U.S. at 33; *accord Daniels*, 306 F.3d at 461 ("[I]n *Berman*, the Court upheld the taking of private property that the government intended to reconvey to other private persons because the taking was part of a legislatively enacted plan . . . found by the legislature to be for public good.").

Therefore, because there can be no question that the challenged obligation is "rationally related to a conceivable public purpose," *see Midkiff*, 467 U.S. at 241, it satisfies the Fifth Amendment's "public use" requirement, and Lilly's private-regulatory-taking claim thus fails.

### 2. LILLY FAILS TO STATE AN UNCONSTITUTIONAL-CONDITIONS CLAIM

Under the 340B Program, Congress conditioned Medicaid and Medicare Part B coverage of a manufacturer's drugs on its compliance with 340B requirements. *See* 42 U.S.C. § 1396r-8(a)(1). Receipt of this government benefit may therefore depend on a manufacturer's willingness to ship 340B-discounted drugs to contract pharmacies that distribute those drugs on behalf of covered entities. Lilly believes—albeit mistakenly—that this obligation violates its rights under the Fifth Amendment by effecting a private regulatory taking of its property. *See supra* § II.D.1. And based on this mistaken assumption, Lilly contends further that the challenged obligation places an unconstitutional condition on its access to Medicaid and Medicare Part B coverage. Compl. ¶¶ 206–09. Essentially, Lilly claims that it has been given a choice: succumb to a private regulatory taking by complying with the requirement to ship 340B-discounted drugs to contract pharmacies or "forego billions of dollars in revenues pursuant to Medicaid and Medicare Part B." Compl. ¶¶ 207–09. But as explained, Lilly has failed to allege that the challenged obligation effects an unconstitutional taking or otherwise implicates its constitutional rights. Therefore, Lilly's unconstitutional-conditions claim fails *a fortiori*.

At a "basic level," the unconstitutional-conditions doctrine "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). This "sometimes murky" doctrine is founded on the principle "that what a government cannot compel, it should not be able to

34

coerce"; or said differently, "the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly." *Planned Parenthood*, 699 F.3d at 986.

A "predicate" flows naturally from these principles: "[A]ny unconstitutional conditions claim" must show that "the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing" by placing a condition on a government benefit. *Koontz*, 570 U.S. at 612. In other words, a condition on a government benefit "cannot be unconstitutional if it could be constitutionally imposed directly." *Rumsfeld v. Forum For Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59–60 (2006); *accord Planned Parenthood*, 699 F.3d at 988.

Lilly's claim fails to meet this predicate, as it challenges the obligation to ship 340B drugs to contract pharmacies as a private regulatory taking, but fails to show how this requirement effects a taking or lacks a justifying public purpose. *See supra* § II.D.1. Because Lilly has failed to demonstrate that the obligation upon which Medicaid and Medicare Part B coverage has been conditioned is itself unconstitutional, its unconstitutional-conditions claim must fail. *See Singer v. City of New York*, 417 F. Supp. 3d 297, 327 (S.D.N.Y. 2019) ("Absent the pleading of facts sufficient to demonstrate a 'taking,' an unconstitutional conditions doctrine claim fails."); *see also Rumsfeld*, 547 U.S. at 59–60.

Moreover, Lilly's claim relies on virtually identical reasoning rejected by the Supreme Court in *Monsanto*. There, the plaintiff argued that being statutorily required to "give up its property interest in [trade secrets]" to obtain registration for its pesticide products "constitute[d] placing an unconstitutional condition on the right to a valuable Government benefit." 467 U.S. at 1007. Responding to this argument, the Court held that, "as long as [the plaintiff] is aware of the conditions under which the data are submitted" (*i.e.*, the property to be relinquished), "and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by [the plaintiff] in exchange for the economic advantages of a registration can hardly be called a taking." *Id.*

Like the plaintiff in *Monsanto*, Lilly objects to having to "give up its property" in the drugs it manufacturers to obtain "the economic advantages of" coverage under Medicaid and Medicare Part B—a "voluntary … exchange" that "can hardly be called a taking." *See id.*; *accord Horne*, 576 U.S. at 365–66. As *Monsanto* explains, in such circumstances, a condition on a government benefit is

constitutional as long as the plaintiff has notice and the condition is "rationally related to a legitimate Government interest." 467 U.S. at 1007. There can be no question that Lilly is aware (and has been aware for over a decade) that it is required to ship 340B discounted drugs to contract pharmacies or else risk losing coverage of its drugs under Medicaid and Medicare Part B. And, as explained above, this condition is rationally related to the public benefits Congress sought to realize through the 340B Program. *See supra* § II.D.1.ii. Thus, *Monsanto* forecloses Lilly's unconstitutional-conditions claim.[7]

In support of this claim, Lilly embraces an inapposite (and even unfavorable) line of cases— *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz*—none of which call into question the applicability of *Monsanto*'s holding. These cases "involve a special application" of the unconstitutional-conditions doctrine that "protects the Fifth Amendment right to just compensation for property the government takes when owners [of real property] apply for land-use permits." *Koontz*, 570 U.S. at 604 (emphasis added) (quoting *Lingle*, 544 U.S. at 547). In this context, the Supreme Court has held that, in adjudicating an individual's land-use permit application, the government "may not condition" approval of the permit "on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Id.* at 599. The Court has gone to lengths to explain that the "rough-proportionality test" of *Nollan*, *Dolan*, and *Koontz* is strictly confined "to th[is] special context of exactions." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702–03 (1999). Indeed, a test that requires an assessment of a land owner's "proposed development" of real property could hardly be applied outside the land-use context.

Still, *Nollan*, *Dollan*, and *Koontz* acknowledge the same general principle as *Monsanto*: a condition on a valuable government benefit requiring the relinquishment of property is constitutional as long the government has a sufficient reason for imposing the condition. Or as the Seventh Circuit has explained: "What the law of 'unconstitutional conditions' boils down to … is simply that

---

[7] Crediting Lilly's unconstitutional-conditions theory would also contravene the holdings of at least nine courts of appeals, including the Seventh Circuit, all of which have upheld conditions on government benefits—like Medicaid and Medicare coverage—against challenges invoking rights under the Takings Clause. *See supra* § II.D.1.i.

conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right"—"provided the conditions are reasonable." *See Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000). Simply put, even the cases embraced by Lilly cut against its position.

## III.   THE ADMINISTRATIVE-DISPUTE RESOLUTION MECHANISM MANDATED BY CONGRESS WAS LAWFULLY ESTABLISHED

### A.   ADR BOARD MEMBERS ARE LAWFULLY APPOINTED INFERIOR OFFICERS

Lilly's claim that the ADR Rule creates principal officers in contravention of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, *see* Compl. ¶¶ 211-22, contorts the Rule's plain language and ignores precedent holding that similar schemes create inferior, not principal, officers. Lilly insists that "the ADR Rule insulates ADR panel judgments from any review by a superior (much less Senate-confirmed) Executive Branch official," and that members can only be removed "for cause," Compl. ¶¶ 139, 144, but neither premise finds support in the plain text of the Rule. Although the Rule does not create an internal agency appeals process, there are no restrictions on the Secretary's oversight and supervision of the Board. The Secretary appoints ADR Board members and delegates to them responsibility for issuing final decisions, and the Secretary retains the ability to revoke that delegation at any time, to issue binding regulations that constrain the Board members, and may remove a Board member at will, at any time. Under established precedent, Board members thus serve as inferior officers who may be appointed by the Secretary.

The Appointments Clause divides officers into two categories: principal and inferior. *See* U.S. Const. art. II, § 2, cl. 2. Although principal officers require appointment by the President with confirmation by the Senate, the Constitution grants flexibility for the appointment of inferior officers; they may be named in the same manner as principal officers, or Congress may vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

Although the Supreme Court has "not set forth an exclusive criterion for distinguishing between principal and inferior officers," it has explained that, "[g]enerally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on *whether he has a superior.*" *Edmond v. United States*, 520

U.S. 651, 661-62 (1997) (emphasis added). The focus is not merely on whether the officer has some "superior" who "formally maintain[s] a higher rank," but on whether the officer is one "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 662-63. *Edmond* involved a challenge to military judges of the Coast Guard Court of Criminal Appeals—officers that exercised significant discretion and responsibility, including the authority to resolve constitutional challenges, review death sentences, and independently weigh evidence to determine guilt and sentence. *Id.* at 662. In deeming the judges inferior officers, the Court emphasized that "the line between principal and inferior officers" turns on supervision by a higher authority, not on the "exercise of significant authority," which is the hallmark of *any* officer. *Id.* at 662-66. And because a higher authority could remove a military judge "without cause"—"a powerful tool for control"—and also "exercise[] administrative oversight," including the ability to "prescribe uniform rules of procedure" and "formulate policies and procedure," the judges were subject to sufficient supervision to qualify as inferior officers. *Id.* at 664. This conclusion was not altered by the fact that the supervising principal officer "may not attempt to influence (by threat of removal or otherwise) the outcome of individual proceedings." *Id.*[8]

The Supreme Court again addressed the line between principal and inferior officers in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). There, after striking down a statutory removal restriction, thus rendering Board members subject to at-will removal by the Securities and Exchange Commission, the Court had "no hesitation in concluding that under *Edmond* the Board members are inferior officers." *Id.* at 510. "Given that the Commission is properly viewed, under the Constitution, as possessing the power to remove Board members at will," and given the Commission's general oversight abilities, no constitutional concerns were presented by the absence of Presidential appointment. *Id. Free Enterprise Fund* emphasizes the importance of removal as a relevant and "powerful" form of control for Appointment Clause purposes—regardless of the fact that

---

[8] The *Edmond* Court also noted that certain decisions issued by the judges were subject to limited review in the Court of Appeals for the Armed Forces. 520 U.S. at 664-65. As demonstrated herein, however, numerous persuasive decisions establish that the absence of direct review of an officer's *decisions* does not render that officer a principal.

oversight of the Board was not "plenary." *Id.* at 504, 510. "[T]he Board is empowered to take significant enforcement actions, and does so largely independently of the Commission," which lacks statutory authority "to start, stop, or alter individual Board investigations." *Id.* at 504.

Applying these principles, the Third Circuit held that members of HHS's Appeals Board, which were empowered to review "*a ruling by the Secretary of HHS*," constituted inferior officers properly appointed by the Secretary. *Commonwealth of Pennsylvania v. HHS*, 80 F.3d 796, 798 (3rd Cir. 1996) (emphasis added). The Appeals Board at issue in *Pennsylvania* had been created by the Secretary through regulation (and later granted additional authority by Congress through statute) to resolve disputes between the Secretary and states arising under a complicated regulatory scheme related to child support. *Id.* at 800. Board members were appointed by the Secretary, and Board rulings constituted final agency action reviewable only in district court. *Id.* at 800-01. Pennsylvania argued board members must be principal officers in light of: (1) the broad "scope of the Board members' authority"; (2) the Board's statutory jurisdiction, which placed "much of the Board's jurisdiction … beyond the reach of the Secretary"; and (3) that "Board members will serve indefinitely unless removed for misconduct." *Id.* at 802. The Third Circuit agreed with the government that Board members were inferior, not principal, officers because the Board was bound by the Secretary's regulations, "*i.e.*, it applies, rather than makes, agency policy"; because its review was restricted to certain categories of disputes "limited by regulation"; because the Secretary could remove board members; and because the Secretary "retains discretion to terminate or reassign all but a few of the Appeals Board's functions." *Id.* at 803. "[P]erhaps most significantly," the court continued, "the Secretary could altogether eliminate the powers of the Board that are at issue here." *Id.*; *see also id.* at 804 (confirming "it is difficult to imagine how Appeals Board members could be principal officers" under controlling Supreme Court authorities). Importantly, this conclusion was in no way displaced by the fact that Appeals Board rulings were reviewable only in district court under the APA.

*Pennsylvania* is far from unique; on-point, persuasive appellate authorities have reached similar conclusions, and demonstrate the different ways in which an inferior officer's work may be "directed and supervised at some level," *Edmond*, 520 U.S. at 662-63, by superior officers. For example, the D.C.

Circuit held that the judges of the Copyright Royalty Board are inferior officers, so long as they have no statutory restrictions on removal, even though their decisions are not "directly reversible" by any other Executive Branch officer. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338-41 (D.C. Cir. 2012). After severing a statutory removal restriction, the court explained: "With unfettered removal power, the Librarian [of Congress] will have the direct ability to 'direct,' 'supervise,' and exert some 'control' over the Judges' decisions"—*even though individual decisions "will still not be directly reversible" by any higher official. Id.* at 1341 (emphasis added). As with *Edmond*, although the judges exercised "broad discretion" to decide the cases before them, a principal officer provided general supervision through the ability to approve the judges' procedural regulations, issue ethical rules, and "oversee[] various logistical aspects of their duties," including the provision of administrative resources. *Id.* at 1338. Yet even absent any mechanism for the supervising principal officer "to play an influential role in the [judges'] substantive decisions," and that the judges "issue decisions that are final for the executive branch, subject to reversal or change only when challenged in an Article III court," the court of appeals was "confident that … the [judges] will be inferior rather than principal officers" absent any statutory removal restriction. *Id.* at 1338, 1340, 1341; *see also Fleming v. USDA*, No. 17-1246, slip op. at 18-19 (D.C. Cir. Feb. 16, 2021) (rejecting claim that "an inferior officer's decisions must be subject to review by a principal officer."

Likewise, that same court recently concluded that Special Counsel Mueller was an inferior officer, even though DOJ regulations "impose various limitations on the Attorney General's ability to exercise effective oversight of the Special Counsel." *In re Grand Jury Invest.*, 916 F.3d 1047, 1052 (D.C. Cir. 2019). That conclusion turned on the Attorney General's "authority to rescind" those regulations "at any time," thereby allowing him to exercise supervisory authority. *Id.* In other words, regulations restricting a principal officer's supervisory authority make no difference from a constitutional perspective, because the agency head retains plenary authority to revise or rescind the regulations.

There is no question that the ADR Rule creates inferior officers that may validly be appointed by the Secretary and remain subject to his supervision. Through the Rule, the Secretary has delegated to Board members the authority to act as adjudicators under the APA and the 340B statute, 42 U.S.C.

§ 256b(d)(3)(A). *See* 42 C.F.R. § 10.3 (creating "a decision-making body within the Department that, acting on an express, written delegation of authority from the Secretary of HHS, reviews and makes a precedential and binding decision for a claim"). The Secretary retains the ability to revoke this delegation and could, if he so chose, adjudicate these matters personally; nothing in the statute places any restriction on the "decision-making official or decision-making body" selected by the Secretary to resolve 340B disputes. 42 U.S.C. § 256b(d)(3)(B). Moreover, Board members are bound by the Secretary's regulations, including those governing adjudicatory procedures, and substantive regulations relating to the 340B Program. Perhaps most importantly, Board members serve at the pleasure of the Secretary and can be removed at any time. Neither the statute nor the regulations contain any restrictions on the Secretary's removal power (and a removal restriction in the Rule would make no difference because the Secretary could rescind it, *In re Grand Jury Invest.*, 916 F.3d at 1052-53).

Lilly's assertions to the contrary misconstrue the Rule and misapply both the supervision and removal prongs of the Appointments Clause analysis. As to supervision, Lilly insists that, because "[t]he Supreme Court has *never* found an agency adjudicative officer to be an inferior officer when—as here—her decisions were not reviewable by a superior executive officer," the absence of an internal appeals process "*is alone sufficient* to render the [panelist] unconstitutionally appointed." Compl. ¶¶ 218-19. That assertion lacks merit for numerous reasons: the weight of Appointments Clause authority does not involve *adjudicative* officers; the Supreme Court has never held that an inferior adjudicative officer's decisions *must* be reviewed, individually, by a principal officer; and the Court's reasoning in *Edmond* and *Free Enterprise Fund* emphasizes other means of "supervision" than direct review of an officer's decisions. Moreover, the lack of direct, intra-agency review was true of the judges in *Intercollegiate Broadcasting* and *Pennsylvania* too, yet the courts of appeals were confident in deeming them inferior officers. At bottom, the absence of an internal review mechanism does not prevent the Secretary from supervising Board members—nor does it render them principal officers.[9]

---

[9] Lilly's reliance, Compl. ¶ 217, on *Association of American Railroads v. U.S. Department of Transportation* is disingenuous, since that court twice explicitly has rejected the argument Lilly portrays as settled law. 821 F.3d 19 (D.C. Cir. 2016). The arbitrators in question there were not deemed principal officers

Lilly's argument as to the removal prong rests on a flatly false premise. Lilly admits, as it must, that "[t]he ADR Rule makes no provision for any Board member's removal," Compl. ¶ 139, yet argues that this silence somehow constrains the Secretary's removal authority. But the statute contains no restriction on the Secretary's removal of Board members, 42 U.S.C. § 256b(d)(3)(A)-(B), and the regulation likewise does not purport to prevent members' removal at will. Lilly's argument contravenes "[t]he general and long-standing rule [] that, in the face of statutory silence, the power of removal presumptively is incident to the power of appointment." *Kalaris v. Donovan*, 697 F.2d 376, 389 (1983); *see also Free Enter. Fund*, 561 U.S. at 509 ("removal is incident to the power of appointment.").

Lilly attempts to elide this lack of constraint by pointing to a provision delegating *to the HRSA Administrator* the power to remove a panel member "for cause," including for a conflict of interest. *E.g.*, Compl. ¶ 139; 42 C.F.R. § 10.20(a)(1)(ii), (2). But that delegation of partial authority to take ADR Board members from a particular panel merely allows the HRSA Administrator to share in the supervision of the ADR process; it in no way constrains the Secretary's ability to remove an individual from a panel, or from the Board, at will—with or without a conflict of interest.[10] Put simply, Lilly is flatly incorrect that "[n]o superior Executive official has any power to … remove them from an ADR panel except for cause," Compl. 6, because the Secretary may rescind his delegation of authority at any time by removing a Board member for any reason.

Contrary to Lilly's view, Compl. ¶ 222, *Arthrex, Inc. v. Smith & Nephew, Inc.*, bolsters HHS's argument here. 941 F.3d 1320 (Fed. Cir. 2019). The relevant principal officer there *lacked authority* to review patent judges' decisions, whereas here the Secretary could rescind the Rule and reserve to

---

solely because their decisions lacked secondary review before constituting final agency action. Rather, that "anomalous" statute permitted a *private arbitrator* to exercise regulatory authority, and "[n]owhere d[id] [the statute] suggest the arbitrator" was "directed and supervised by any federal entity." *Id.* at 39. Indeed, the arbitrators lacked *any* supervision, whatsoever, and could operate wholly outside the government. *Id.* (citation omitted). That level of independence is fundamentally different from the ADR Rule, which leaves Board members subject to supervision in numerous ways.

[10] Lilly's assertion that the HRSA Administrator may only remove a panel member for conflicts of interest, Compl. ¶ 139, also is incorrect; the regulation delegates authority to remove members "for cause," without limiting that term. 42 C.F.R. § 10.20(a)(1)(ii). Lilly's inaccuracy is irrelevant, however, since it is the Secretary's power—not that of the HRSA Administrator, acting through delegation— that matters for constitutional purposes.

himself the power to decide 340B claims. The *Arthrex* court also found it significant that, like here, the principal "exercise[d] a broad policy-direction and supervisory authority," could "promulgate regulations governing the conduct of" the adjudicatory process, and could "issue policy directives and management supervision of the Office," all of which "weigh in favor of a conclusion that [the judges] are inferior officers." *Id.* 1331-32. Indeed, the court relied on the D.C. Circuit's opinion in *Intercollegiate Broadcasting* to determine that, once a statutory for-cause removal provision was severed, no constitutional problem was presented by the lack of direct internal review. *Id.* at 1335-38.

Lilly's challenge fails because Board members are inferior officers whose work is "directed and supervised at some level" by the Secretary. *Edmond*, 520 U.S. at 663. Like the officers in *Intercollegiate Broadcasting*, 684 F.3d at 1341, and *Free Enterprise Fund*, 561 U.S. at 510, Board members are freely removable at will. Like the Special Counsel in *In re Grand Jury Investigation*, 916 F.3d at 1052-53, the Secretary could revoke or modify the ADR Rule—and thus the members' authorizing regulations— at any time. And like the inferior officers in *Edmond*, 520 U.S. at 664, Board members must follow their superior's rules of procedure and substantive policy, and members may be removed from any particular assignment. The Secretary retains plenary authority to revise the Rule and, in so doing, modify the workings of the Board. Board members thus have received a proper appointment as inferior officers from the Secretary of HHS as the Head of a Department.

### B. THE ADR PROCESS DOES NOT INFRINGE THE POWER OF THE JUDICIARY

As with its Article II challenge, Lilly's Article III claim, Compl. ¶¶ 223-31, rests on a fundamentally inaccurate portrayal of the Board's remedial powers and of the claims it is empowered to hear. Far from unlawfully usurping the powers of life-tenured, Article III judges as Lilly charges, *id.*, the ADR Rule creates a straightforward mechanism for the agency to determine compliance with a statutory scheme Congress entrusted to HHS—precisely the type of administrative adjudication that courts have blessed for much of the past century. The Rule creates no Article III concerns.

As an initial matter, Lilly falsely claims that the Board is empowered "to adjudicate claims for money damages or equitable relief brought by one private party to obtain another's property without paying for its value." Compl. ¶ 228. This assertion is nonsensical because, under the 340B statute, a

sale of Lilly's medications to a covered entity at the statutory ceiling price *is full payment*, and Lilly must comply with its statutory obligation to fulfill covered entities' orders at the ceiling price if it wishes to retain access to Medicaid and Medicare Part B. The Board determines compliance—it does not set prices or command the conveyance of private property.

Moreover, the ADR Rule facially disproves Lilly's claim as to the Board's powers. Although ADR Panels are empowered to issue a final agency decision, those decisions are *not* self-effectuating. *Contra* Compl. ¶ 228. Panel decisions must be "submit[ted] … to HRSA for appropriate action regarding refunds, penalties, removal, or referral to appropriate Federal authorities." 42 C.F.R. § 10.24(e). Indeed, in response to comments, some of which expressed "concern[]" that the proposed rule *lacked* a specific enforcement mechanism, the agency rejected calls for more-specific provisions by explaining that ADR panels "may make recommendations to HRSA for sanctions" that may be the basis for imposition of civil monetary penalties and that the absence of specific enforcement mechanisms in the Rule is designed "to permit HHS maximum flexibility in determining what is appropriate" when a panel determines a violation has occurred. *See* 85 Fed. Reg. at 80,642. Lilly's clamoring about "binding, precedential, and self-executing judgments," *e.g.*, Compl. ¶ 143, ignores the Rule's plain text requiring panels to submit decisions *to HRSA* "for appropriate action." § 10.24(e).

Tellingly, *not once* does Lilly acknowledge that the Rule does not purport to authorize panels to issue sweeping injunctions. Rather, the "equitable relief" referred to in the Rule establishes a jurisdictional floor on the claims heard by a panel, to exclude *de minimis* claims. 42 C.F.R. § 10.21 (a), (b) (granting jurisdiction "to entertain any petition where the damages sought exceed $25,000 or where the equitable relief sought will likely have a value of more than $25,000" within twelve months); 85 Fed. Reg. at 80,633 (explaining that provision is designed to exclude *de minimis* claims). Read in context, the "equitable relief" contemplated in the Rule means an order determining whether a manufacturer or covered entity has violated the statute—not a self-executing, judicial-style remedy. Nowhere does the Rule allow panels to grant a sweeping "injunction," under penalty of contempt, as can be issued by an Article III court.

Far from unusual, the orders contemplated in the ADR Rule find analogues throughout the federal bureaucracy. "Some agencies have the power in an adjudication, similar to the power that courts possess, to order the payment of money, either to the Government or to a third party, subject to judicial review. More typically, agencies will issue orders that resemble court-issued injunctions, though they may be called something else, such as 'cease and desist orders' (Federal Trade Commission (FTC)), 'exclusion orders' ([Securities and Exchange Commission]), or 'deportation orders' directing an alien to leave the country (U.S. Citizenship and Immigration Service)." Alan B. Morrison, *Administrative Agencies Are Just Like Legislatures and Courts-Except When They're Not*, 59 Admin. L. Rev. 79, 99-100 (2007); *see also id.* n.66 (noting that National Labor Relations Board can order an employee's reinstatement, with back pay, and Commodity Futures Trading Commission can order fines "of the higher of $100,000 or the gain of the wrongdoer" plus restitution).

Lilly's complaints about the ADR Board's authority to conduct proceedings are easily dispatched. Lilly urges this Court to find an Article III problem based on panels' "authority to … take evidence and hear testimony, apply the Federal Rules of Civil Procedure and Evidence, impose sanctions, issue precedential and binding decisions, and decide ancillary legal issues." Compl. ¶ 230. And the adoption of court-like procedures makes no difference, because the Supreme "Court has never adopted a 'looks-like' test to determine if an adjudication has improperly occurred outside of an Article III court," since "[t]he fact that an agency uses court-like procedures does not necessarily mean it is exercising the judicial power." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1378 (2018) (rejecting argument that non-judicial patent adjudication "violates Article III because it shares 'every salient characteristic associated with the exercise of the judicial power,'" including "motion practice …; discovery, depositions, and cross-examination of witnesses; introduction of evidence and objections based on the Federal Rules of Evidence; and an adversarial hearing before the Board") (citation omitted). In short, the procedures adopted by the ADR Rule mirror those found, and upheld, in other agency adjudications. ADR_1105; ADR_1205; ADR_1321.

That leaves only Lilly's argument that the Board usurps the power of federal courts. Article III prevents Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature,

is the subject of a suit at the common law, or in equity, or admiralty." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855)). In other words, non-judicial fora may not be assigned adjudication of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring). But when Congress creates a new right by statute—*i.e.* a "public right[]"—"it depends upon the will of [C]ongress whether a remedy in the courts shall be allowed at all," so "Congress may set the terms of adjudicating" that right. *Stern*, 564 U.S. at 489. The separation of powers is not offended by adjudication of public rights outside the judiciary because, when Congress creates new rights through a novel, comprehensive regulatory scheme, it has broad latitude to grant jurisdiction to federal courts or assign adjudication in another branch.

Public rights capable of resolution before an administrative agency are not limited to rights collectively held by the public at large or involving disputes between the government and a private party. On the contrary, the Supreme Court long ago "rejected the limitation of the public rights exception to actions involving the Government as a party," instead explaining that it encompasses "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490-91 ("[W]hat makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action."). Thus it matters not that the dispute may arise between private parties; it is the character of the *right* at issue—one specially created by Congress—that renders it amenable to non-judicial resolution. In fact, the contrary argument Lilly presses here, *e.g.*, Compl. 6, has been explicitly rejected by the Supreme Court. After canvassing various agency adjudicative schemes, all of which "surely determine liabilities of individuals," the Court explained that, "[i]f the identity of the parties alone determined the requirements of Article III … the constitutionality of many quasi-adjudicative activities carried on by administrative agencies involving claims between individuals would be thrown into doubt." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587, 589 (1985); *see also id.* 571-75, 584 (upholding binding arbitration to resolve disputes between private companies because "[a]ny right to compensation …

46

results from [the statute] and does not depend on or replace a right to such compensation" under state or common law). These principles recently were reaffirmed in *Oil States*, which upheld a procedure whereby an administrative board, through adversarial proceedings between private parties, determines the validity of patent rights. The Court's conclusion was not displaced by the fact that patents might be "property for purposes of the Due Process Clause or the Takings Clause." 138 S. Ct. at 1379.

Lilly's assertion that the Rule violates Article III by allowing non-judicial adjudication of private rights, Compl. ¶¶ 226-30, rests on a warped interpretation of the disputes presented to the Board. The ADR process does not decide Lilly's right to sell its product at its chosen price, nor can a panel "mandate that Lilly transfer its property in the form of its drugs to covered entities often at an extreme financial loss," or extinguish "[r]ights to private property," *id.* at ¶¶ 227-28. The ADR process, like other administrative determinations of public rights, *supra*, determines compliance with the statutory provisions enacted by Congress. *See* 42 U.S.C. § 256b(d)(3)(A); 42 C.F.R. § 10.3. The panels cannot determine disputes over the prices Lilly may charge for its product; the statutory ceiling price accomplishes that task. The panels do not decide to whom Lilly must offer discounted drugs; the 340B statute determines this, too. The ADR panels, contrary to Lilly's portrayal, do not have independent authority to order the disgorgement of private property—only compliance with the statutory regime. And the statutory disputes ADR panels resolve emphatically are not "traditional actions at common law," *Stern*, 564 U.S. at 484, since they are entirely creatures of the 340B Program.

Congress created the 340B Program, thereby granting covered entities the statutory *right* to discounted medications, and pharmaceutical manufacturers, like Lilly, the statutory *right* to access incredibly valuable revenue streams in exchange for providing its property in the form of discounted drugs. The rights of both covered entities and manufacturers under this scheme are quintessential public rights, created by a comprehensive regulatory system, and of precisely the same character as the administrative proceedings cited approvingly in *Union Carbide*. *See* 473 U.S. at 587-89. Lilly can opt out of the 340B Program and lose the right to access Medicaid and Medicare Part B, but it cannot enjoy those rights while shirking its obligations under 340B. The Board, for its part, decides only whether manufacturers and covered entities each are complying with statutory requirements, not

Lilly's preexisting natural property rights. *See Kalaris*, 697 F.2d at 388 ("The law is emphatically clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated.").

Tellingly, Lilly ignores the fact that the claims it seeks to thwart—claims by covered entities that Lilly has denied their statutory entitlement to 340B discounts—arise wholly from a public right, given that it exists only as a matter of statute. This point is dispositive; as demonstrated above, the Supreme Court repeatedly has upheld administrative adjudication of statutory, public rights notwithstanding that the disputes arose between private parties and resulted in the exchange of property. The ADR Rule does not concern private rights any more than those sanctioned in, *e.g.*, *Union Carbide*, 473 U.S. at 587-89. Indeed, Lilly attempts to confuse the applicable standard by hanging its Article III argument on inapposite bankruptcy cases such as *Stern* and *Northern Pipeline*. Compl. ¶¶ 224-27. Article III challenges arising in bankruptcy proceedings *necessarily* involve state or common-law counterclaims (since Congress does not assign adjudication of complex regulatory schemes to bankruptcy courts) meaning that bankruptcy challenges involve private rights. By contrast, cases involving administrative-agency adjudications arising under complex regulatory schemes, such as *Crowell* and *Oil States*, provide the rule of decision for public-rights claims such as this.

Lilly's argument that the ADR process is "quite unlike most other administrative review schemes" the Supreme Court has accepted because panel decisions allegedly are self-executing without application "to a federal court for enforcement of an order," Compl. ¶ 230, is equally doomed. Decisions must be referred to HRSA, 42 C.F.R. § 10.24(e), and HRSA (not the panel) is empowered to take "appropriate action regarding refunds, penalties, removal, or referral to appropriate Federal authorities," *id*. And the fact that enforcement can be initiated by the agency, without involvement by a court, matters not. Lilly relies for this argument on cases involving the adjudication of *private* rights, not public rights, where non-judicial schemes were considered "adjuncts" of the federal courts. *CFTC v. Schor*, 478 U.S. 833, 853 (1986) ("The counterclaim asserted in this litigation is a 'private' right for

which state law provides the rule of decision."); (Compl. ¶¶ 229-30). That doctrine is inapplicable here because only public rights are at stake, so Congress is free to assign initial review outside the judiciary.[11]

Any remaining doubt as to the character of the disputes resolved by the Board is answered by *Astra*, 563 U.S. at 110. The *Astra* Court rejected an attempt by covered entities to sue drug manufacturers for violating 340B requirements, explaining that Congress placed oversight in HHS and did not grant covered entities any right to sue for program violations. *Id.* at 117. Although the ADR Rule had not yet been promulgated, the Court explained that "Congress directed HRSA to create a formal dispute resolution procedure … to make the new adjudicative framework the proper remedy for covered entities complaining of 'overcharges and other violations of the discounted pricing requirements … and to render the agency's resolution of covered entities' complaints binding, subject to judicial review under the APA." *Id.* at 121-22 (citation omitted). True, the Court did not expressly consider the public/private rights doctrine. But in firmly rejecting the covered entities' ability to sue, *Astra* confirms that the rights created under the 340B statute—including the right *to purchase* covered drugs at the 340B ceiling price—are creatures of statute, the resolution of which Congress vested within the agency. Lilly ignores this precedent, likely because its assertion that the ADR Board resolves private rights that must be determined in federal court is irreconcilable with *Astra*'s holding that the very same claims *may not* be determined in federal court.[12]

"Congress has been creating quasi-judicial boards subject to Executive control for years, and the courts have not previously prevented them from doing so. To do so now 'would be to turn the

---

[11] Lilly's contention that "private rights must be overseen by Article III courts, and Article III courts alone," Compl. ¶ 226, also is wrong. Private rights sometimes may be adjudicated by agencies serving as adjuncts of the Third Branch. *See Schor*, 478 U.S. at 853; *Crowell v. Benson*, 285 U.S. 22, 47 (1932); *Kalaris*, 697 F.2d at 386.

[12] Lilly's complaint that the ADR Rule fails to "authorize any particular standard of judicial review … for instance, [] *de novo* review" is absurd. *See* Compl. ¶ 145. Congress, not the Secretary of HHS, authorizes federal court review. And absent a contrary intent in a statute, judicial review of final agency actions is authorized by the APA, 5 U.S.C. §§ 701 *et seq.* The Secretary could not "authorize" federal courts to conduct more-sweeping review than Congress provided in the APA.

clock back on at least a century of administrative law." *Kalaris*, 697 F.2d at 401 (citation omitted). This Court should grant summary judgment for HHS on Lilly's meritless Article III claim.[13]

### C. THE SECRETARY FULLY COMPLIED WITH NOTICE-AND-COMMENT REQUIREMENTS IN PROMULGATING THE ADR RULE

#### 1. HHS DID NOT TERMINATE THE ADR RULEMAKING IN ADVANCE OF ISSUING THE FINAL RULE.

Lilly's procedural APA claim also fails as a matter of law. Under the APA, when an agency is required to undertake notice-and-comment rulemaking, the agency must publish a notice of proposed rulemaking that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The agency must then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). Noticeably absent from the APA is any requirement that a final rule follow an NPRM within a specified amount of time, or any provision that causes an NPRM to expire. Indeed, there significant time often elapses between the end of a comment period and issuance of a final rule. *E.g.*, Food Labeling; Gluten-Free Labelling of Fermented or Hydrolyzed Foods, 85 Fed. Reg. 49,240, 49,244 (Aug. 13, 2020) (final rule issued nearly five years after notice of proposed rulemaking). HHS fully complied with the APA's notice and comment procedures. HHS first issued an advanced NPRM requesting comments on the development of an ADR process in 2010. 75 Fed. Reg. 57,233 (Sept. 20, 2010). It then issued an NPRM on the same topic in 2016. 81 Fed. Reg. 53,381 (Aug. 12, 2016). After reviewing the comments received on both notices, HHS issued the final ADR Rule in 2020. 85 Fed. Reg. 80,632 (Dec. 14, 2020).

Lilly's sole argument to the contrary is that HHS "withdrew" the rulemaking from the Unified Agenda of Regulatory and Deregulatory Actions ("Unified Agenda") after the NPRM's comment period and prior to issuance of the ADR Rule, supposedly nullifying the NPRM. Compl. ¶ 243. But removing a rulemaking from the Unified Agenda alone is not sufficient to terminate a rulemaking or

---

[13] Count VII of Lilly's complaint, ¶¶ 232-37, relies on the same contentions as its Article II and III claims, but asks the Court to set aside the Rule as exceeding statutory authority under the APA. That claim fails for the same reasons outlined above.

render an NPRM invalid. The agency must formally withdraw the NPRM, accompanied by a statement explaining its reasons for the withdrawal, often accomplished by a publication of the withdrawal notice in the Federal Register. *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 42 (D.C. Cir. 2004) (acknowledging withdrawal of proposed rule published in the Federal Register); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 844 (D.C. Cir. 1983) (same); *Cierco v. Lew*, 190 F. Supp. 3d 16, 21 (D.D.C. 2016) (same).

In its ruling on Lilly's motion for preliminary injunction, this Court concluded that the "relevant inquiry," in determining whether HHS withdrew the ADR Rule, "is whether, through their actions and statements, [HHS] effectively communicated a withdrawal of the proposed rule to the public." PI Order 21. The Court's approach is foreclosed by well-established Supreme Court precedent and, in any event, is not supported by the APA. The Court's approach essentially imposes a new procedural requirement on agencies not found in the APA—that agencies must publish a new NPRM and re-do the notice and comment process if the totality of the circumstances would lead a reasonable observer to view the original NPRM as withdrawn. But, as the Supreme Court has oft repeated, "the [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978). It is reversible error to create additional requirements constraining the agency's ability to engage in rulemaking directed by Congress.

Moreover, this test, created in the first instance by the Court's Order, is incompatible with existing law setting forth the procedures for review of agency action under the APA. The decision to terminate rulemaking proceedings is typically reviewable as final agency action under the APA. *Ctr. for Auto Safety*, 710 F.2d at 846. As such, when an agency terminates a rulemaking, it must provide "an explanation that will enable the court to evaluate its rationale at the time of the decision." *Int'l Union*, 358 F.3d at 42. Because of this requirement, the Court correctly noted HHS's practice is to publish a notice of withdrawal in the Federal Register. *See, e.g.*, 78 Fed. Reg. 12,702-01 (Feb. 25, 2013). In additional to being foreclosed by well-established precedent, the Court's totality-of-the-circumstances

approach would not allow for this classic review under APA principles based on a statement of decision accompanied by any administrative record.

Finally, contrary to the Court's opinion, HHS is not asking the court to "impose upon agencies" the "specific procedural requirement" of publication of withdrawal in the Federal Register. PI Order 21 (quoting *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2385 (2020)). Rather, HHS asks the Court to recognize that the agency must provide courts and the public with some statement of its decision that would permit a court to review termination of the rulemaking on the record in order to effectively withdraw a NPRM and terminate a rulemaking. Here, HHS provided no such statement, and did not terminate the ADR Rule.

But even accepting the Court's novel totality of the circumstances test, HHS submits that the Court incorrectly concluded that HRSA's actions "would have led a reasonable observer to believe the ADR Rule had in fact been withdrawn." PI Order 22. First, listing or delisting of rulemaking on the Unified Agenda is not presumed to provide notice to regulated parties of agency action. Though the Unified Agenda exists to provide "uniform reporting of data on regulatory and deregulatory activities under development" in the Executive Branch, *About the Unified Agenda*, REGINFO.GOV,[14] listing a rulemaking on the Unified Agenda does not satisfy statutory requirements to provide notice of rulemaking, 5 U.S.C. § 553(b), or establish presumptive notice of regulation required for enforcement, *cf.* 44 U.S.C. § 1507. Accordingly, de-listing a rulemaking from the regulatory agenda is not sufficient to withdraw that rulemaking for the purposes of the APA. The Unified Agenda is simply an administrative tool to assist the Executive Branch in the organization and exercise of its regulatory authority. For the same reasons, the existence of a different RIN is legally insignificant. RINs are administrative tags created by the Office of Information and Regulatory Affairs, not the agency, and cannot properly be interpreted as a sign of the agency's intent with respect to rulemaking. *See* How to Use the Unified Agenda, Reginfo.gov.[15]

---

[14] https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_About.myjsp (last visited Feb. 16, 2021).

[15] https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_HowTo.myjsp#rin.

Finally, the statements by an unnamed HRSA official in a news publication are far from a clear and direct statement of withdrawal that the public would expect if a rulemaking were terminated. Lilly cites to a news report quoting a HRSA official as stating that "[i]t would be challenging to put forth rulemaking on a dispute resolution process when many of the issues that would arise for dispute are only outlined in guidance," Am. Compl. ¶ 134, but nowhere does Lilly allege that the HRSA official actually withdrew or purported to withdraw the existing NPRM. More importantly, Lilly does not cite, and HHS is not aware of, any caselaw supporting the contention that a public statement from an individual agency official without decisionmaking authority can provide any evidence as to whether a rulemaking has been withdrawn.

Contrary to Lilly's allegations, the context and timing of HHS's removal of the rulemaking from the Unified Agenda only provide further support for the interim nature of its decision. On January 20, 2017, President Trump's Chief of Staff issued a memorandum to agencies implementing a "regulatory freeze pending review," consistent with the common practice of transitioning administrations. *See, e.g.*, Memorandum for the Heads of Executive Departments and Agencies ("Regulatory Freeze Memorandum"), 74 Fed. Reg. 4435 (Jan. 26, 2009); *see also* Anne Joseph O'Connell, *Agency Rulemaking and Political Transitions*, 105 Nw. U. L. Rev. 471, 509 (2011).

In accordance with the Regulatory Freeze Memorandum, HHS reviewed its ongoing rulemakings and updated the removal status of the ADR rulemaking in the next available edition of the Unified Agenda, a twice-yearly publication. Reginfo.gov, Historical Unified Agenda and Regulatory Plan.[16] Though Lilly accuses HHS of not treating the memorandum as applicable to the ADR Rule, because HHS did not act "immediately," in freezing the ADR rulemaking, Lilly fails to acknowledge that HHS froze the ADR rulemaking in the next Unified Agenda. Compl. ¶ 245. It is difficult to see how HHS might have acted any more "immediately" without actually withdrawing the NPRM from the Federal Register, which, as discussed above, it declined to do. Lilly also suggests that the ADR rulemaking was exempt from the Regulatory Freeze Memorandum because it was subject to

---

[16] https://www.reginfo.gov/public/do/eAgendaHistory (last visited Feb. 16, 2021).

a statutory deadline. *Id.* But by 2017, the deadline for ADR rulemaking had already passed. It is clear that, given the circumstances, HHS did not consider the Memorandum's "exemption" as an impediment to removing the rulemaking from the Unified Agenda.

## 2. THE ADR RULE IS A LOGICAL OUTGROWTH OF THE NPRM.

Because the NPRM gave Lilly adequate notice of the topics covered by the ADR Rule, as required by the APA, Lilly's "logical outgrowth" claim fails as a matter of law. Compl. ¶¶ 249-50. Even when a final rule "work[s] a substantial change to the NPR[M]," the standards of the APA may be satisfied. *Am. Med. Ass'n v. United States*, 887 F.2d 760, 767 (7th Cir. 1989). An NPRM need only "apprise[] interested parties of the issues to be addressed in the rule-making proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner." *Id.* "[A] final rule is not invalid for lack of adequate notice if the rule finally adopted is a 'logical outgrowth' of the original proposal." *Id.* (citation omitted).

Lilly argues that two aspects of the ADR Rule fail under these standards because they "were absent from" the NPRM:" (1) ADR panels' supposed "authority to issue binding judgments for money damages;" and (2) the "precedential" weight of ADR decisions." Compl. ¶ 249. But that argument cannot succeed, as it is based on a demonstrably false reading of the ADR Rule and, in any event, concerns topics that were clearly addressed in the NPRM.

First, as shown above, Lilly is incorrect that an ADR Panel has authority to issue binding judgments for money damages. The ADR Rule requires the Panel to make a decision on the merits of the alleged statutory violation, but only empowers it to "make recommendations to HRSA," Rule at 80,646, "for appropriate action regarding refunds, penalties, removal, or referral," 40 C.F.R. § 10.24(e). Lilly's misunderstanding of the Rule appears to stem from language in response to comments on an unrelated provision of the Rule. In the NPRM, HHS advised, "covered entities and manufacturers should carefully evaluate whether the ADR process is appropriate for de minimis claims given the investment of the time and resources required of the parties involved." NPRM at 53,382. Commenters urged HHS to "clarify" what would constitute such a de minimis claim. Rule at 80,633. HHS set a threshold monetary value for claims raised with the ADR Panel in response, stating, "[w]e believe that

54

an appropriate threshold for a claim or claims for money damages should be $25,000." *Id.* But nowhere does HHS state that the Panel would have authority to award such damages. Lilly cannot rely on its misreading of the Rule to support its assertion that HHS failed to give proper notice to interested parties, particularly when, as here, the agency was properly "refin[ing], modify[ing], and supplement[ing]" its proposal "in the light of evidence and arguments presented in the course" of the rulemaking. *See Alto Dairy v. Veneman*, 336 F.3d 560, 569 (7th Cir. 2003).

As properly read, the provision of the Rule requiring the Panel to submit its decisions to HRSA is also "materially identical" to the NPRM, further dooming Lilly's claim. *See Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176, 185 (D.D.C. 2018). Just as the Rule provides that the Panel "will submit the final agency decision to all parties, and to HRSA for appropriate action regarding refunds, penalties, removal, or referral," 42 C.F.R. § 10.24(e), the NPRM proposed regulatory language requiring the Panel to "submit the binding final agency decision letter to all parties, and to HRSA, as necessary, for appropriate enforcement action." NPRM at 53,388 (proposed 42 C.F.R. § 10.23(b)(2)). Simply spelling out the type of enforcement actions that HRSA may take does not constitute a change in the agency's position, much less a material change.

Second, Lilly takes issue with HHS's alleged change in position on the precedential nature of ADR Panel decisions. HHS first proposed that the Panel's decisions would be "binding upon the parties involved," NPRM at 53,385, then in the Rule determined that the Panel's decision would also be "precedential" in other ADR proceedings, in addition to being "binding on the parties." 85 Fed. Reg. at 80,641. But the fact that HHS expanded the effect of the Panel's decisions does not mean that Lilly lacked notice. *See Am. Med. Ass'n*, 887 F.2d at 768 (noting "that courts have upheld final rules" which represented "outright reversal of the agency's initial position"). The relevant question is simply "whether or not potential commentators would have known that an issue in which they were interested was 'on the table' and was to be addressed by a final rule," and "if interested parties favor a particular regulatory proposal, they should intervene in the rulemaking to support the approach an agency has tentatively advanced." *Id.* Here, the effect of the Panel's decision was clearly "on the table."

*Id.* And particularly where HHS was "writing on a clean slate," Lilly cannot claim that it lacked notice of the agency's intent to define the effect of Panel decisions. *Id.* at 769.

As the Seventh Circuit has opined, "[i]f every modification is to require a further hearing at which that modification is set forth in the notice, agencies will be loath to modify initial proposals, and the rulemaking process will be degraded." *Alto Dairy*, 336 F.3d at 569-70. "The object, in short, is one of fair notice," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

### D. **The ADR Rule is Substantively Compliant with the APA**

Lilly asserts various arbitrary-and-capricious claims challenging the ADR Rule, all of which lack merit. *See* Compl. ¶¶ 251–63; *see also Prometheus*, 141 S. Ct. at 1158 ("The APA's arbitrary-and-capricious standard requires [only] that agency action be reasonable and reasonably explained.").

*First*, HHS was not required to predict and address Lilly's meritless constitutional challenges. *See* Compl. ¶¶ 255–56. At the outset, Lilly waived any such objection to the ADR Rule by failing to raise it during the comment period. *See Bank of N. Shore v. Fed. Deposit Ins. Corp.*, 743 F.2d 1178, 1183 (7th Cir. 1984); *see also Toledo, Peoria & W. Ry. v. Surface Transp. Bd.*, 462 F.3d 734, 749 n.21 (7th Cir. 2006) (applying waiver to constitutional claim not raised in agency proceedings). Lilly challenges a rule produced through notice-and-*comment* rulemaking, but it never alleges that it (or any other party) submitted comments raising Appointments Clause or Article III concerns during the rulemaking process, and the government is aware of no such objection. Whether it be in the interest of fairness, judicial economy, or simply to discourage "sand-bagging," *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in the judgment), "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection," *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

Even so, Lilly's constitutional theories warranted no response because they are meritless. The ADR Rule fully comports with Articles II and III. *Supra* § III.A, B. And even if an agency must address "changed legal circumstances" (as Lilly suggests), *see* Compl. ¶ 255, Lilly fails to identify any legal developments relevant to its constitutional arguments. *Lucia v. SEC*, 138 S. Ct. 2044 (2018), did not modify or refine the distinction between "inferior" and "principal" officers, *see id.* at 2051, which is

56

the only appointments-related dispute presented here. Further, Lilly misunderstands the import of the grant of certiorari in *Anthrex*, *see* Compl. ¶ 255, which neither "suggest[s] a view on the merits," *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1299 (11th Cir. 2007); *accord Clinton v. Jones*, 520 U.S. 681, 689 (1997), nor "constitute[s] new law," *Ritter v. Thigpen*, 828 F.2d 662, 665–66 (11th Cir. 1987).

*Second*, HHS adequately explained its decision to utilize ADR panelists to resolve 340B disputes rather than employing ALJs. Compl. ¶¶ 258–59. Lilly suggests that HHS disregarded concerns that ADR Panelists "are likely to hold biases, policy positions, or other objectives outside of the limited facts of the dispute at issue." Compl. ¶ 258. Putting aside the fact that Lilly's claim is speculative,[17] HHS did consider these concerns. *See* 85 Fed. Reg. 80,634–35. In response, HHS established multiple procedures and safeguards "[t]o ensure fairness and objectiveness" in the ADR process, *id.*, chief of which is the requirement that "[a]ll individuals who serve on a 340B ADR Panel will be screened for conflicts of interest prior to reviewing a claim," 42 C.F.R. § 10.20(b), and no individual will "be allowed to conduct a review if any conflicts of interest exist," *see* 85 Fed. Reg. 80,635. And ADR panelists are removable from a panel "for cause," 42 C.F.R. § 10.20(a)(ii), with no express restrictions on the causes that may qualify. HHS need not *agree* with commenters' concerns, so long as they are considered.

Lilly next contends that it was irrational for HHS not to adopt an ALJ structure for the ADR process because "the lion's share" of decisions in resolving a 340B dispute "are the tasks of judges" that do not require "specialized agency expertise." Compl. ¶ 259. HHS (and several commenters) drew the contrary conclusion, however. *See, e.g.*, 85 Fed. Reg. 80,634 ("HHS disagrees that ALJ's are best positioned to resolve 340B disputes."). As HHS explained, its "established cadre of ALJs . . . resolve disputes between the Department and private entities involving federal funds whether through grants, contracts, or under benefit programs such as Medicare," but have no familiarity with "the complexities of the 340B program" or the "complex commercial arrangements" that would form the basis for 340B disputes. *Id.* at 80,634–35. Accordingly, several commenters thought it critical "that the 340B ADR

---

[17] There being no indication in the record of any bias among ADR panelists, the Court should reject Lilly's contention outright. *See Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 716 (7th Cir. 2000) ("[A] contention of bias must overcome a presumption of honesty and integrity in those serving as adjudicators." (alteration adopted and citation omitted).

Panel members should have demonstrated expertise or familiarity with the 340B Program," such that they would be "uniquely situated to handle" its "complexities." *Id*.; *see also id*. at 80,634; ADR_181, 193, 217–18. HHS agreed, and therefore required that each ADR Panel have two members with "drug pricing, drug distribution, and other relevant 340B expertise," as well as "a non-voting member of [the Office of Pharmacy Affairs] who would bring additional 340B Program expertise to the ADR proceedings." *Id*. And given that ADR proceedings require application of procedural and evidentiary rules, each panel also includes an official from the Office of General Counsel with "expertise and experience in handling complex litigation." 42 C.F.R. § 10.20. HHS's decision to utilize ADR panelists in resolving 340B disputes was a product of its reasoned judgment.

Lilly finally takes issue with the precedential nature of ADR Panel decisions, suggesting that this feature turns decisions into a type of rulemaking. Compl. ¶ 260. But Lilly fails to explain why giving panel decisions precedential effect in subsequent ADR proceedings is arbitrary and capricious, particularly where commenters were concerned with preventing inconsistencies between decisions. *See* 85 Fed. Reg. 80,643. Lilly's conjecture about the unstated reasons for making panel decisions precedential, *see* Compl. ¶ 260, is not only incorrect, but it is irrelevant and unsupported by the record, *see Allegheny Def. Proj., Inc. v. U.S. Forest Serv.*, 423 F.3d 215, 231 (3d Cir. 2005) ("[T]he reasonableness of the agency's action is judged in accordance with its stated reasons," not "speculat[ion] about the agency's ulterior motives to an extent not supported by the record." (citation omitted)).

*Third*, HHS was not required to respond to comments recommending that it revise HRSA's manufacturer auditing guidelines before moving forward with the ADR Rule. Compl. ¶ 261. Still, Lilly faults HHS for failing to elaborate on its conclusion that such comments were not pertinent to the development of the ADR process. *See* 85 Fed. Reg. 80,633. But whether HHS "adequately responded to these comments makes no difference" under the APA because the agency "had no obligation to respond to them in the first place." *See City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007). Agencies "need not respond to every fact or contention in the comments submitted" on a proposed rule, *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1469 (7th Cir. 1985), and they are under no obligation to respond to comments raising issues beyond the scope of the rulemaking process, *see Nat'l Mining*

58

*Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997). An agency is required to address only comments raising "significant points" or "major issues," *St. James Hosp.*, 760 F.2d at 1470 (citation omitted)—*i.e.*, those "comments that are 'relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule.'" *Nat'l Mining Ass'n*, 116 F.3d at 549.

Here, HHS proposed a rule to develop requirements and procedures for an ADR process, as mandated under 42 U.S.C. § 256b(d)(3). NPRM at 53,381. Congress required the Secretary to develop a dispute-resolution mechanism, and the Secretary was not required to expand the scope of that mandatory rulemaking to encompass a separate matter—potential revisions to HRSA's auditing guidelines. *See, e.g., Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230-31 (1991) ("An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, and priorities … [and it] need not solve every problem before it in the same proceeding." (citations omitted)). Comments regarding HRSA's auditing guidelines raised an issue that was simply beyond the scope of this rulemaking process. In fact, these comments did not even seek "a change in [the] proposed [ADR] rule," *see Nat'l Min. Ass'n*, 116 F.3d at 549 (citation omitted), but instead asked HHS to abandon the rule altogether and to turn its attention to a different course of action, *see* Rule at 80,633 ("Commenters recommend that, *before* HRSA develops the ADR process, HRSA should … reform its guidelines regarding manufacturer audits of covered entities.") (emphasis added). But comments cannot "unilaterally expand the scope of [a proposed rule]," nor can they compel an agency "to initiate a separate rulemaking to address" a different problem. *See Sec. Indus. & Fin. Mkts. Ass'n v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 429 (D.D.C. 2014). At bottom, HRSA's auditing guidelines were not a "significant point[]" or "major issue[]" that HHS was required to consider in the ADR rulemaking, particularly in light of the fact that Congress expressly mandated development of the ADR process. *See St. James Hosp.*, 760 F.2d at 1470 (citation omitted).

*Fourth*, for those reasons just explained, the Secretary was also not obligated to address the issues raised in Pharmaceutical Research and Manufacturers of America's ("PhRMA") petition for proposed rulemaking. *See* Compl. ¶ 257. PhRMA's petition (submitted to HHS three weeks prior to issuance of the ADR Rule) asked HHS to initiate a *new* rulemaking to revise both HRSA's auditing

guidelines and guidelines regarding the 340B statute's definition of a covered entity's "patient," two additional measures that PhRMA felt would solve certain program-compliance issues.[18] *See generally* Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,156 (Oct. 24, 1996). But again, the ADR Rule is the culmination of a congressionally mandated rulemaking for the development of a 340B dispute-resolution mechanism. In meeting this mandate, the Secretary was not required to propose an omnibus rule to address separate matters or to solve every potential problem brought to his attention. *See Mobil Oil Expl.*, 498 U.S. at 230-31.

*Lastly*, HHS had no reason to hold Lilly and other manufacturers immune from claims based on recent statutory violations. *See* Compl. ¶162. Lilly suggests that it would be "manifest[ly] unfair[]" to hold it liable for violating the 340B statute during the three-year period preceding the ADR Rule's promulgation simply because it did not expect to be held liable. *Id.* Lilly's position is certainly puzzling. One would expect manufacturers like Lilly to have "ordered their businesses" to comply with their legal obligations, irrespective of whether the imposition of penalties for noncompliance was "imminent." *See id.* And Lilly's position also rings hollow, for manufacturers have been aware of the agency's contract-pharmacy interpretation since 1996 and, in recent years, have known that violating the 340B statute by overcharging covered entities could give rise to steep civil monetary penalties. *See* 42 C.F.R. § 10.11. Therefore, it is simply no answer for Lilly to claim that it expected no consequences for any recent violations of the 340B statute, and it is not unreasonable (or unfair) to hold them accountable for any such violations.

## CONCLUSION

Because each of Lilly's claims are meritless, the Court should dismiss each count or, in the alternative, grant summary judgment for HHS.

---

[18] PhRMA's petition is not attached as an exhibit to Lilly's amended complaint. *See* ¶ 244 (citing "Exh. O"). It can be found at: https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/P-R/PhRMA-Petition-for-340B-ADR-Rulemaking_November-2020.pdf.

Dated: April 19, 2021                    Respectfully submitted,

                                         SARAH HARRINGTON
                                         Deputy Assistant Attorney General

                                         MICHELLE R. BENNETT
                                         Assistant Branch Director

                                          /s/ Kate Talmor
                                         KATE TALMOR
                                         RACHAEL WESTMORELAND
                                         JODY LOWENSTEIN
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, D.C. 20005
                                         (202) 305-5267
                                         kate.talmor@usdoj.gov
                                         *Attorneys for Defendants*