## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ELI LILLY AND COMPANY,<br>Lilly Corporate Center<br>893 Delaware Street<br>Indianapolis, IN 46225,<br><br>and<br><br>LILLY USA, LLC,<br>1500 South Harding Street<br>Indianapolis, IN 46221,<br><br>           Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, in his official capacity as<br>Secretary of Health & Human Services,<br>Office of the Secretary<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>DANIEL J. BARRY, in his official capacity as<br>Acting General Counsel of Health & Human<br>Services<br>Office of the General Counsel<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington D.C. 20201,<br><br>DIANA ESPINOSA, in her official capacity as<br>Acting Administrator of the Health Resources<br>and Services Administration<br>5600 Fishers Lane,<br>Rockville, MD 20852,<br><br>and<br><br>HEALTH RESOURCES AND SERVICES<br>ADMINISTRATION<br>5600 Fishers Lane,<br>Rockville, MD 20852,<br><br>           Defendants. | No. 1:21-cv-81-SEB-MJD<br><br>*Document Electronically Filed* |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

This case concerns the lawful scope of the 340B Drug Pricing Program ("340B Program" or "Program"), which Congress created in 1992 to expand low-income Americans' access to affordable prescription medicines.  *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (adding section 340B to the Public Health Service Act).  Under the 340B statute, pharmaceutical manufacturers "must" offer steep discounts on their products to certain "covered entities."  42 U.S.C. § 256b(a)(1); *see also id.* § 256b(a)(4), (b)(1); *id.* § 1396r-8(a)(1), (5).  And while manufacturers are not formally required to participate in the Program, they have little practical choice but to "opt in[]":  "Manufacturers' eligibility to participate in State Medicaid [and federal Medicare] programs"—which not only "touch[] the lives of nearly all Americans," *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019), but make up a significant portion of manufacturers' annual revenues—"is conditioned on their" participation in the Program. *Astra U.S.A., Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

Cognizant of the constitutional limits on forcing private parties to effectively subsidize other private parties, Congress made clear in the 340B statute that only "covered entities"—a narrowly circumscribed class that Congress defined to be limited to 15 specifically enumerated types of non-profit healthcare providers—could demand these steep discounts.  Entities not included on Congress's list of covered entities, such as for-profit hospitals or big businesses like Walgreens and CVS (the latter of which are referred to in this context as "contract pharmacies"), had no legal basis to demand to receive prescription medications or other product from manufacturers at 340B prices.  *See* 42 U.S.C. § 256b(a)(4).

Yet the government claims that things are different now.  Even though nothing about the statutory limitation regarding covered entities has changed, the U.S. Department of Health and Human Services ("HHS") Office of the General Counsel ("OGC") "released an advisory opinion"

on December 30, 2020, "concluding that drug manufacturers are required to deliver discounts under the 340B Drug Pricing Program [ ] on covered outpatient drugs when contract pharmacies are acting as agents of 340B covered entities." U.S. Dep't of Health and Human Servs., *HHS Releases Advisory Opinion Clarifying that 340B Discounts Apply to Contract Pharmacies* (Dec. 30, 2020), https://bit.ly/38Qh0lB; *see* U.S. Dep't of Health & Human Servs. Office of the General Counsel, *Advisory Opinion 20-06 on Contract Pharmacies under the 340B Program*, at 1 (Dec. 30, 2020) ("December 30 Decision") ("We conclude" that "a drug manufacturer in the 340B Program is **obligated** to deliver its covered outpatient drugs to those contract pharmacies **and to charge the covered entity no more than the 340B ceiling price for those drugs**" whenever a contract pharmacy acts as a covered entity's "agent." (emphasis added)), https://bit.ly/357nqfk.

That is no small matter. Unlike the 15 types of entities Congress enumerated in the statute, contract pharmacies do not exist to serve vulnerable populations, and they rarely pass along any 340B price savings to the patients who purchase 340B drugs. *See* U.S. Gov't Accountability Office ("GAO"), *Discount Drug Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480 ("2018 GAO Report"), at 10-13 (June 2018), https://bit.ly/3kJ7eGa; Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program*, at 3 (Oct. 2020), https://bit.ly/2XryAY5. Indeed, when Defendant the Health Resources and Services Administration ("HRSA"), which administers the Program, first allowed covered entities to enter into an unlimited number of contract pharmacy arrangements for 340B drugs back in 2010 (but did not require manufacturers to honor those arrangements, because nothing in the statute authorizes the government to impose such a requirement), contract pharmacies began "generat[ing] revenue" **to the tune of hundreds of millions of dollars per year** by perverting the Program simply by "purchas[ing] covered outpatient drugs at the 340B Program price for all

3

eligible patients regardless of the patients' income or insurance status" and "receiving reimbursement from patients' insurance that may exceed the 340B prices paid for the drugs." GAO, *340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 5 (Dec. 2019), https://bit.ly/34Vj6zK.

Against this backdrop, and consistent with the plain text and clear purpose of the statute, Plaintiffs Eli Lilly and Company and Lilly USA, LLC (together, "Lilly") announced last summer that it would cease to offer 340B discounts to contract pharmacies on three formulations of its drug Cialis®. Lilly later expanded this new distribution model to include all of its prescription drug products—except when a covered entity lacks an in-house pharmacy. In that limited circumstance, where an outside pharmacy is necessary for a covered entity to dispense covered outpatient drugs to patients, Lilly will permit the covered entity to designate one outside contract pharmacy to receive and dispense 340B product to 340B-eligible patients. To be clear: Lilly still offers full 340B discounts to *all* entities eligible for them, and Lilly will continue to ensure that patients are able to receive 340B product even when a covered entity cannot dispense drugs itself. Lilly's new distribution plan is thus not only a necessary bulwark against contract pharmacy abuses (and a more-than-reasonable response to limit exposure to the raft of penalties the statute authorizes), but is consistent with the plain text and the original intent of the 340B statute.

Yet when Lilly announced that it would no longer allow an unlimited number of contract pharmacies to demand discounts, Defendants threatened Lilly with sanctions. And they have now made good on those threats: Defendants have jettisoned their prior, longstanding, and nonbinding guidance that contract pharmacy arrangements are permissible but not enforceable on pain of penalty in favor of a new, binding decision under which manufacturers like Lilly must offer full 340B discounts to an unlimited number of contract pharmacies on all covered outpatient drugs. If

a manufacturer refuses, Defendants say it will face massive penalties of up to $5,000 per occurrence, plus the potential revocation of the manufacturer's ability to participate in and receive reimbursements under the pervasive Medicare and Medicaid programs.

Worse, Defendants propose to adjudicate manufacturers' liability under this made-up statutory regime using unconstitutional, unlawful, and arbitrary procedures.  Although the goal of the 340B Program was to provide financial support to hospitals and clinics that serve vulnerable populations, Congress did not appropriate federal funds for that purpose; instead, it coerced pharmaceutical manufacturers to effectively subsidize covered entities via the 340B Program as a condition of participating in Medicare Part B and Medicaid.  Congress's decision to set up a taxpayer-to-taxpayer system has had a number of downstream consequences, including creating a lax regulatory environment ripe for for-profit contract pharmacies like CVS and Walgreens to siphon huge sums of money from the Program by partnering with covered entities and engaging in arbitrage.  The decision also ensured that, eventually, 340B disputes between these taxpayers would arise.  Hence, Congress instructed HHS in 2010 to establish an administrative dispute resolution ("ADR") procedure to hear 340B disputes between manufacturers and covered entities. But just as Defendants HHS and HRSA have flouted the clear limitations on their authority vis-à-vis contract pharmacies, they flouted that clear statutory command to establish ADR protocols: Although Congress instructed HHS to establish ADR procedures within 180 days, it took HHS nearly six *years* to promulgate a Notice of Proposed Rulemaking ("NPRM") suggesting ADR procedures and seek public comment—and even then, the NPRM did not last long; recognizing the host of problems with the belatedly proposed rule, HHS withdrew it altogether in 2017.

After ignoring congressional instructions regarding ADR for nearly a decade, HHS finally acted.  Yet instead of issuing a new NPRM or giving any consideration to the concerns that led it

to withdraw the original NRPM in the first place, the agency rushed an ADR regulation out the door at the twilight of the Trump Administration as a panicked response to covered-entity-initiated litigation pressure.  In particular, HHS simply blew the dust off its long-ago-withdrawn rule; pretended that the withdrawn NPRM has been alive the whole time; changed the rule in important ways; and then carried it into immediate effect—all without giving regulated parties any opportunity for public comment.  *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 85 Fed. Reg. 80,632-01 (Dec. 14, 2020) ("ADR Rule").  That is precisely the sort of unlawful agency gamesmanship that federal courts exist to police.

And if the ADR Rule's procedural history is bad (which it is), its substance is worse.  First, it violates the Appointments Clause of Article II of the U.S. Constitution.  The ADR Rule installs Executive Branch employees on ADR panels and gives them the power to adjudicate disputes between private parties and to issue "binding" judgments for money damages.  No superior Executive official has any power to review these employees' decrees or remove them from an ADR panel except for cause, thus making the employees principal Executive officers, and making their non-Presidential appointment contrary to Article II.  Second, the ADR Rule confers on ADR panels the power to issue final judgments for money damages and equitable relief to resolve private rights—authority reserved to Article III courts.  As a result, the ADR Rule is contrary to the Constitution, or, at a minimum, it exceeds Congress's statutory authorization for agency action.

The ADR Rule is also arbitrary and capricious under the Administrative Procedure Act ("APA").  In comments to the NPRM, a number of manufacturers raised concerns about the agency's refusal to at least utilize an independent administrative law judge ("ALJ") to perform quintessentially adjudicatory tasks.  The final ADR Rule not only arbitrarily and capriciously rejects that suggestion, it exacerbates the problem, expanding the panels' powers to include money

judgments and equitable relief (neither of which is in the original NPRM), providing that the panels' decisions will be "precedential" in future cases, and allowing covered entities' agents and trade associations (neither of which has any entitlement to 340B discounts under the statute) to bring ADR panel claims for money damages against manufacturers.

To make matters worse, one of the "judges" of these would-be "courts" is the HHS General Counsel, which is the Office that issued the December 30 Decision (mis-)interpreting the 340B statute to require manufacturers to provide discounts to contract pharmacies whenever the latter act as a covered entity's "agent."  As a result, when confronted with the question of whether a manufacturer can and/or should be subjected to penalties for not offering 340B discounts to for-profit contract pharmacies, the Executive Branch employees who comprise the ADR panels will not apply their expertise in administering a pharmacy benefit program, but rather will apply common law principles of agency to adjudge the legal nature of the relationship between covered entities and contract pharmacies like CVS.  That is a task for an Article III judge, not a bureaucrat. It also confirms that, as a result of the agencies' recent and final actions, the 340B Program writ large has been fundamentally transformed from a system designed to subsidize nonprofit healthcare providers that serve vulnerable patients into an unlawful and unconstitutional forced wealth transfer backstopped by an unlawful and unconstitutional administrative tribunal.

Subsequently, in a May 17, 2021 letter, Defendant Diana Espinosa ordered Lilly comply with Defendants' interpretation of the statute and demanded that Lilly reimburse all instances it did not provide 340B discounts for contract pharmacy transactions.  This letter constitutes additional final agency action, determining that Lilly is in violation of the government's interpretation of the statute, and threatening the imposition of serious civil penalties.  *See U.S. Army Corps of Eng. v. Hawkes*, 136 S. Ct. 1807, 1815 (2016) ("As we have long held, parties need

not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'").  The letter is an unlawful agency decision, not only departing from the agency's settled interpretation of the statute that had been in place at least prior to the December 30 Decision, but also departing from the rationale the agency relied on just five months before in its December 30 Decision.

Lilly therefore brings this action seeking an order:  (1) declaring that the substantive obligation imposed in the December 30 Decision and May 17 Letter violates the APA because it violates the Constitution, is in excess of statutory authority, was issued without following proper procedure, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (2) declaring that Lilly is not required and cannot be required to provide 340B discounts to contract pharmacies (including on covered outpatient drugs acquired by contract pharmacies to replenish drugs that were dispensed to purported patients of 340B covered entities, and drugs not purchased by covered entities); (3) enjoining enforcement of the December 30 Decision, the May 17 Letter, and all actions by Defendants inconsistent with that declaratory relief; (4) declaring that the ADR Rule violates the APA because it violates the Constitution, is in excess of statutory authority, was issued without following proper procedure, and is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law; and (5) enjoining implementation of the ADR Rule.

## THE PARTIES

1.     Plaintiff Eli Lilly and Company is a publicly traded pharmaceutical company organized and existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana.  Eli Lilly and Company participates in the 340B Program.

2.     Plaintiff Lilly USA, LLC is a wholly owned subsidiary of Eli Lilly and Company existing under the laws of the State of Indiana and headquartered in Indianapolis, Indiana.

3.      Defendant HHS is an executive branch department in the United States government headquartered in the District of Columbia.  HHS oversees the activities of HRSA.

4.      Defendant Xavier Becerra sued in his official capacity only, is the Secretary of HHS, and is substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  His official address is in the District of Columbia.  Secretary Becerra has ultimate responsibility for oversight of the activities of HRSA, including with regard to the administration of the 340B Program and the actions complained of herein.

5.      Defendant Daniel J. Barry, sued in his official capacity only, is the Acting General Counsel of HHS.  His official address is in the District of Columbia.  Mr. Barry oversees the Office of General Counsel, which publishes final legal decisions on behalf of the agency.

6.      Defendant HRSA is an administrative agency within HHS and is responsible for administering the 340B Program.  HRSA is headquartered in Rockville, Maryland.

7.      Defendant Diana Espinosa, sued in her official capacity only, is the Acting Administrator of HRSA, and is substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  Her official address is in Rockville, Maryland.  Acting Administrator Espinosa is directly responsible for the administration of the 340B Program and the actions complained of herein.  Acting Administrator Espinosa, among his other duties, has ultimate responsibility for the Office of Pharmacy Affairs ("OPA") in HRSA, which is headed by Rear Admiral Krista M. Pedley of the Public Health Service.  OPA is involved directly in the administration of the 340B Program, as a constituent part of HRSA.

## JURISDICTION AND VENUE

8.      Lilly brings this action under the APA, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is proper because, among other things, Lilly resides in this judicial district and "no real property is involved in the action."  28 U.S.C. § 1391(e)(1).

11.     This Court may grant injunctive and declaratory relief pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–2202.

## FACTS

### I.     Congress Created The 340B Program To Help Vulnerable And Low-Income Patients

12.     Congress established the 340B Program, named for the statutory provision authorizing it in the Veterans Health Care Act of 1992, *see* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (adding section 340B to the Public Health Service Act), to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 WM. & MARY L. REV. 637, 638 (2015); *see* H.R. Rep. No. 102-384 (II), at 12 (1992) (The 340B Program "provides protection from drug price increases to specified Federally-funded clinics and public hospitals that provide direct clinical care to large numbers of uninsured Americans.").  The point of the 340B Program, in other words, was to "create[] a low-cost source of pharmaceutical medication for the indigent patients themselves."  Baer, *supra*, at 638.

13.     Although participation in the 340B Program is formally optional, *see Astra*, 563 U.S. at 117-18, manufacturers have no real choice but to opt in:  Manufacturers cannot receive coverage or reimbursement for their products under Medicaid and Medicare Part B unless they participate in the 340B Program.  42 U.S.C. § 1396r-8(a)(1), (5).

14.     Manufacturers "opt into" the 340B Program by signing a form contract with HHS "for covered drugs purchased by 340B entities."  *Astra*, 563 U.S. at 113, 117.  That form contract is known as the Pharmaceutical Pricing Agreement ("PPA").  *Id.* at 117.

15.     A PPA is not an ordinary contract.  PPAs are entirely composed by HHS, they "have no negotiable terms," and they "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them."  *Id.* at 118.  "The statutory and contractual obligations, in short, are one and the same."  *Id.*

16.     The government may terminate a PPA if it determines that a manufacturer has failed to comply with its obligations.  *See* 42 U.S.C. 1396r-8(b)(4)(B)(v); 61 Fed. Reg. 65,406, 65,412–65,413 (Dec. 12, 1996); PPA §§ IV(c), VI(c).

17.     Under the 340B statute and the terms of the PPA, any manufacturer that participates in the 340B Program must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  42 U.S.C. § 256b(a)(1).  Only "covered entities"—a class of non-profit healthcare organizations the 340B statute defines in painstaking detail—are eligible to participate in the Program and receive these discounts for prescription drugs.

18.     The 340B statute exhaustively defines "covered entities."  The statutory definition enumerates 15 categories of "covered entities" (*e.g.*, "A black lung clinic receiving funds under section 937(a) of title 30"), but not the specific eligible entities themselves (*e.g.*, the Philadelphia Black Lung Clinic).  *See id.* § 256b(a)(4).

19.     Consistent with the 340B Program's overriding goal of helping vulnerable and low-income patients acquire lower-cost access to life-saving medicines, the statute defines "covered entities" to include only organizations that naturally, and often predominantly, serve low-income individuals.  For instance, Federally Qualified Health Centers, children's hospitals, rural hospitals, and other clinics serving vulnerable populations are all specifically defined as "covered entities"

eligible to enroll and participate in the 340B Program. *Id.*; *see also Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 820 (D.C. Cir. 2020).

20.     The statute further makes clear that entities ***not*** on the list—*e.g.*, for-profit hospitals, and commercial businesses such as "contract pharmacies" that profit off manufacturer discounts—are not entitled to receive medications from manufacturers at 340B discounted prices. 42 U.S.C. § 256b(a)(4).

21.     Pursuant to the 340B statute and the terms of the PPA, HRSA publishes on its website a list of specific qualifying "covered entities," which it updates quarterly. *See* 42 U.S.C. § 256b(a)(9); PPA § III.(a).  HRSA treats the quarterly list as definitive and binding on manufacturers. *See* 82 Fed. Reg. 1,210, 1,227 (Jan. 5, 2017).

22.     Covered entities pay significantly discounted prices for "covered outpatient drugs," a category which includes most drugs used on an outpatient basis, according to a prescribed statutory formula. *See* 42 U.S.C. § 256b(a)(1), (a)(4), (b)(1).  The 340B price is calculated by determining the difference between the manufacturer's Average Manufacturer Price and its Medicaid rebate amount, as determined under the Medicaid Drug Rebate Program statute, codified at Section 1927 of the Social Security Act. *Id.* § 256b(a)(1)-(2) & (b).  The resulting prices, known as the 340B "ceiling prices," are significantly lower than what other purchasers would pay for the same product and can even be as low as one penny per pill or per milligram.  Covered entities are then able to turn around and bill patients or insurers the drug's full price, pocketing the difference.

23.     The 340B statute delegates oversight and enforcement responsibilities to HHS.  In addition to requiring HHS to notify manufacturers of the identity of covered entities, *see id.* § 256b(a)(9), the statute authorizes HHS to monitor unlawful drug diversion by covered entities

and to audit covered entities and manufacturers, *see id.* § 256b(d)(1)(B)(vi).  HHS has delegated 340B oversight and enforcement to HRSA, one of the defendants in this suit.

24.    That authority empowers HRSA to evaluate manufacturer compliance with Program requirements, and it may impose civil monetary penalties ("CMPs") on manufacturers that knowingly and intentionally charge covered entities more than the statutory 340B ceiling price for covered outpatient drugs.  In particular, HRSA may impose CMPs of more than $5,000 "for each instance of overcharging" a covered entity.  85 Fed. Reg. 2,869, 2,873 (Jan. 17, 2020); *see* 42 C.F.R. § 10.11(a); 42 U.S.C. § 256b(d)(1)(B)(vi).

25.    In addition to limiting the universe of covered entities, Congress also prohibited covered entities from causing "duplicate discounts or rebates," which means they may not request both a 340B discount and a Medicaid rebate for the same drug.  42 U.S.C. § 256b(a)(5)(A).

26.    And to help ensure that covered entities and others do not inappropriately benefit from the opportunity of 340B price arbitrage, Congress further forbade any "covered entity" from engaging in "diversion," *i.e.*, "resell[ing] or otherwise transfer[ring]" a covered outpatient drug "to a person who is not a patient of the entity."  *Id.* § 256b(a)(5)(B).  In other words, covered entities may not transfer or sell the discounted drugs to any person or entity except their own patients.  The 340B statute does not extend this diversion prohibition to manufacturers—thereby ensuring that if a covered entity lacks an in-house pharmacy through which it can dispense medicines itself, manufacturers may lawfully opt to deliver discounted product to a dispensing pharmacy of the covered entity's choosing (as Lilly has always done and continues, in a more limited fashion, to do still today).

27.    There are two potential forms of diversion at play when covered entities use contract pharmacies.  First, diversion occurs when the covered entities transfer or sell discounted

drugs to any person or entity except their own patients—*i.e.*, to the contract pharmacies.  Second, diversion occurs when covered entities (or contract pharmacies) transfer or sell discounted drugs to patients who are not eligible to receive drugs at discounted prices pursuant to 340B.  In other words, contract pharmacy arrangements, which instruct wholesalers to honor 340B prices to for-profit commercial pharmacies, may be (or at least result in) 340B discounted product being diverted—*i.e.*, "otherwise transfer[red]" to another person or entity in violation of the statute.

## II.   The 340B Statute Neither Requires Manufacturers To Offer Discounts To For-Profit Contract Pharmacies Nor Empowers HHS/HRSA To Impose Such A Requirement

28.   The 340B statute contemplates that manufacturers will provide covered outpatient drugs at 340B discounted prices ***only*** to covered entities.

29.   Nothing in the statute allows, let alone mandates, the use of contract pharmacies or that manufacturers respect an unlimited number of covered entity – contract pharmacy relationships.  In fact, the opposite is true.

30.   Section 340B's plain language limits a manufacturer's obligation to offer 340B prices to "each covered entity."  42 U.S.C. § 256b(a)(1); *see id.* (authorizing the HHS Secretary (and thus HRSA) to "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price").

31.   A contract pharmacy, however, is not a covered entity.

32.   The 340B statute defines the term "covered entity" in exhaustive detail.  In 42 U.S.C. § 256b(a)(4)—titled "'Covered entity' defined"—Congress defined the term as "an entity that meets the requirements described in paragraph (5)," which prohibits diversion and duplicate discounts, "and ***is*** one of the following":

(A) A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act).

14

(B) An entity receiving a grant under section 256a of this title.

(C) A family planning project receiving a grant or contract under section 300 of this title.

(D) An entity receiving a grant under subpart II of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

(E) A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

(F) A black lung clinic receiving funds under section 937(a) of title 30.

(G) A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act.

(H) A Native Hawaiian Health Center receiving funds under the Native Hawaiian Health Care Act of 1988.

(I) An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act.

(J) Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

(K) An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) of this title (relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

(L) A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act that—

> (i) is owned or operated by a unit of State or local government, is a public or private non-profit corporation which is formally granted governmental powers by a unit of State or local government, or is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act or eligible for assistance under the State plan under this subchapter;

> (ii) for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social Security Act) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act; and

(iii) does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

(M) A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act, or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii) of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

(N) An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act), and that meets the requirements of subparagraph (L)(i).

(O) An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act, or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

33.     The 340B statute thus lists 15 different types of entities that can qualify as "covered entities" for purposes of the 340B Program.  Contract pharmacies do not make the list.

34.     Furthermore, neither the 340B statute nor any other provision of law confers upon Defendants authority to require manufacturers to provide discounts to contract pharmacies through any exception process or carve out through a "safe harbor" for unlisted covered entities, or by claiming that contract pharmacies act as the "agents" of covered entities.  That means Defendants have no such authority:  As creatures of statute, agencies like HHS and HRSA have no valid power to act "unless and until Congress confers power upon [them]."  *Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1486 (7th Cir. 1993) (quoting *La. Public Service Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  Congress has not granted any such authority here.

35.     Nor does the 340B statute permit Defendants to obligate manufacturers to offer discounts to contract pharmacies based on the theory that the latter are merely acting as "agents" of covered entities.  To be sure, the statute contemplates that various entities that themselves are

16

not covered entities may effectively step in the shoes of a covered entity in certain, limited circumstances. *See, e.g.*, 42 U.S.C. § 256b(d)(3)(B)(vi) (referring separately to three types of agents, including "associations or organizations representing the interests of [ ] covered entities," rather than simply calling them "covered entities"); *id.* § 256b(d)(1)(B)(v) (same vis-à-vis "wholesalers"); *id*. § 256b(d)(2)(B)(iv) (same vis-à-vis "distributors"). But contract pharmacies are not among them. Contract pharmacies are obviously not wholesalers and distributors (they are retailers). And they are equally not "associations or organizations representing the interests of [ ] covered entities." That latter category encompasses trade associations and the like that lobby and litigate on behalf of covered entities and their interests; it does not include for-profit commercial enterprises that are publicly traded and that represent their own pecuniary interests above all else.

36.     Nor did Congress delegate any discretionary or rulemaking authority to add to or subtract from the list of entities that manufacturers are required to treat as "covered entities" under the Program, or to impose a requirement that manufacturers offer 340B discounts to "associations or organizations representing the interests of [ ] covered entities" on pain of penalty. To the contrary, Congress specifically limited HRSA's authority to undertake rulemaking in the 340B Program to three specific areas: (1) the establishment of an administrative dispute resolution process; (2) the issuance of precisely defined standards of methodology for calculation of ceiling prices; and (3) the imposition of monetary civil sanctions, *see Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 41 (D.D.C. 2014) ("*Orphan Drug I*"), the latter of which is specifically and deliberately limited to instances of overcharging ***covered entities themselves***, not any agents thereof, *see* 42 U.S.C. § 256b(d)(1)(B)(vi)(II)-(III).

37.     In short, HRSA has no authority to create exceptions to the statutory limitation that only the explicitly enumerated "covered entities" may receive 340B discounts. Only Congress

holds that power.  Any agency determination to the contrary is in excess of its statutory authority

and contrary to law.  5 U.S.C. § 706(2)(A); *see FDA v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 125 (2000) (An agency "may not exercise its authority in a manner that is inconsistent

with the administrative structure that Congress enacted." (internal quotation marks omitted)).

### III.   Despite These Statutory Limitations, HRSA Issued Guidance Permitting The Use Of Contract Pharmacies In 1996 And Then Expanded That Permission In 2010, But Stopped Short Of Requiring Manufacturers To Offer Contract Pharmacies Discounts

38.     Until 1996, covered entities purchased and dispensed 340B drugs exclusively

through in-house pharmacies.

39.     In 1996, HRSA issued guidance allowing "contract pharmacies"—typically large,

commercial, for-profit entities—to sign agreements with covered entities to dispense covered

outpatient drugs in connection with the 340B Program.  61 Fed. Reg. 43,549 (Aug. 23, 1996).

40.     This initial allowance for contract pharmacies, which are not themselves covered

entities, was narrow:  Only covered entities without an in-house pharmacy could contract with

contract pharmacies to dispense 340B drugs to the covered entity's patients—and even then, each

covered entity could contract with just a single contract pharmacy.

41.     The 1996 guidance made clear that HRSA itself recognized that it lacks authority

to expand or contract the universe of covered entities.  *See id.* at 43,550.

42.     In issuing the 1996 guidance, moreover, HRSA intentionally chose not to follow

the notice-and-comment requirements of the APA.  *See* 5 U.S.C. § 553(b), (c).  That was because,

in HRSA's view, the guidance amounted merely to an interpretive rule that "create[d] no new law

and create[d] no new rights or duties."  61 Fed. Reg. at 43,550.  *Compare, e.g.*, *Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 97 (2015) ("Interpretive rules do not have the force and effect of law

and are not accorded that weight in the adjudicatory process." (internal quotation marks and

citation omitted)), *with, e.g.*, *Metro. Sch. Dist. v. Davila*, 969 F.2d 485, 489 (7th Cir. 1992)

(legislative rules "create new law, rights, or duties," and must proceed through notice and comment).

43.     In short, HRSA's 1996 allowance for contract pharmacies created no new obligations on manufacturers that do not arise from the statute itself, and it did not require (or even purport to require) manufacturers to deliver 340B discounted product to contract pharmacies; the guidance merely presents HRSA's view that it would not enforce against covered entities in the event they engaged contract pharmacies in limited and highly controlled situations.

44.     The lay of the land from 1996 to 2010 was thus largely consonant with the Program's aims:  In the ordinary course, only covered entities—which, again, uniformly are nonprofit healthcare providers that serve large numbers or proportions of vulnerable patients, not shareholders—could receive 340B discounted drugs from manufacturers.  But if a covered entity lacked an in-house pharmacy, it could contract with one (but only one) nearby pharmacy to dispense 340B discounted drugs to its patients, near or far.

45.     That all changed in 2010, when HRSA issued new guidance significantly expanding covered entities' ability to contract with outside, for-profit pharmacies.  *See* 75 Fed. Reg. 10,272 (Mar. 5, 2010).

46.     This 2010 guidance allows all covered entities, not just those without an in-house pharmacy, to contract with commercial pharmacies to dispense 340B discounted drugs.  It further allows covered entities to enter into an unlimited number of such arrangements with an unlimited number of contract pharmacies—whether the pharmacy is across the street or across the country.

47.     As in 1996, HRSA styled the 2010 guidance as an interpretive rule, did not go through the notice-and-comment procedures, and made clear that the guidance imposed no

obligations.  *Id.* at 10,274; *see also id.* at 10,273 (2010 guidance "neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law").

48.     The 2010 guidance has radically altered—and undermined—the 340B Program. No longer is it a program designed to improve access to drugs among vulnerable patient populations; instead, the Program has become a massive profit engine for large businesses such as Walgreens, CVS, and other for-profit commercial enterprises.

49.     In the first seven years following HRSA's relaxation of the rules, the GAO reported a 1,438% increase in the number of contract pharmacy arrangements, from 1,300 in 2010 to nearly 20,000 in 2017.  2018 GAO Report at 2.  A more recent study reported an even greater, ***4,228%*** increase between 2010 and today.  Vandervelde et al., *supra*, at 4.  And according to HRSA's own figures, there are now tens of thousands of contract pharmacy locations across the country and more than 190,000 arrangements between contract pharmacies and covered entities.  *See* HRSA, OPA 340B OPAIS, *340B Contract Pharmacy Database*, https://bit.ly/3nLdX3X (last visited May 25, 2021).  That is a remarkable figure, particularly given that HRSA's online 340B Covered Entity Database lists only about 50,000 covered entity locations in the entire Program.  *See id.*



Source: https://www.drugchannels.net/2019/07/walgreens-cvs-and-walmart-lead-25000.html.



As of September 2, 2020, the number of contract pharmacy relationships in the OPAIS database has more than doubled since 2019, to **179,048**

The actual number of 340B contract pharmacy arrangements—the number of contractual arrangements between contract pharmacies and the sites of a covered entity—is unknown because HRSA does not require a covered entity to register pharmacies with each of its child sites. Based on GAO analysis of HRSA data, 1,645 covered entities that had at least one child site registered their contract pharmacies only with their parent sites. These 1,645 entities could have as many as **866,388** contract pharmacy arrangements. Therefore, the number of contract pharmacy arrangements is likely higher than what is reported in HRSA's database.

     50.     Some covered entities use staggering numbers of contract pharmacies to dispense 340B Program drugs.  In 2017, for example, the GAO reported that a single covered entity used as many as 439 distinct contract pharmacies—meaning each of those 439 pharmacies would seek

drugs from manufacturers at the 340B prices.  2018 GAO Report at 18.  Covered entities also used

contract pharmacies that were ***thousands of miles*** away.  *Id*. at 22; *see also id.* at 23 n.38 ("The

maximum distance across all covered entities was for a disproportionate share hospital located in

Connecticut that contracted with a pharmacy in Hawaii.").

51.     This dramatic expansion of the use of contract pharmacies cannot be explained by

an increase in the number of covered entities; as of April 2020, the number of arrangements

between contract pharmacies and covered entities far exceeds the number of covered entities

eligible to receive 340B discounted product.[1]  Instead, the "enormous growth in 340B contract

pharmacy arrangements seems to boil down to a single factor:  outsized profit margins" for

pharmacies and covered entities.  Vandervelde et al., *supra*, at 4; *see also* 2018 GAO Report at 23

n.38 (noting that the government's "340B database does not provide information on why a covered

entity may choose to contract with a pharmacy that is located a long distance away").

## IV.     Contract Pharmacies Have Repeatedly And Consistently Abused The 340B Program

52.     The massive expansion of the 340B Program since 2010 has created a number of

program integrity concerns that neither HRSA nor Congress has addressed, despite persistent calls

from drug manufacturers and other industry stakeholders.

### A.     Contract Pharmacies Are Not Required to Pass on 340B Discounted Prices to Patients—And they Rarely Do, Leaving Patients to Pay Full Price

53.     In addition to transforming the 340B Program from a mechanism for increasing

low-income Americans' access to medicines into one enriching for-profit pharmacies, the 2010

guidance has created profound program integrity concerns, enabling (and arguably encouraging)

practices the 340B statute expressly prohibits—namely, drug diversion and duplicate discounts.

---

[1] Lilly respectfully requests that this Court take notice of the documents cited herein (*i.e.*, the government reports and published news sources), as their contents cannot reasonably be disputed and their accuracy can be readily determined.  *See* Fed. R. Evid. 201.

*See* Vandervelde et al., *supra*, at 4 ("The 2010 guidance created an opportunity for sophisticated, for-profit pharmacy chains to realize larger margins than they otherwise could.").

54.     For example, in the Medicare Part B context, government reports have found that covered entities typically paid between 20 and 50 percent below the average sales price for prescription drugs. *See, e.g.*, 85 Fed. Reg. 48,772, 48,886 (Aug. 12, 2020) (the "typical acquisition cost … under the [Medicare Hospital Outpatient Prospective Payment System] is … 34.7 percent" lower than the average sales price).   Yet when they dispensed the drugs, they received the full reimbursement from Medicare.   GAO, *Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals*, GAO-15-442 (June 2015), https://bit.ly/3q3yG4p.   In other words, covered entities with in-house pharmacies have generated considerable revenue via the 340B Program even without contract pharmacies.

55.     That transfer of value from manufacturers to covered entities—all non-profit healthcare providers—is one thing.   It is quite another for the government to force manufacturers to allow for-profit pharmacy chains like Walgreens and CVS to get in on the action.   *See* 2018 GAO Report at 20 (75% of 340B contract pharmacies are commercial chain pharmacies).   The five biggest retail chains (including, *e.g.*, CVS and Walgreens) together represent 60% of 340B contract pharmacies, but only 35% of pharmacies nationwide.   *Id.* at 21.

56.     Yet, under the current model, that is precisely what is happening.   Like covered entities, contract pharmacies pay significantly discounted prices, known as ceiling prices, on outpatient drugs when they act on covered entities' behalf.   Contract pharmacies are also permitted to—and typically do—bill the patient's third-party insurer or otherwise charge the patient out of pocket, thereby generating profits from the substantial difference between the low acquisition price mandated by the 340B statute and the higher reimbursement value of the drug.   The covered entity

then pockets this "spread" and typically pays the contract pharmacy either a pre-negotiated fee or a share of the spread for each covered outpatient drug dispensed.

57.     What that means in practice is simple, but pernicious:  Contract pharmacies can use covered entities to secure huge discounts on pharmaceuticals, but then turn around and charge patients full price, and kick back some part of the difference to the covered entity—capturing a nontrivial portion of the discounts intended to benefit vulnerable patient populations in the process.

58.     Under the current model, contract pharmacies therefore may purchase prescription drugs at these same steep discounts from the manufacturer list prices (in some cases, as low as one penny), but then turn around and sell them for the full list price.  *See* 85 Fed. Reg. at 48,888.

59.     Contract pharmacies unsurprisingly have profited greatly from this arrangement. "The average profit margin on 340B medicines commonly dispensed through contract pharmacies is an estimated 72 percent, compared with just 22 percent for non-340B medicines dispensed through independent pharmacies."  Vandervelde et al., *supra*, at 3; *see also* Raymond James, *340B Pharmacy Follow Up—Less Than $1.4B but Still Yuge*, at 1 (Sept. 9, 2020) (Walgreens generated profits "in the hundreds of millions" through 340B contract pharmacy arrangements).  A recent industry analysis found that covered entities and their contract pharmacies generated ***more than $13 billion in estimated profits*** from 340B purchased medicines in 2018 alone.  Vandervelde et al., *supra*, at 7.  While the 340B Program was "originally intended to provide healthcare services to indigent populations," "more than half of all profits realized by the 27,000 340B contract pharmacies participating in the 340B [P]rogram today are concentrated in just four companies," all of which are for-profit entities that are under no obligation to—and typically do not—pass on any portion of the discounts they receive to the patients the 340B Program is designed to help.  *Id.*

24

60.     Despite the 340B Program's objective of providing affordable drugs to underserved patients, contract pharmacies are not even required to "pass along" to patients the spread between the discounted acquisition prices from manufacturers and the reimbursement paid by an insurer (or the price charged to the uninsured patient).   Nor are there any restrictions or reporting requirements related to how or even if the contract pharmacy redirects this 340B savings to benefit low-income or underserved patients in other ways.   In other words, any entity obtaining 340B discounts—including a contract pharmacy—may decide to keep the full savings without ever passing the discounts along to any patient it serves.   Without any reporting requirements to HRSA or otherwise, contract pharmacies can freely direct fungible money generated from the 340B Program savings to any cause without accountability, including their own bottom line.

61.     These are not hypothetical concerns.   Government reports show that "large numbers of low-income patients" that Congress intended to benefit from the 340B Program do not receive the substantial discounts on drugs dispensed through contract pharmacies.   H.R. Rep. No. 102-384, at 10.   For example, in response to a 2018 GAO survey, 45 percent of covered entities admitted they do not pass along *any* discount to *any* patients that use *any* of their contract pharmacies.   2018 GAO Report at 30.   Nor is there reason to believe the remaining 55 percent does.   The GAO specifically noted that the remaining surveyed entities using contract pharmacies may only provide discounts to patients in limited cases.   *Id*.   By contrast, it noted that 17 of 23 covered entities that used in-house pharmacies—instead of contract pharmacies—reported offering discounts to their patients.   *Id.*

62.     Add it all up, and a program designed to benefit needy American patients has become a mechanism for multiplying large, for-profit pharmacy chains' profit margins while exposing manufacturers to greater risk of duplicate discounts, diversion and potential penalties.

For instead of reinvesting the profits they generate from the 340B Program to expand access to affordable prescription drugs, contract pharmacies simply pocket the money.

63.     Many businesses are not even trying to hide what they are doing; some covered entities contract with hundreds of different commercial pharmacies that are located up to 5,000 miles away.  Such faraway contract pharmacies rarely, if ever, actually dispense discounted drugs to needy patients; they simply engage in arbitrage, as they are under no obligation to pass on discounts to patients.  It is little wonder, then, that a recent *New England Journal of Medicine* study found that covered entities' "[f]inancial gains" under the 340B Program post-2010 "have not been associated with clear evidence of expanded care or lower mortality among low-income patients." Sunita Desai & J. Michael McWilliams, *Consequences of the 340B Drug Pricing Program*, 378 N. ENGL. J. MED. 539, 539 (Feb. 8, 2018); *see also* 2018 GAO Report at 10.

64.     Even members of Congress have elevated concerns about for-profit, retail pharmacy chains taking advantage of the 340B Program to turn enormous profits.  In July 2013, for example, U.S. Senator Chuck Grassley sent a letter to Walgreens CEO Gregory Wasson detailing concerns about Walgreens' 5,400 contract pharmacy locations and demanding information such as a "summary of all profits generated as a result of participating in the 340B [P]rogram as a contract pharmacy."  *See* Ltr. from U.S. Sen. C. Grassley to G. Wasson (July 31, 2013), https://bit.ly/3rFSE6N.  The letter reported that Walgreens employees projected dispensing 340B discounted drugs through Walgreens contract pharmacies would "add a ***minimum of $250 million***" in revenue over a 5-year period.  *Id.* (emphasis added).

65.     Those projections were accurate—if anything, they understated the amount the pharmacies stood to make.  A September 2020 analysis by an investment bank confirmed that Walgreens had generated profits through 340B contract pharmacy arrangements "***in the hundreds***

*of millions*." *See* Raymond James, *supra* (emphasis added). This is why Walgreens' October 15, 2020 10-K regulatory filing reported that any pricing changes "in connection with the federal 340B drug pricing program[] could ***significantly reduce our profitability***." *See* Walgreens Boots Alliance, Inc., Form 10-K, at 23 (Oct. 15, 2020), https://bit.ly/2MoLX9d (emphasis added).

66.    Uninsured patients also suffer from this contract pharmacy abuse. The HHS Office of Inspector General ("OIG") found that many contract pharmacies do not offer 340B discounted prices to uninsured patients. HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 2014), https://bit.ly/2LwZrzl. As a result, "uninsured patients pay the full non-340B price for their prescription drugs at contract pharmacies." *Id.*; *see also* Desai & McWilliams, *supra*, at 539 (340B-related "[f]inancial gains" post-2010 "have not been associated with clear evidence of expanded care or lower mortality among low-income patients.").

**B.    Contract Pharmacy Arrangements Flout the 340B Statute's Explicit Prohibitions on Diversion and Duplicate Discounts**

67.    In addition to capturing as profits the price savings intended to benefit patients in need for price assistance on life-saving prescription medicines, contract pharmacy arrangements have also led to diversion and duplicate discounts. As described above, contract pharmacy arrangements arguably constitute diversion *per se*. But even if the transfer of discounted drugs from a covered entity to a contract pharmacy (*i.e.*, an entity that is not the covered entity's own patients) is not diversion *per se*, contract pharmacy arrangements increase the incidence of a second and no less troublesome form of diversion in all events. Contract pharmacies fill prescriptions for both 340B and non-340B patients, and many contract pharmacies do not determine eligibility until weeks after the patient receives her prescription, meaning contract

pharmacies can improperly claim discounts for ineligible patients.  In other words, they claim 340B discount prices for drugs provided to patients not eligible under the 340B Program.

68.     Since 2010, government agency reports have disclosed shocking numbers of 340B violations by contract pharmacies, including violations of the prohibition on drug diversion to ineligible patients and the prohibition on "duplicate discounts"—*i.e.*, where the entity buying the drug from the manufacturer makes the manufacturer pay both a 340B discount and a Medicaid rebate on the same utilization, *see* 42 U.S.C. § 256b(a)(5)(A).  *See, e.g.*, GAO, *Manufacturer Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement*, GAO-11-836 ("2011 GAO Report"), at 28 (Sept. 2011) ("Operating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in house pharmacies."), https://bit.ly/2JvWKgJ.

69.     In 2018, as the number of contract pharmacies burgeoned without any government oversight, the HHS OIG acknowledged before Congress that it had "identified a number of challenges and inconsistencies arising from the widespread use of contract pharmacy arrangements."  HHS OIG Testimony, *Examining Oversight Reports on the 340B Drug Pricing Program, Testimony of Ann Maxwell, Assistant Inspector Gen. for Evaluation and Inspections, OIG Before the U.S. S. Comm. on Health, Educ., Labor, and Pensions*, at 5 (May 15, 2018), https://bit.ly/3lCv4Uj.  That same HHS OIG testimony revealed that certain contract pharmacies unlawfully diverted drugs through their uncontrolled inventory management practices:  "many contract pharmacies dispense drugs to all of ***their*** customers—340B-eligible or otherwise—from ***their regular inventory***."  *Id*. at 6 (emphases added).

70.     Another GAO report found that two-thirds of 340B diversion violations uncovered in HRSA audits "involved drugs distributed at contract pharmacies."  2018 GAO Report at 44.

71.     Publicly available HRSA audits underscore pervasive compliance issues involving contract pharmacies.  HRSA audits routinely uncover dozens of instances of unlawful 340B drug diversions, despite HRSA auditing fewer than 200 entities per year:

| Fiscal Year | Entity Audits | Entities with Contract Pharmacy Adverse Findings (All) | Entities with Contract Pharmacy Adverse Findings (Diversion) |
|---|---|---|---|
| 2013 | 94 | 32 | 21 |
| 2014 | 99 | 51 | 38 |
| 2015 | 201 | 92 | 64 |
| 2016 | 200 | 81 | 68 |
| 2017 | 199 | 83 | 63 |
| 2018 | 200 | 63 | 43 |
| 2019 | 199 | 30 | 20 |

Source:   HRSA, *340B Program Integrity, Audits of Covered Entity Results* (Apr. 2020), https://bit.ly/38MxknH.

### C.     The Government Has Utterly Failed to Rectify These Abuses

72.     These marked shifts away from the 340B Program's intended goals come as no surprise to industry players, who vociferously objected to HRSA's 2010 expansion.

73.     When HRSA issued the 2010 guidance that allowed covered entities to enter into an unlimited number of contract pharmacy arrangements, industry stakeholders expressed concern that the guidance expanding distribution to an unlimited number of contract pharmacies—entities never mentioned in the statute—was unlawful and unauthorized under the 340B statute.

74.     Stakeholders also expressed concern that expanding the Program to allow covered entities to enter into an unlimited number of arrangements with commercial contract pharmacies would cause program integrity issues, increasing the risk of the already-widespread noncompliance with the statute's requirements for covered entities and prohibitions on drug diversion and duplicate discounts, and that the financial incentives related to participating in the

340B Program, coupled with HRSA's proposal to permit unlimited contract pharmacy relationships, would inevitably cause for-profit contract pharmacies to dominate the Program. As one commenter put it, HRSA's "guidelines do not adequately describe safeguards that will combat drug diversion and duplicate discounts." 75 Fed. Reg. at 10,273.

75.     The government was, and remains, well aware of the abuses the contract pharmacy model has precipitated. *See, e.g.*, *id.* (noting but waiving away such concerns); Exhibit ("Exh.") A (Ltr. from Reps. Larry Bucshon, M.D., & Brad Wenstrup, D.P.M., to The Honorable Alex M. Azar, II (Oct. 15, 2020)) ("We have received reports that covered entities and/or their contract pharmacies are able to charge uninsured and potentially under-insured individuals mark-ups on prescriptions [sic] drugs" and "that patients in the 340B program, including the uninsured, can—and often do—bill cash-paying patients the 'usual and customary' pharmacy price plus a dispensing fee."); *see also, e.g.*, 2018 GAO Report at 44 (approximately two-thirds of diversion "involved drugs distributed at contract pharmacies"); HHS OIG Testimony, *supra*, at 5 (OIG "identified a number of challenges and inconsistencies arising from the widespread use of contract pharmacy arrangements"); H. Energy & Commerce Committee, *Review of the 340B Drug Pricing Program*, at 75 (Jan. 20, 2018) (HRSA's guidance "has led to concerns about whether the money is truly devoted to improving patient care"), https://bit.ly/3pyqNUk; 2011 GAO Report at 28 (contract pharmacy model "creates more opportunities for drug diversion compared to in-house pharmacies").

76.     Yet HRSA and HHS have completely ignored these realities—and the text of the 340B statute—for a decade now, thus allowing for-profit pharmacy chains to come to represent a disproportionate share of this contract pharmacy expansion. *See* 2018 GAO Report at 21; *see also* GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*,

GAO-21-107 ("2020 GAO Report"), at 15-16 (Dec. 2020) (noting that HRSA stopped auditing contract pharmacies "because the 340B statute does not address contract pharmacy use" and thus provides no standard against which to audit contract pharmacies' abuses), https://bit.ly/3hfFVD8.

**V.  Lilly Introduced Distribution Plans Designed To Curb Contract Pharmacy Abuses Consistent With The 340B Statute**

77.     Against this backdrop, Lilly introduced a new distribution program that complies with the 340B statute's text and purpose and would curb the abuses the 2010 guidance unleashed.

78.     Effective July 1, 2020, Lilly instructed its wholesalers to provide 340B discounts exclusively to covered entities and their child sites—and not to contract pharmacies—for certain formulations of Cialis® (tadalafil).  Lilly limited its July 2020 plan to those Cialis® products indicated for erectile dysfunction and for which a generic formulation was available.  The Cialis® distribution plan included an exception for covered entities that do not have an in-house pharmacy, permitting them to designate one contract pharmacy location as eligible to receive 340B discounts.

79.     In August 2020, after rolling out the transition for Cialis® products, Lilly extended its distribution plan to all of Lilly's covered outpatient drugs under the 340B Program.

80.     Reflecting Lilly's commitment to the original goal of the Program, however, Lilly is continuing to allow covered entities that lack an in-house pharmacy to designate a single contract pharmacy at which 340B medicines may be dispensed, and Lilly also allows contract pharmacies that are wholly owned by a covered entity to access 340B-priced product.  Lilly also recently began to allow covered entities with an in-house pharmacy that does not dispense retail products to designate a single retail contract pharmacy.  As these accommodations make clear, Lilly fully intends to continue to work flexibly with all stakeholders to refine its distribution plan as needed.

81.    To be clear:  Lilly continues to offer all covered outpatient drugs to all covered entities at (or below) the ceiling price, and even continues to allow contract pharmacies to dispense its 340B product when a covered entity lacks the capacity to dispense prescription medicines itself.

82.    Furthermore, reflecting Lilly's commitment to making insulin products affordable, and following on the heels of an Executive Order issued by the President on July 24, 2020, Lilly made an exception for insulin patients, under which a covered entity may use a contract pharmacy to dispense insulin to 340B patients so long as the contract pharmacy agrees to pass on the entire 340B discount—in this case, one-penny-per-milliliter prices—to the patient.

83.    The Executive Order echoes key concerns that many stakeholders, including government entities and officials, have expressed about the 340B Program—namely, that "one penny per unit … steep [340B] discounts … are not always passed through to low-income Americans at the point of sale," and that "[t]hose with low-incomes can be exposed to high insulin and injectable epinephrine prices, as they often do not benefit from discounts negotiated by insurers or the Federal or State governments."  Exec. Order No. 13,937, 85 Fed. Reg. 45,755 (July 29, 2020) (ordering HHS to ensure that future grants available to Federally Qualified Health Centers, one type of 340B covered entity, be conditioned on making insulin and injectable epinephrine available to patients at the 340B-discounted price).  In other words, contract pharmacies failed to pass along 340B discounts even though they purchased insulin products at *one penny* per milliliter.

84.    These voluntary measures by Lilly are consistent with other patient-focused programs Lilly has initiated to help patients reduce out-of-pocket expenses, particularly uninsured patients, senior citizens covered by Medicare Part D, and patients with high-deductible plans.

85.     For instance, Lilly provides automatic discounts at retail pharmacies to any patient with commercial insurance, capping monthly insulin costs at $95.  Lilly also distributes three non-branded insulins with a list price 50 percent lower than brand name alternatives and donates insulin for distribution at free clinics for qualifying patients with demonstrated financial need.  In 2019, Lilly's insulin affordability solutions helped up to 20,000 patients per month, decreasing patients' out-of-pocket spending by 65 percent on average.  And Lilly expanded its patient affordability options for insulin last year to respond to the financial consequences of COVID-19, announcing in April 2020 that both uninsured and commercial-insurance patients can purchase a prescription of certain Lilly insulin products for $35 a month through the Lilly Insulin Value Program.  Lilly also recently began participating in the CMS Innovation Center's Medicare Part D insulin cost sharing program, making affordable insulin available for patients covered by Medicare Part D.

86.     Early in the pandemic, Lilly developed, at its own expense, a highly accurate COVID-19 test that it administered for free to front-line healthcare workers and first responders in Indiana.  Lilly has also devised and made available ventilator splitters that allowed ventilators to serve two patients at once.  In addition, Lilly has invested hundreds of millions of dollars developing COVID-19 treatments—including two monoclonal antibody treatments already in human trials and two other molecules to treat COVID-19-induced acute respiratory distress syndrome—and recently received emergency use authorization for two COVID-19 treatments.

87.     Lilly also donates substantial sums to the Lilly Cares program, an independent 501(c)(3) that provides up to a one-year supply of Lilly medications for free to low-income patients with no insurance, Medicare Part D, and in some instances commercial insurance.

**VI.    HRSA First Approves Lilly's Distribution Plan, But Then—After Telling The Public It Lacks Authority To Do So—Threatens Sanctions In Response To Lilly's Attempt To Comply With Section 340B And To Halt Contract Pharmacy Diversion**

**A.    HRSA Repeatedly Confirms that the 1996 and 2010 Contract Pharmacy Guidance Are "Not Legally Enforceable"**

88.    Lilly was transparent with the government about its distribution plans, informing the government of both the initial Cialis® plan and the later expanded plan.

89.    Lilly first notified HRSA in May 2020 that it intended to implement the Cialis® distribution plan effective July 1, 2020.  *See* Exh. B.  Lilly explained to HRSA that it did "not believe 340B-priced purchases for contract pharmacies are consistent with or required by" the 340B statute, and it accordingly would "no longer honor contract pharmacy-related requests" for the three Cialis® formulations "[u]nless HRSA objects and states that it believes [Lilly's] proposed discontinuation of voluntary contract pharmacy 340B discounts is unlawful, providing [Lilly] the reasons for its conclusions."  *Id.* at 1-2.

90.    HRSA responded on June 11, 2020, that "contract pharmacies" "are not independent covered entities" and that its "contract pharmacy advice" was "guidance" and "not binding regulations."  Exh. C at 1-2.  To be clear:  HRSA did not state that Lilly's Cialis® distribution plan was unlawful or identify any statutory provision that it violated.

91.    Lilly followed up with HRSA on June 16, 2020, thanking HRSA for "confirming" that the agency's contract pharmacy guidance "does not impose binding obligations on manufacturers" requiring them to offer 340B discounts to contract pharmacies.  Exh. D at 2-3.  Lilly also pointed out that, in HRSA's June 11 response, the agency "did not say that [Lilly is] prohibited from moving forward" or "that [Lilly's] proposed action would, in fact, violate the statute."  Lilly thus asked HRSA to correct any misinterpretation by Lilly on that score.  *Id.* at 2.

92.     HRSA responded to Lilly on June 18, 2020.  Far from stating that Lilly had misunderstood HRSA's position, HRSA confirmed that it "look[ed] forward to receiving" Lilly's manufacturer notice announcing its Cialis® distribution plan for posting on the HRSA website. *Id.* at 1-2.  For the second time, HRSA failed to identify any statutory provision that Lilly's distribution plan violated and did not assert that the distribution plan was in any way unlawful.

93.     On June 26, 2020, Lilly provided the published notice relating to its Cialis distribution plan, and again invited HRSA to raise any questions or concerns that it might have. *See id.* at 1.  HRSA responded on June 29, 2020, stating that it did not have any further questions at this time; HRSA then posted Lilly's notice to covered entities on its 340B Program website on July 1, 2020, without objection.  *See* HRSA, *Manufacturer Notices to Covered Entities* (July 2020) (linking to *Limited Distribution Plan Notice for Cialis® (tadalafil) Erectile Dysfunction NDCs*, https://bit.ly/3n3DaWS), https://bit.ly/3hzDOua.

94.     Days later, a 340B-focused publication, the *340B Report*, published an article quoting HRSA's reaction to Lilly's Cialis® distribution program and confirming that its 2010 Contract Pharmacy Guidance was non-binding, this time describing it as "not legally enforceable":

> The 2010 guidance is still in effect.  However, guidance is not legally enforceable.  Regarding the 340B Program's guidance documents, HRSA's current authority to enforce certain 340B policies contained in guidance is limited unless there is a clear violation of the 340B statute.

Tom Mirga, *HRSA Says its 340B Contract Pharmacy Guidance Is Not Legally Enforceable*, 340B Report (July 9, 2020), https://bit.ly/2X0I1xe.  And far from asserting that Lilly's conduct was unlawful, the article stated that "[i]t appears now that HHS and HRSA have concluded that Lilly cannot be compelled to provide 340B discounts on drugs dispensed by contract pharmacies." *Id.* Lilly came to the same conclusion based on its communications with the agency.

95.     Thereafter, on July 16, 2020, 340B Coalition (a trade association for 340B hospitals) and certain other 340B covered entity stakeholders wrote to Defendant Azar, asking him to declare that Lilly's Cialis® distribution program violated the 340B statute—specifically, that it violated the requirement that manufacturers "offer *each covered entity*" no more than the ceiling price for all "covered outpatient drugs." *See* 42 U.S.C. § 256b(a)(1) (emphasis added).

96.     In response to that intervention, Lilly sent a letter to Defendant HHS the next day, describing its communications with HRSA and explaining why Lilly's distribution plan complies with the 340B statute.  Exh. E.  HHS did not respond to Lilly for over two months (as discussed below), and even then, never stated that Lilly's distribution plan would violate the 340B statute.

**B.     HRSA and HHS Suddenly Change Course, Threatening Lilly with Sanctions**

97.     On August 19, 2020, with the transition for the Cialis® products underway, Lilly informed HRSA that it would extend its new distribution plan to include all of Lilly's covered outpatient drugs under the 340B Program (*i.e.*, not just Cialis), by "discontinu[ing] [its] practice of voluntarily honoring requests for 340B 'contract pharmacies' for orders on all Lilly products." Lilly explained that HRSA had already confirmed that the 2010 Contract Pharmacy guidance was non-binding when discussing the plan for Cialis® and "the legal analyses performed previously by HRSA and Lilly apply equally here."  Exh. F at 1.  And as with its Cialis® program, Lilly provided HRSA an opportunity to object to Lilly's plan and, if it did, to explain its reasoning by August 31, 2020.  *See id.*  Lilly also provided HRSA with an updated Limited Distribution Plan Notice for posting on the agency's manufacturer notices website on September 1, 2020, the effective date of Lilly's new distribution plan.  *See* Exh. G.

98.     On August 26, 2020, HRSA sent Lilly a letter (Exh. H) purporting to respond not only to Lilly's August 19 expansion letter, but also to the original Cialis® program letter dated

May 18, 2020—even though correspondence for that initial program had ended more than a month earlier with HRSA stating that the agency did not have any further questions, *see* Exhs. A, B.

99.     Although HRSA and HHS had previously declined to state that Lilly's conduct was unlawful despite at least four opportunities to do so, HRSA threatened that Lilly could be subject to sanctions if it followed through with its expanded distribution plan.  Specifically, in its August 26 response to Lilly, HRSA stated that it was "considering whether your new proposed policy constitutes a violation of section 340B and whether sanctions apply," including, but "not limited to, civil monetary penalties pursuant to 42 U.S.C. § 256b(d)(1)(B)(vi)."  Exh. H at 1.

100.    Given the significance of HRSA's threat, which carried the prospect of subjecting Lilly to CMPs—not to mention the potential revocation of Lilly's PPA and thus ability to participate in and receive reimbursements pursuant to Medicare Part B and Medicaid—Lilly responded to HRSA the next day (August 27, 2020).  *See* Exh. I.  In its August 27 letter, Lilly reiterated its position that its distribution program was entirely lawful under the plain text and original understanding of the 340B statute.  *See id.* at 1.  Lilly also highlighted the imminent harm resulting from HRSA's "threats of sanctions," which were transparently designed to force Lilly to acquiesce to HRSA's position.  *Id.*  Lilly accordingly requested that HRSA "confirm by August 31st that nothing in the 340B Statute prohibits the Cialis Limited Distribution Plan or an expansion of that plan," and that if HRSA believed there was a "violation of the statute, [to] please identify with specificity the agency's grounds for that position."  *Id.*

101.    HRSA neither responded nor posted Lilly's updated notice on its website.  Instead, on September 2, 2020, it released a new public statement to the *340B Report* reiterating its threat. HRSA stated to the *340B Report* that it was "considering whether manufacturer policies, ***including Lilly's***, violate the 340B statute and whether sanctions may apply."  Bronwyn Mixter, *HRSA is*

*Investigating Whether Manufacturer Policies to Restrict 340B Pricing at Contract Pharmacies Violates Statute*, 340B Report (Sept. 2, 2020) (emphasis added), https://bit.ly/3aWgZPT.

102.    In light of these threats, Lilly reached out to HHS on September 8, 2020, seeking "confirmation that HHS is not considering, and will not consider, sanctions against Lilly in response to Lilly's stated plan to discontinue providing 340B discounts to contract pharmacies." Exh. J at 1; *see also id.* at 1-5.

103.    HHS responded nearly two weeks later on September 21, 2020.  *See* Exh. K.  HHS did not state that Lilly's distribution plan was unlawful.  *See id.*  Nor did it identify a single statutory provision that the plan violates.  *See id.*  Nevertheless, HHS declined to state that neither HRSA nor HHS was considering sanctions against Lilly.  *See id.*  And rather than defusing HRSA's threats of sanctions against Lilly, HHS issued a threat of its own, telling Lilly to "bear in mind" that a private "qui tam False Claims Act" action (which carries the potential of huge damages) is a "potential consequence in the event that Lilly knowingly violates a material condition of the program that results in over-charges to grantees and contractors."  *Id.* at 2.

104.    HHS    immediately    posted    this    threat    on    its    public    website.    *See* https://www.hrsa.gov/sites/default/files/hrsa/opa/pdf/hhs-eli-lilly-letter.pdf (last visited May 25, 2021).  After that public posting, many covered entities reached out to Lilly to demand that Lilly reverse its distribution plan and offer full 340B discounts to all contract pharmacies.  HRSA still did not post Lilly's updated manufacturer notice on its 340B website.

105.    On December 9, 2020, HRSA sent a letter to the CEO of 340B Health, a group that represents covered entities, regarding the modified distribution programs of Lilly and other manufacturers, stating that it was "continuing to review the various proposals and whether these actions by manufacturers violate the 340B statute and whether sanctions may apply."  Exh. L at 1.

38

HRSA added that it was "working closely with each impacted covered entity," "actively investigating the matter in order to make a final determination as to any potential action."  *Id.* at 2.  HRSA still did not post Lilly's updated notice on its 340B website (and has not to this day).

106.    In early- and mid-December 2020, the GAO reported that HRSA acknowledged that "the 340B statute does not address contract pharmacy use," 2020 GAO Report at 16, and counsel for HHS and HRSA described movements to compel "participation through contract pharmacies" as improper attempts to foist "wholesale changes to an agency program" on the government, *see* Defs.' Mot. to Dismiss for Lack of Jurisdiction 19-20, *Ryan White Clinics for 340B Access v. Azar*, No. 20-cv-2906 (D.D.C. Dec. 14, 2020), Dkt. 41.

**VII.    HRSA Issues A Final Decision Concluding, Contrary To The Text And Purpose Of The Statute, That Manufacturers Must Offer 340B Discounts To An Unlimited Number Of Contract Pharmacies Whenever Covered Entities Ask**

107.    On December 30, 2020, Defendants resolved any doubt about their position on the issue.  They did so by issuing a decision making clear that they now (incorrectly) "conclude" that "a drug manufacturer in the 340B Program is ***obligated*** to deliver its covered outpatient drugs to those contract pharmacies ***and to charge the covered entity no more than the 340B ceiling price for those drugs"*** whenever a contract pharmacy acts as a covered entity's "agent."  December 30 Decision at 1 (emphasis added); *see also HHS Releases Advisory Opinion Clarifying that 340B Discounts Apply to Contract Pharmacies* (Dec. 30, 2020) (noting that HHS "has clarified that drug manufacturers must provide 340B discounts when a contract pharmacy is acting as an agent of a covered entity, providing services on behalf of the covered entity"), https://bit.ly/38Qh0lB.

108.    In issuing that decision, Defendants acknowledged that they are not "authorized to add requirements to the [340B statute]."  December 30 Decision at 2.

109.    Defendants further recognized that "the core requirement of the 340B statute, as also reflected in the PPA and Addendum, is that manufacturers must 'offer' covered outpatient

drugs at or below the ceiling price for 'purchase *by*' *covered entities*."  *Id.* at 2 (emphasis added).
(Recall that Lilly in fact is continuing to offer all covered outpatient drugs to covered entities at or
below the ceiling price, and has always done so.)

110.    Defendants nonetheless "conclude[d]"—for the first time, and in contrast to every
other pronouncement HRSA and HHS had previously made on the subject—that "the plain text of
the statute" *requires* manufacturers participating in the 340B Program to offer discounts to contract
pharmacies whenever a covered entity is the one that placed the order for the drugs.  *Id.* at 3.

111.    Defendants' cursory textual analysis began from the "understand[ing]" that the
340B Program functions as follows in practice:   "the medications at issue are sold by the
manufacturer to the covered entity; the covered entity takes title and the covered entity pays the
manufacturer either directly or through the manufacturer's distributor."  *Id.*

112.    Defendants then concluded that, under the 340B statute, "[t]he situs of delivery, be
it the lunar surface, low-earth orbit, or a neighborhood pharmacy, is irrelevant" to the statutory
obligation to charge no more than the ceiling price.  *Id.*

113.    That was the sum-total of Defendants' textual analysis.  Defendants did not address
the fact that Congress exhaustively enumerated 15 types of entities as "covered entities" and
specifically limited that class to non-profit healthcare providers, or that the 340B statute authorizes
HHS and HRSA to impose CMPs for "each instance" that a manufacturer "knowingly and
intentionally" overcharges "a covered entity," 42 U.S.C. § 256b(d)(1)(B)(vi)(II)-(III), *not* "a
covered entity or its non-in-house pharmacy" or "a covered entity and its contract pharmacy."  And
they likewise nowhere reconciled their conclusion with the fact that the statute unambiguously
distinguishes between "covered entities" and agents—*i.e.*, "associations or organizations
representing the interests of [] covered entities," "wholesalers," and "distributors."  *See id.*

§ 256b(d)(1)(B)(v), (2)(B)(iii), (3)(B)(vi).  Nor did they reconcile this novel interpretation, which *requires* manufacturers to offer 340B discounts to an unlimited number of contract pharmacies, with the position they had taken for approximately fifteen years (and had reiterated mere months before) that the guidance allegedly creating this "obligation" is "legally unenforceable."

114.    Nor did Defendants acknowledge, let alone defend against, the severe constitutional concerns raised by a requirement that one set of private parties (manufacturers) offer another set of for-profit private parties (contract pharmacies) massive discounts on pain of having their ability to participate in and be reimbursed under Medicare Part B and Medicaid.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) ("[I]t has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B.").

115.    Instead of tackling any of these arguments head-on, Defendants simply waived them away as bad-faith "attempt[s] to circumvent section 340B's procedures for resolving disputes between manufacturers and covered entities."  December 30 Decision at 5.

116.    Defendants spent the majority of the Decision rejecting "[t]he argument that [because] the statute also evinces a purpose to prevent drug diversion or duplicate discounting, [it] therefore prohibits contract-pharmacy arrangements."  *Id.* at 3 n.2; *see id.* at 4-7.  Notably, however, Defendants did not dispute that contract pharmacy arrangements have multiplied the incidence of diversion and duplicate discounting exponentially.  Nor could they:  Defendants had previously recognized that fact many times.  *See, e.g.*, Kenneth Yood, *Maneuvers on the 340B Drug Pricing Program Battlefield: Duplicate Discounts and Contract Pharmacies*, Healthcare Law Blog (Sept. 29, 2020) ("In a 2011 GAO report, … the GAO concluded that the 'increased use of the 340B program by contract pharmacies and hospitals may result in greater risk of drug diversion, further heightening concerns about HRSA's reliance on participants self-policing to

oversee the program'"; and "[i]n a 2014 OIG report, … the OIG found that contract pharmacies create 'complications' in preventing diversion and duplicate discounts."), https://bit.ly/3bsQ0fh.

117.    Defendants made no mention of the fact that their decision to mandate that manufacturers provide an unlimited number of contract pharmacies with 340B-priced drugs forces manufacturers like Lilly either to transfer their property, in the form of the prescription medicines they manufacture, to for-profit entities at a devastating financial loss, or to choose not to and suffer the economic equivalent of the death penalty by losing their ability to participate in and be reimbursed under critical federal healthcare programs. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("Our precedents … forbid[] the government from engaging in 'out-and-out … extortion' that would thwart the Fifth Amendment" by coercing individuals into relinquishing their property without proper "just compensation." (third alteration in original) (quoting *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987))).

118.    Nor did Defendants refute that the two mechanisms contract pharmacies use in capturing 340B discounts intended only for covered entities both necessarily effect a prohibited diversion of 340B-discounted drugs to the contract pharmacy.  In fact, the Decision does not mention this concern at all, instead brushing it aside via a reductive purpose analysis that cannot be squared either with the text of the statute or with the reality of how the Program operates.  But these diversions mechanisms that Defendants ignored illustrate how the contract pharmacy system is ripe for abuse.  First, under the "retroactive replenishment" model, contract pharmacies do not segregate 340B inventory from non-340B inventory; rather, they have ***their own stock*** of inventory, purport to track dispensed prescriptions to the patients of 340B covered entities with which they have contracts, and then supposedly ***retroactively*** seek to "replenish" product at 340B pricing.  For those prescriptions, they secure—through an entirely retrospective process—

replacement product at 340B pricing when the covered entity places an order with instructions to ship directly to the contract pharmacy.  *See* Alliance for Integrity and Reform of 340B, *The Impact of Growth in 340B Contract Pharmacy Arrangements*, at 1 (July 2014) ("data indicates that neither the pharmacy nor the patient know that the transaction is '340B' at the point of sale"), https://bit.ly/3mRQ4YR; Nat'l Council for Prescription Drug Programs, *340 Information Exchange Reference Guide*, at 8-9 (June 2019), https://bit.ly/2JJVtCY.  The 340B product, once transferred to a contract pharmacy, is then sold by the contract pharmacy in its own name to its own patients.  Second, under the "physical inventory" system, the product is transferred directly from the wholesaler to the contract pharmacy, the latter of which sells it to a customer who appears at its counter.  Under this model, the covered entity never takes possession of the product.  Because both models entail the use of a "ship-to/bill-to" arrangement where covered entities purchase 340B drugs with instructions to ship directly to the contract pharmacy, an action to mandate that manufacturers honor requests for 340B discounts for contract pharmacy transactions would result in statutorily prohibited diversion of 340B-discounted product to independent commercial actors that are not covered entities or patients of covered entities, in violation of the 340B statute.

## VIII.   The Congressional Mandate, Demise, and Sudden Resurrection of the ADR Rule

### A.   Congress Amends the 340B Statute to Require Defendants to Establish an ADR Procedure within 180 Days

119.   Congress amended the 340B statute in March 2010 as part of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, § 7102(a), 124 Stat. 119 (2010).

120.   Most relevant here, the ACA amendments required Defendant HHS to promulgate regulations establishing an ADR process for resolving 340B price disputes between covered entities and manufacturers.  *See id.*, 124 Stat. at 826-27 (codified at 42 U.S.C. § 256b(d)(3)).

121.   The ADR regulations were to be promulgated within 180 days of enactment:

> Not later than 180 days after the date of enactment of the Patient
> Protection and Affordable Care Act, the Secretary shall promulgate
> regulations to establish and implement an administrative process for
> the resolution of claims by covered entities that they have been
> overcharged for drugs purchased under this section, and claims by
> manufacturers, after the conduct of audits as authorized by
> subsection (a)(5)(D), of violations of subsections (a)(5)(A) or
> (a)(5)(B), including appropriate procedures for the provision of
> remedies and enforcement of determinations made pursuant to such
> process through mechanisms and sanctions.

*Id.*

122.    The ACA amendments further instructed that these "[r]egulations promulgated by

the Secretary" must "designate or establish a decision-making official or body within the

Department of Health and Human Services to be responsible for reviewing and finally resolving

claims by covered entities that they have been charged prices for covered outpatient drugs in excess

of the ceiling price … and claims by manufacturers that violations of [statutory prohibitions on

conduct like diversion] have occurred."  *Id.* (codified at 42 U.S.C. § 256b(d)(3)(B)(i)).

123.    The statute further directed that "[t]he administrative resolution of a claim or claims

under the regulations promulgated under subparagraph (A) shall be a final agency decision and

shall be binding upon the parties involved, unless invalidated by an order of a court of competent

jurisdiction."  *Id.*, 124 Stat. at 827 (codified at 42 U.S.C. § 256b(d)(3)(C)).

124.    The statute does not explicitly authorize any official of the Executive Branch to

review, overturn, or modify the judgment of an ADR panel.

**B.     HHS Belatedly Proposes, then Withdraws, the ADR Rule**

125.    Congress's 180-day deadline came and went.  It was not until August 12, 2016—nearly six years after the ACA's enactment—that Defendants issued a Notice of Proposed Rulemaking ("NPRM") suggesting ADR procedures.  *See* 81 Fed. Reg. 53,381-01 (Aug. 12, 2016).

126.    That NPRM proposed to resolve ADR claims through three-member panels "chosen from a roster of eligible individuals alternating from claim to claim, and one ex-officio, non-voting member chosen from the staff of [HHS's Office of Pharmacy Affairs]."  *Id.* at 53,382. Panel members would be "Federal employees (e.g., employees of [the Centers for Medicare & Medicaid Services, or CMS] or the U.S. Department of Veterans Affairs) with demonstrated expertise or familiarity with the 340B Program."  *Id.*

127.    Importantly, ADR panelists would be appointed by the HHS Secretary, and could only be removed from an ADR panel "for cause."  *Id.*  The only "for cause" removal scenario contemplated by the notice, moreover, was a conflict of interest.  *Id.*

128.    The NPRM proposed specific procedures for the adjudication of disputes brought before the ADR panels and suggested that covered entities and manufacturers would have three years to file a "written claim" to be resolved through the ADR process.  *Id.* at 53,383.  The NPRM specified that the ADR panel's decisions would "be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction."  *Id.*  The NPRM did not provide for any appeals process for these binding decisions.  In fact, it provided no opportunity for the Secretary to oversee, review, or in any way alter an ADR panel decision.

129.    The NPRM did not specify any specific remedies that ADR panels might impose, requiring only that "the final agency decision letter also be submitted to [HRSA's Healthcare Systems Bureau] to take enforcement action or apply sanctions, as appropriate."  *Id.*

130.    Lilly filed timely comments objecting to the proposed rule on October 11, 2016.

*See* Exh. M.  In particular, Lilly argued that HHS should (like many other administrative agencies)

employ a neutral and disinterested adjudicator such as an ALJ.  *See id.* at 8-10.  Lilly reasoned that

"the inclusion of an 'ex-officio, non-voting' HRSA employee undermines the guarantee that there

would be a true separation of the regulatory and adjudicative functions" of the agencies.  *Id.* at 9.

The use of an ALJ, in contrast, would not pose this risk.  Lilly further worried that nothing

guaranteed that the ex-officio member would limit itself to giving purely technical advice, but

would likely also "have some responsibility for HRSA rule making, investigation, and

prosecution."  *Id.* at 10.  Finally, Lilly noted that "by virtue of his or her well-developed views on

how the program 'should' work … and his or her greater sophistication with the subject matter,"

the ex-officio member could exert undue influence over the panel.  *Id.*  In sum:

> Since that panel would be comprised of individuals who work at
> HRSA and/or other federal agencies, those individual[s] are likely
> to bring their policy predilections to bear.  That is, they are more
> likely than an ALJ to interpret regulations based on what they,
> themselves, 'intended' for the regulation to mean or how it was
> 'intended' to apply, irrespective of whether stakeholders could have
> divined this intent or whether the evidence presented supported such
> an outcome.

*Id.* at 11-12.

131.    Lilly also raised concerns that the rule would be biased against manufacturers if

Defendants did not first update the guidelines used for auditing a covered entity.  The 340B statute

requires a manufacturer to complete an audit prior to filing a claim that a covered entity has

engaged in diversion or duplicate discounts.  *See* 42 U.S.C. § 256b(d)(3)(B)(i).  Lilly explained

that, based on its own experiences, the auditing guidelines imposed numerous burdensome and

costly requirements on manufacturers that did not serve to facilitate the audit.  As Lilly noted,

"[t]he bureaucratic effort and expense imposed by the 1996 Audit Guidelines makes it untenable,

except in the most egregious cases, for Lilly to conduct additional audits."  Exh. M at 5.
Defendants' failure to update the guidelines would mean that manufacturers would be
disproportionately disfavored in the ADR process, as covered entities could more easily access
and use the process compared to manufacturers.

132.    After the close of the notice-and-comment period, the ADR began appearing on the
Unified Agenda of Federal Regulatory and Deregulatory Actions ("Unified Agenda"), a
semiannual compilation of information about federal regulations under agency development.  On
August 1, 2017, however, the rule was summarily withdrawn from the Unified Agenda without
explanation.  *See* Office of Mgmt. & Budget, *RIN: 0906-AA90: 340B Drug Pricing Program;
Administrative Dispute Resolution Process*, https://bit.ly/3biRMPH.

133.    Three years passed, with no indication from HHS or HRSA that the ADR
rulemaking remained pending.  The NPRM never appeared again on the Unified Agenda, nor did
the agency publish a new NPRM in the Federal Register.

134.    In fact, on March 12, 2020, a HRSA official told *The 340B Report* that Defendants
had no plans to issue an ADR rule.  According to the official, "[i]t would be challenging to put
forth rulemaking on a dispute resolution process when many of the issues that would arise for
dispute are only outlined in guidance" that Defendants understood to be legally unenforceable.
Tom Mirga, *HRSA: 340B Dispute Resolution Will Stay on Hold Until We Get Broader Regulatory
Authority*, 340B Report (Mar. 12, 2020), https://bit.ly/3651i5z.

C.    **Under Litigation Pressure, HHS Suddenly Resurrects and Implements the
       Previously Withdrawn Proposed Rule**

135.    On October 9, 2020, Ryan White Clinics for 340B Access and two affiliated 340B-
covered entities filed a lawsuit in the United States District Court for the District of Columbia,

seeking to compel Defendants to promulgate the long-overdue ADR rules.  *See* Compl. ¶¶ 99-100, *Ryan White Clinics for 340B Access v. Azar*, No. 20-cv-2906 (D.D.C. Oct. 9, 2020), Dkt. 1.

136.    Two months after that lawsuit was initiated—and despite having withdrawn the NPRM and having publicly stated that it had no intention of promulgating a rule establishing an ADR process until after Congress further amended the 340B statutory scheme—HRSA suddenly published a final rule on December 14, 2020, without giving the public opportunity for notice and comment.  *See* 85 Fed. Reg. 80,632-01 (Dec. 14, 2020).

137.    The ADR Rule does not purport to invoke any statutory ground for excusing notice and comment (because there is none).  Instead, it simply pretends that the agency had not, years earlier, withdrawn its NPRM, and then proceeds to alter and finalize its original proposal without further public input.  *See id.* at 80,633 (claiming that the NPRM was not *really* withdrawn, just frozen by Presidential action).  But that explanation is demonstrably false.  First, the memorandum to which the agency refers *on its face* is inapplicable to the ADR Rule:  That memorandum explicitly excluded "regulations subject to statutory … deadlines," Reince Priebus, Asst. to the President and Chief of Staff, *Memorandum for the Heads of Executive Departments and Agencies*, (Jan. 20, 2017), https://bit.ly/2KIutnM, which obviously includes the ADR Rule, notwithstanding the agency's defiance of Congress's 180-day deadline.  Second, the agency's contemporaneous actions demonstrate that it itself believed the memorandum inapplicable:  The memorandum ordered agencies to remove pending regulations to which it *did* apply "immediately," *id.*, but Defendants did not remove the ADR NPRM from the Unified Agenda for another eight months.  And third, although regulatory actions retain the same Regulatory Identification Number ("RIN") throughout the entire rulemaking process, the final Rule was designated with a different RIN than the NPRM.  *Compare* 81 Fed. Reg. 53,381, *with* 85 Fed. Reg. 80,632.

48

138.    Ignoring the obligation to solicit public comment in a lawful and orderly way, the ADR Rule proceeds to finalize specific procedures for the resolution of disputes.  It establishes a Board of "at least six members appointed by the Secretary":  two each from HRSA, CMS, and the HHS OGC, plus one non-voting ex-officio member from OPA.  85 Fed. Reg. at 80,634.  Each three-person ADR panel would consist of one member drawn from each voting group.  *Id.*

139.    The ADR Rule makes no provision for any Board member's removal from the ***Board***, providing only that individual panel members can be removed from a ***panel*** "for cause." *Id.*  Like the NPRM, the final rule lists "a conflict of interest" as the only grounds for panel removal.  *Id.*

140.    In issuing the final rule, Defendants recognized that commenters had raised concerns that such a system would result in biased decisionmaking.  But they cursorily brushed these concerns aside.  According to the Rule, the ADR panels "are uniquely situated to handle the complexities of the 340B Program and related disputes," and the ex-officio "OPA staff member would not exercise undue influence over the three voting members."  *Id.* at 80,634-35.

141.    The Rule also made important changes regarding the remedies available to covered entities.  Although the NPRM said nothing about the subject, the ADR Rule now provides that ADR panels can resolve claims for "money damages," as well as other unspecified "equitable relief" sought by disgruntled litigants.  *Id.* at 80,633.

142.    Furthermore, the ADR Rule empowers panels to function like federal courts.  It expressly grants panel members "significant discretion" in their adjudicative functions.  *Id.* at 80,635.  A panel may "determine, in its own discretion, the most efficient and practical form of the ADR proceeding."  *Id.* at 80,645.  It may require "submission of additional information," and it has discretion to choose from an array of formidable sanctions if it concludes that its instructions

were inadequately complied with.  *See id.*; 42 C.F.R. § 10.22(c) (permitting ADR panels to "[p]reclude a party from presenting or contesting a particular issue" or even enter judgment as a sanction).  It has "discretion in admitting evidence and testimony" during the arbitration and may apply the Federal Rules of Civil Procedure and Federal Rules of Evidence.  *Id.* at 80,641; *see* 42 C.F.R. § 10.23.  It even has the discretion to issue whatever "additional instructions as may be necessary or desirable governing the conduct of ADR proceedings."  85 Fed. Reg. at 80,639; 42 C.F.R. § 10.21.  Finally, ADR panel decisions "will" be based only and entirely on the panel's independent "review and evaluation of the evidence" and the governing law.  42 C.F.R. § 10.24(b).

143.    The Rule also states that "[e]ach 340B ADR Panel will necessarily have jurisdiction to resolve all issues underlying any claim or defense, including, by way of example, those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales that the 340B ADR Panel deems relevant for resolving an overcharge, diversion, or duplicate discount claim."  85 Fed. Reg. at 80,636.  And, even more notable, it imbues ADR panels with the authority to issue binding, precedential, and self-executing judgments.  In a stark departure from the NPRM, the Rule now provides that ADR panel decisions are both "binding" on the parties and "precedential" for purposes of future adjudications.  *Id.* at 80,634; 42 C.F.R. § 10.20.  The regulation provides that the ADR panel's decision "constitutes a final agency decision that is precedential and binding on the parties involved unless invalidated by an order of a court of competent jurisdiction."  42 C.F.R. § 10.24(d).

144.    Adding insult to injury, the ADR Rule insulates ADR panel judgments from any review by a superior (much less Senate-confirmed) Executive Branch official.  Indeed, when expressly addressing comments concerning the earlier NPRM noting the need for an internal

appeals process, the Rule stated that such a process was not "necessary given that an aggrieved party has a right to seek judicial review." 85 Fed. Reg. at 80,641.

145.    Nor does the ADR Rule purport to authorize any particular standard of judicial review.  It does not, for instance, authorize *de novo* review in Article III courts of the private money judgments and equitable injunctions the ADR panelists are authorized to issue.  Instead, it says only that review would be available under the APA and that "[t]he form of judicial review for ADR panel decisions is beyond the scope of this final rule." *Id.* at 80,642.

## IX.    HRSA Doubles Down On Its December 30 Decision By Issuing A New Ultimatum Requiring Lilly to Fall In Line Immediately or Risk Massive Penalties

146.    Lilly filed this lawsuit on January 12, 2021, seeking to set the December 30 Decision aside as ultra vires under the statutory text, violative of the constitution, irregularly promulgated without notice and comment, and substantively arbitrary and capricious.  Compl. for Decl. & Inj. Relief (Jan. 12, 2021), Dkt. 1.  Lilly filed an amended complaint two weeks later, adding claims challenging HHS's ADR Rule on similar grounds.  *See* First Amended Compl. for Decl. & Inj. Relief ¶¶ 211-63 (Jan. 25, 2021), Dkt. 17.  Lilly simultaneously filed a motion preliminarily enjoin the ADR Rule, *see* Pls.' Mot. for Prelim. Inj. (Jan. 25, 2021), Dkt. 18, which the Court granted after full briefing and oral argument, *see* Order Granting Pls.' Mot. for Prelim. Inj. (Mar. 16, 2021) ("ADR PI Op."), Dkt. 81.  The Court found that Defendants' actions before belatedly promulgating the ADR Rule were "duplicitous[] and misleading—the antithesis of fair notice under the APA," and, "[a]ccordingly," concluded "that Plaintiffs have established with a fair likelihood of success that Defendants violated notice-and-comment rulemaking requirements under the APA" in promulgating the ADR Rule.  *Id.* at 23.  The Court found that Lilly would "suffer irreparable injury for which there is no adequate remedy of law" by virtue of having been "'depriv[ed] of a procedural protection to which [Lilly is] entitled.'"  *Id.* at 23, 25 (first alteration

in original) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)); *see also id.* at 25-26 ("[I]f the ADR Rule were permitted to go into effect and was later determined to have been promulgated without an adequate, fair opportunity for advance notice and comment, Plaintiffs would be deprived of their right, under the APA, to provide meaningful input into the agency's decision at a time when it is most likely to be carefully considered, a harm which the Court would be unable to fully remedy after the fact.").  And the Court found that "the balance of harms and the public interest factors weigh in favor of Plaintiffs."  *Id.* at 27.  The Court therefore entered an order preliminarily enjoining Defendants "from implementing or enforcing [the ADR Rule] against Plaintiffs" "until further order of this Court."  Prelim. Inj. (Mar. 16, 2021), Dkt. 82.

147.    The lawsuit then proceeded to dispositive briefing on Lilly's claims, including the central issue of whether the 340B statute permits HHS to require Lilly to provide its products to contract pharmacies at the steeply-discounted 340B prices under any circumstances.  On May 17, 2021, in the middle of the agreed-upon dispositive motion briefing on this and other claims and almost nine months after the government purportedly began its alleged "review" of Lilly's distribution plan, *see* Dkt. 85, Defendant Diana Espinosa sent a Lilly executive (not its counsel) an extraordinary demand letter.  *See* Exh. P ("May 17 Letter").

148.    The May 17 Letter announced that "HRSA has determined that Lilly's actions have resulted in overcharges and are in direct violation of the 340B statute," and demands that "Lilly must immediately begin offering its covered outpatient drugs at the 340B ceiling price to covered entities through their contract pharmacy arrangements" and must "credit or refund all covered entities for overcharges that have resulted from Lilly's policy."  *Id.* at 1-2.  The Letter then goes on to levy a number of threats, both open and veiled, against Lilly.  The letter reminds Lilly that it

"signed a Pharmaceutical Pricing Agreement (PPA) and PPA addendum" and that "Lilly is bound by the terms of the PPA." *Id.* at 1.

149.    The letter goes on to warn that "[c]ontinued failure to provide the 340B price to covered entities utilizing contract pharmacies" will "result in CMPs" (which "would be in addition to repayment") unless Defendant HHS is sufficiently satisfied with "Lilly's willingness to comply with" HRSA's unilaterally imposed view of Lilly's "obligations under section 340B." *Id.* at 1-2. And it concludes by "request[ing]" (*i.e.*, demanding) "that Lilly provide an update on its plan to restart selling, without restriction, covered outpatient drugs at the 340B price to covered entities that dispense medications through contract pharmacy arrangements by June 1, 2021." *Id.* at 2.

150.    Unaccountably, the May 17 Letter's explanation for its demands differs from the attempted justifications the government has given for the December 30 Decision, not only in the Decision itself, but also in the summary judgment brief it filed in this case less than a month earlier. The May 17 Letter makes no mention of the "agency" theory set out in the Decision and proffered by the government in its briefing in this case.  Nor does it cite the "purchased by" language also relied on in the December 30 Decision and by the government in briefing.  *See* MTD/MSJ 22-25. Instead, the May 17 Letter relies solely on the "must offer" language added to the 340B statute by the 2010 Affordable Care Act, *see* Pub. L. No. 111-148, Title VII, § 7102(b), 124 Stat. 119, 827 (Mar. 23, 2010).  *See* Exh. P at 1 (relying on the statutory requirement that "manufacturers 'shall…offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price'").  By apparently jettisoning the agency theory, the Letter takes an ***even more extreme*** position than the December 30 Decision—purporting to require Lilly to deliver discounted drugs to contract pharmacies, period, whether they act as the covered entities' agents or not.  *See id.* at 1-2.  The Letter does not

acknowledge in any way that it encapsulates a different view than the December 30 decision, let alone any explanation for its changed position.

151.    But the May 17 Letter marked more than a seismic shift in the explanation for the government's approach; it also fundamentally changed *who* would be deciding whether Lilly was required to offer 340B prices to contract pharmacies.  At oral argument on Lilly's January 25 motion for preliminary injunction, the government's unequivocal position was that although "the agency has determined that covered entities have a right generally to use contract pharmacy arrangements, the agency has not passed on the specifics of Lilly's new policy, *because that belongs in the ADR*."  Tr. of Feb. 26 Oral Arg. (Exh. Q), at 76:24–77:3 (emphasis added).

## X.    Defendants' Final Agency Action, The Harm To Lilly, And The Need To File Suit

152.    Lilly challenges "final agency action" within the meaning of 5 U.S.C. § 704.

153.    To constitute final agency action, a decision "must [1] mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and "[2] be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *W. Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 126-27 (2012) (EPA order constituted final agency action immediately challengeable in federal court, even though it included a proviso inviting regulated parties to "engage in informal discussion of [its] terms and requirements" with the EPA and purported to be non-final, because "'legal consequences'" flowed from the order's "issuance" and the order marked "the 'consummation' of the [agency's] decisionmaking process" (quoting *Bennett*, 520 U.S. at 178)).

154.    The December 30 Decision, the May 17 Letter, and the ADR Rule each independently constitute final agency action, as set forth below.  Taken together, moreover, they represent a naked and unlawful attempt to accomplish through the back door that which they

cannot do via rulemaking—namely, forcing manufacturers to offer discounts to an unlimited number of for-profit contract pharmacies.

A.     **The December 30 Decision Constitutes Final Agency Action**

155.    The December 30 Decision represents the consummation of Defendants' mature decisionmaking process on this issue.  This is not an issue Defendants only recently began considering; as the 1996 and 2010 guidance documents as well as the correspondence with Lilly and other manufacturers from last year reflect, Defendants have been evaluating this issue for some time now.  Defendants' decision to conclude, once and for all, that manufacturers must offer 340B discounts to contract pharmacies, is the culmination of years' worth of consideration.

156.    The December 30 Decision just as plainly determines rights and obligations from which legal consequences will inevitably flow—thereby creating an imminent threat of harm to Lilly.  Indeed, Lilly has already begun to receive threats from covered entities in light of the December 30 Decision.  *See, e.g.*, Exh. N (Ltr. from Univ. of Wash. Med. Ctr. and Harborview Med. Ctr. to Eli Lilly and Company (Jan. 6, 2021)) ("In light of the [December 30 Decision] your continued denial of 340B pricing [to contract pharmacies] puts Lilly's PPA and reimbursement under the Medicaid and Medicare Part B programs at risk, and subjects Lilly to civil monetary penalties for each overcharge or denied purchase.").

157.    Simply put, Defendants' view that manufacturers ***must offer*** 340B discounts to contract pharmacies, on pain of severe penalties and consequences, is now fully operational.  *See W. Ill. Home Health*, 150 F.3d at 763 (a letter from the Department of Labor was final agency action because "[l]egal consequences flow from it, both with respect to [plaintiffs'] obligations to their employees and with respect to [their] vulnerability to penalties should they disregard [it]").

158.    Furthermore, Defendants have put Lilly to the "painful choice" of either complying with the incorrect "obligation[s]" that result from Defendants' mistaken interpretation of the 340B

statute or "risking the possibility of an enforcement action at an uncertain point in the future." *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 43 (D.D.C. 2015) (quoting *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011)); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (finding agency action fit for judicial review where "continued use of material which [plaintiffs] believe in good faith meets the statutory requirements, but which clearly does not meet the regulation of the Commissioner[,] … would risk serious criminal and civil penalties"), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).  Under the December 30 Decision, if Lilly does not comply with the purported "obligat[ion]" to offer 340B prices to contract pharmacies, it may be subject to allegations of overcharging and even CMPs pursuant to 42 U.S.C. § 256b(d)(1)(B)(vi), which exposes manufacturers to civil penalties of up to $5,000 "*for each instance* of overcharging a covered entity." (Emphasis added.)  That is not a far-off possibility, either:  A few months before the December 30 Decision was published, HRSA told Lilly that its distribution plan could subject Lilly to sanctions "includ[ing] civil monetary penalties pursuant to 42 U.S.C. § 256b(d)(1)(B)(vi)." Exh. H at 1.  Given the 25,000-plus contract pharmacy locations nationwide and the 190,000-plus arrangements between contract pharmacies and covered entities, Lilly's decision to remain faithful to the plain text of the statute could thus have astronomically detrimental financial consequences.

159.    And given Defendants' authority to terminate Lilly's PPA if they determine that Lilly has failed to comply with the 340B statute's obligations, a decision by Lilly not to acquiesce to the new obligations reflected in the December 30 Decision would jeopardize Lilly's participation in the Program altogether—as the Attorney General of Connecticut, who "led a bipartisan coalition of attorneys general urging [HHS] to hold accountable drug manufacturers," has already recognized.  *See* Office of the Atty. Gen., *Attorney General Tong Leads Coalition of*

*Attorneys General in Important Win on Prescription Drugs* (Dec. 31, 2020) (recognizing that the December 30 Decision "puts a tremendous amount of pressure on drug companies"), https://bit.ly/356wuB0.  That is no small matter.  Termination of Lilly's PPA would be devastating to Lilly's business, as it would prohibit Lilly from receiving coverage and reimbursement for pharmaceutical products under Medicaid and Medicare Part B.  Given the enormous size and importance of those federal programs, continuing participation in them is functionally necessary for Lilly (or any manufacturer) to be viable.  *See, e.g.*, August 2020 Medicaid & CHIP Enrollment Data Highlights, Medicaid.gov (70 million people receive Medicaid), https://bit.ly/3rRO8SX; Nat'l Comm'n to Preserve Soc. Sec. & Medicare, *Number of People Receiving Medicare* (2019) (56 million people receive Medicare Part B)*, https://bit.ly/3olIG8D; see also Allina Health*, 139 S. Ct. at 1808 ("One way or another, Medicare touches the lives of nearly all Americans."). Defendants have thus left Lilly in the untenable position of offering 340B discounts that are not required by the statute or else face crippling financial sanctions simply for asserting its right to comply with the obligations in the statute.  *See, e.g., Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1172 (6th Cir. 1983); *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 524 (3d Cir. 1976).

160.    In short, the December 30 Decision—backed by the threat of massive sanctions— imposes "direct and immediate" burdens on Lilly, *Abbott Labs.*, 387 U.S. at 152, and is therefore final agency action subject to immediate review.  "To hold otherwise would open a path for the defendants to substitute informal [advisory opinion]-writing for the formal process of notice and comment rulemaking.  Perhaps more important, to hold otherwise would insulate the [December 30 Decision] from effective judicial review unless and until an affected party is willing to act contrary to [Defendants'] stated position and to risk severe civil … penalties."  *Novelty, Inc. v. Tandy*, 2006 WL 2375485, at *1 (S.D. Ind. Aug. 15, 2006); *see id.* (holding that "one of a series

of letters" from the Drug Enforcement Agency constituted final agency action even though the agency did not follow "formal procedures" in promulgating it). It therefore warrants immediate review, and any delay in addressing this dispute would be manifestly inappropriate, as "'[e]ach day [it] wait[s] for the agency to drop the hammer," Lilly risks "accru[ing]" significant penalties *plus* losing its eligibility for Medicare and Medicaid programs. *See Sackett*, 566 U.S. at 127.

161.   The need for immediate review is all the more acute given that the December 30 Decision does more than put Lilly to the choice between severe penalties and complying with the regulation: It effectuates an unconstitutional taking of property by forcing Lilly to transfer property in the form of its drugs to private, for-profit entities, not for the benefit of the public, but solely so that those for-profit entities can increase their profit margins. The Fifth Amendment expressly forbids such a regime. *See Kelo*, 545 U.S. at 477; U.S. Const. amend. V.

162.   Moreover, the revenues Lilly generates pursuant to the 340B Program constitute personal property that cannot be taken by the government without just compensation. *See Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015).

163.   It is also black-letter constitutional law that the government may not condition a benefit, such as participating in Medicare Part B and Medicaid, on the relinquishment of a constitutional right. *Koontz*, 570 U.S. at 604. Yet the December 30 Decision does precisely this: In order to receive reimbursement and coverage from the federal government—the nation's largest insurance provider that provides health insurance to hundreds of millions of individuals—the December 30 Decision forces Lilly to forego billions of dollars in revenue generated by its participation in the 340B Program.

164.   The May 17 Letter confirms that HRSA views the December 30 opinion as final agency action. The agency went from merely threatening to level CMPs against manufacturers

that stray from the new interpretation of the statute to acting on that threat.  The Letter explicitly finds that "Lilly's actions have resulted in overcharges and are in direct violation of the 340B statute," and stated that Lilly was subject to CMPs for failing to provide 340B prices to all covered entities.  Exh. P at 1-2.  The letter also stated that Lilly must "credit or refund all covered entities for overcharges that have resulted from Lilly's policy."  *Id.* at 1.  This letter enforces the final agency determination of its interpretation of the 340B statute announced in the December 30 opinion, and confirms that the decision was the consummation of agency decision-making and that Lilly was required to comply with the new legal obligations announced at the time of that decision.

**B.** **Even if the December 30 Decision Did Not Constitute Final Agency Action, The May 17 Letter Does Constitute Final Agency Action**

165.    Even if the December 30 Decision were not a final agency action—and it is—the May 17 Letter certainly is one.  Far from being "merely tentative or interlocutory [in] nature," *W. Ill. Home Health*, 150 F.3d at 662, the May 17 Letter unambiguously constitutes the consummation of the agency's decision process.  In no uncertain terms, it proclaims:  "After review of this policy and an analysis of the complaints HRSA has received from covered entities, HRSA has determined that Lilly's actions have resulted in overcharges and are in direct violation of the 340B statute."  Exh. P at 1.

166.    By the same token, the Letter is also a decision by which "rights or obligations have been determined" and "legal consequences will flow," *W. Ill. Home Health*, 150 F.3d at 662: it states that "Lilly must immediately begin offering its covered outpatient drugs at the 340B ceiling price to covered entities through their contract pharmacy arrangements" or else suffer "CMPs as described in the CMP final rule."  Exh. P at 2.  Just like the December 30 Decision, the May 17 Letter forces Lilly to choose—this time with a strict deadline and an individualized threat—between  complying with Defendants' mistaken interpretation of the 340B statute or suffering

59

massive penalties, and even termination from the 340B Program.  *See, e.g.*, *Gardner*, 387 U.S. at 153.  Further, for the first time, the agency has announced that manufacturers have an obligation to provide 340B discounts to *all* contract pharmacies, not just those that are common law agents of a covered entity, *and* it relies on statutory language that was enacted after 2010.  There is therefore no argument that the view announced in the May 17 Letter embodies a previous position held by the agency, but rather it announces new legal obligations for manufacturers.

167.    Indeed, the Supreme Court has already explained why "compliance orders" like the May 17 Letter constitute final agency action.  In *Sackett v. EPA*, 566 U.S. 120 (2012), the EPA sent the Sacketts a letter concluding that the Sacketts' home-building efforts "constitute[d] a violation of" a federal statute.  *Id.* at 125.  On the basis of that violation, the EPA demanded that the Sacketts "immediately" comply with their purported statutory obligations.  *Id.*  The Court unanimously concluded that this letter constituted final agency action.  The letter set out the Sacketts' purported "legal obligation" under statute, "expose[d] the Sacketts to double penalties in a future enforcement proceeding," and was "not subject to further Agency review."  *Id.* at 126-27.

168.    So too here.  The May 17 Letter captures the agency's "determin[ation] that Lilly's actions … are in direct violation of the 340B statute," and holds itself out as the culmination of the agency's "review" and "analysis."  Exh. P at 1.  While the May 17 Letter may be the start of the agency's review for purposes of penalties, under *Sackett* it is immediately challengeable because it represents a determination by the agency of Lilly's obligations, and also precisely because of the fact that legal consequences can now follow from that decision.  Indeed, the May 17 Letter expressly requires that Lilly "immediately" fall in line with its purported "340B statutory obligations."  *Id.* at 2.  And it expressly threatens that a failure to comply exposes Lilly to penalties.  *See id.* ("Continued failure to provide the 340B price to covered entities utilizing contract

pharmacies, and the resultant charges to covered entities of more than the 340B ceiling price, may result in CMPs as described in the CMP final rule."). Further, just as in *Sackett*, "each day [Lilly] wait[s] for the Agency to drop the hammer," *Sackett*, 566 U.S. at 127, they run the risk of accruing additional penalties if it continues to follow its current pricing policy regarding contract pharmacies. The May 17 Letter is a *Sackett* redux, and therefore inarguably constitutes final agency action.

169.    Indeed, it is apparent that, under the government's view, Lilly's decision to assert its rights **in this lawsuit**—rather than immediately capitulate—could be a basis for civil monetary penalties under the 340B Statute, which are supposed to be available under the Statute only for knowing and willful violations. *See* 42 U.S.C. § 256b(d)(1)(B)(vi)(II).

C.    **The ADR Rule Constitutes Final Agency Action**

170.    The ADR Rule, codified at 42 C.F.R. §§ 10.20–10.24, became effective on January 13, 2021. *See* 85 Fed. Reg. at 80,632.

171.    There is no doubt that Lilly will be subject to proceedings conducted under the ADR Rule; in fact, ADR petitions against Lilly have already been filed.

172.    Nor is there any doubt that the petitions will continue to roll in. First, ADR proceedings are the exclusive remedial scheme for claims between covered entities and manufacturers. *See Astra*, 563 U.S. at 121-22. Second, many covered entities have been engaged in active litigation against HHS in an effort to force the agency to implement ADR rules so that those entities can make claims against manufacturers including Lilly. *See, e.g.*, Compl. 24, *Nat'l Assoc. of Comm'y Health Ctrs. v. Azar*, No. 1:20-cv-03032 (D.D.C. Oct. 21, 2020), Dkt. 1 (alleging that the plaintiff there would have submitted a claim through the ADR process "[h]ad the Secretary implemented" it). Third, covered entities have already sent Lilly letters threatening them with ADR-panel-issued damages if it does not acquiesce to their (and now HHS's) view that it

must offer full 340B discounts to for-profit contract pharmacies.  Finally, after the Rule became effective, covered entities immediately began to file petitions, seeking all forms of relief—including *preliminary injunctions* nowhere contemplated in the statute—relying on the December 30 Decision as their central authority.

173.    As Lilly has explained above and as it alleges further below, the 340B statute does not empower Defendants to require manufacturers like Lilly to offer product or allow purchases at 340B discounted prices to contract pharmacies.  The term "covered entity" is defined in exhaustive detail to include fifteen very specific types of entities that predominantly provide services to low-income patients, 42 U.S.C. § 256b(a)(4); contract pharmacies, which typically are large and lucrative commercial, corporate pharmacies such as Walgreens and CVS, are mentioned nowhere on this list, *see id.*  Moreover, Congress limited HRSA's authority to undertake rulemaking in the 340B Program to three specific areas:  (1) establishing of an ADR process; (2) issuing standards for calculating ceiling prices; and (3) imposing monetary civil sanctions, *see Orphan Drug I*, 43 F. Supp. 3d at 41, the latter of which is expressly limited to instances of overcharging covered entities themselves, *not their agents*, *see* 42 U.S.C. § 256b(d)(1)(B)(vi)(II)-(III).

174.    Remarkably, however, one set of ADR panel judges, the OGC, *has already staked out a position on Lilly's challenge*.  *See* December 30 Decision.

175.    As explained below, the ADR Rule to which Lilly is now subject is unconstitutional, unauthorized by statute, procedurally improper, and arbitrary and capricious.  Lilly is therefore "suffering [a] legal wrong because of agency action" and "adversely affected or aggrieved by agency action," and is therefore "entitled to judicial review thereof."  5 U.S.C. § 702.

## CLAIMS FOR RELIEF

**I.      Claims Regarding The December 30 Decision**

### COUNT I
**(Violation of the Administrative Procedure Act
Failure to Provide Notice and Comment)**

176.    Lilly re-alleges and incorporates the allegations in all of the preceding paragraphs of this Complaint.

177.    The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C. § 2201(a).

178.    The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

179.    The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  *Id.* § 704.

180.    The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."  *Id.* § 706(2)(D).

181.    The December 30 Decision constitutes "final agency action for which there is no other adequate remedy," *id.* § 704, and Lilly has exhausted all of its available administrative remedies and/or pursuit of any further administrative remedies would be futile.

182.    The APA defines a "rule" to include any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law."  *Id.* § 551(4).

183.    To issue a valid rule, an agency "shall [ ] publish[]" "[g]eneral notice of proposed rule making" "in the Federal Register," and shall include in that notice "either the terms or

substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3).

184.    This notice requirement applies to all rules except "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," and applies unless the agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(A)-(B).

185.    After providing notice of a proposed rule, the agency shall then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

186.    Because the December 30 Decision definitively "conclude[s]" that manufacturers must provide contract pharmacies with 340B prices, it is plainly an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law." *Id.* § 551(4).  It therefore constitutes a "rule" under the APA.

187.    The December 30 Decision is not exempt from the APA notice-and-comment requirement under 5 U.S.C. § 553(b)(A), because it is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  It is instead a legislative rule:  The December 30 Decision creates rights and obligations on manufacturers with which they must comply, on pain of civil sanction and expulsion from the 340B Program.

188.    Indeed, given the existence of the 1996 and 2010 contract pharmacy guidance, as well as HRSA's other repeated insistences that neither of those guidance documents create enforceable obligations, the ***only*** logical explanation for the December 30 Decision is that Defendants wanted to create and did create enforceable obligations under the 340B statute.

189.    Defendants thus needed to comply with the APA's notice-and-comment procedures in order to (attempt to) enshrine these new obligations.

190.    Yet Defendants nevertheless failed to provide public notice of their proposed action before issuing the December 30 Decision, and failed to provide the public any opportunity to comment on that proposed action.

191.    The December 30 Decision was accordingly issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

**COUNT II**
**(Violation of the Administrative Procedure Act**
**Exceeding Statutory Authority)**

192.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

193.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

194.    The 340B statute does not confer on Defendants the authority to require drug manufacturers, on pain of penalty, to offer drugs to contract pharmacies at 340B prices, as contract pharmacies are not covered entities and Defendants have no authority to require manufacturers to offer discounts to any other type of entity.  *See Pharm. Research & Mfrs. of Am.*, 43 F. Supp. 3d at 31, 39-40.

195.    The 340B statute obligates manufacturers to offer drugs to covered entities—a defined term that does not include contract pharmacies.  42 U.S.C. § 256b(a)(1).  And because Congress listed the entities intended to participate in the 340B Program in the definition of covered entity, the addition of contract pharmacies as a new category of recipients of covered outpatient drugs at 340B discount prices is prohibited.  *See, e.g.*, *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) ("[M]ention of one thing implies exclusion of another thing.").

65

196.    Similarly, Defendants have no authority to create, through guidance or otherwise, an exception to the prohibition on diversion to any entity that is not a patient of the 340B covered entity under the statute.

197.    Defendants likewise have no authority to broaden the scope of the 340B statute to effectively expand the statutory term "covered entities" and extend it to contract pharmacies, as they have now purported to do in the December 30 Decision.

198.    Rather, HRSA possesses limited, circumscribed authority in only three areas: (1) the establishment of an administrative dispute resolution process; (2) the issuance of precisely defined standards of methodology for calculation of ceiling prices; and (3) the imposition of monetary civil sanctions. *See Pharm. Research & Mfrs. of Am.*, 43 F. Supp. 3d at 41 (vacating a rule that fell outside HRSA's regulatory authority).

199.    Accordingly, the December 30 Decision is "in excess of statutory jurisdiction, authority, or limitations" and must be set aside.  5 U.S.C. § 706(2)(C).

## COUNT III
### (Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action)

200.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

201.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

202.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "Normally, an agency rule would be arbitrary

and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

203.   Any change to an agency's policy must also be adequately explained.  The agency must "display awareness that it *is* changing position," "show that there are good reasons for the new policy," and be aware that longstanding policies may have "engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citation and alterations omitted).

204.   The December 30 Decision is arbitrary and capricious because Defendants did not consider the relevant factors.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008).  Indeed, Defendants entirely failed to give adequate consideration to the text of the 340B statute, which precludes Defendants from imposing an obligation on manufacturers to offer discounts to any entity other than the 15 classes of covered entities Congress specifically enumerated.

205.   The December 30 Decision is also arbitrary and capricious because Defendants gave no indication that they gave any, let alone sufficient, consideration to the myriad and far-ranging abuses contract pharmacy arrangements have facilitated.

206.   Furthermore, Defendants' application of their misguided view of the statute to mandate that Lilly offer 340B discounts for contract pharmacy transactions enables covered entity

67

diversion that is expressly prohibited by the 340B statute. *See* 42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."). Specifically, contract pharmacy transactions result in covered entities selling or otherwise transferring covered outpatient drugs to entities that are not "patients" of the covered entity. Use of contract pharmacies necessarily involves a prohibited "transfer" of 340B discounted product to a non-340B covered entity, the contract pharmacy.

207. Finally, the December 30 Decision is arbitrary and capricious because Defendants did not even attempt to reconcile the "obligation" enshrined in it with their earlier pronouncements that manufacturers were under no legally enforceable obligation to offer 340B prices to contract pharmacies. The December 30 Decision thus arbitrarily and capriciously fails to explain Defendants' change in policy.

**COUNT IV**
**(Violation of the Administrative Procedure Act**
**Contrary to the Fifth Amendment to and Article I of the U.S. Constitution)**

208. Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

209. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

210. The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend V.

211. The Takings Clause is not limited to instances where the government physically appropriates property for its own use through eminent domain. Rather, a taking can occur through legislation and regulation that sufficiently deprives a user of his property rights. *Squires-Cannon*

68

*v. Forest Preserve Dist.*, 897 F.3d 797, 798 (7th Cir. 2018).   As the Supreme Court has long recognized, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *Squires-Cannon*, 897 F.3d at 798.

212.    The Takings Clause extends to both real and personal property.  "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."  *Horne*, 576 U.S. at 358.  Confiscatory regulations that mandate the transfer of personal property from one private party to another private party therefore amount to an unconstitutional taking with or without just compensation.  *Id.*; *see E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998).

213.    A taking may be found based on "several factors," including "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action."  *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979).  However, takings claims are inherently fact-intensive, and the ultimate question is whether the government has "forc[ed] some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."  *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1127 (7th Cir. 1996) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

214.    Defendants' decision to mandate that Lilly provide contract pharmacies with 340B-priced drugs is an exceedingly clear example of such a confiscatory regulation.  In no uncertain terms, it forces Lilly to transfer its property, in the form of the drugs it manufactures, to contract pharmacies at a devastating financial loss.  *See E. Enters.*, 524 U.S. at 529 (plurality op.) (evaluating economic impact as a prime factor for assessing whether a taking has occurred); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978) (similar).

215.     Under the December 30 Decision, which forces Lilly to offer discounts to an ever-growing number of contract pharmacies, Lilly stands to lose significant sums of money in both the short and long terms.  The requirement reflected in December 30 Decision that Lilly offer discounts to contract pharmacies, on pain of severe penalty, is therefore unconstitutional, as "the 'power to regulate is not a power to destroy.'"  *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968) (quoting *Stone v. Farmers' Loan & Tr. Co.*, 116 U.S. 307, 331 (1886)); *accord, e.g.*, *Ames v. Union Pac. Ry.*, 64 F. 165, 186-89 (C.C.D. Neb. 1894) (Brewer, J.).

216.     Defendants' December 30 Decision is especially galling—and constitutionally suspect—because it does not seek to use the confiscated property for a public use, as required by the Fifth Amendment.  *See Horne*, 576 U.S. at 371.  Rather, it forces Lilly and other manufacturers to transfer their property ***to other private entities***, many (if not most) of which are large and lucrative corporate pharmacies such as Walgreens and CVS, so that such entities can maximize their profits.  The conclusion that manufacturers must offer discounts on all covered outpatient drugs to an unlimited number of contract pharmacies thus amounts to no more than "a naked transfer of property from private party *A* to *B* solely for *B*'s private use and benefit."  *Carole Media LLC v. N.J. Transit Corp.*, 550 F.3d 302, 311 (3d Cir. 2008).

217.     Such a regulation cannot be reconciled with the Fifth Amendment.  "[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation."  *Kelo*, 545 U.S. at 477; *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) (op. of Chase, J.) (the legislature has no power to enact "a law that takes property from A. and gives it to B."); *Reagan v. Farmers' Loan & Tr. Co.*, 154 U.S. 362, 399, 410 (1894) (similar).   Indeed, such private takings are always unconstitutional, "since [n]o amount of compensation can authorize such action." *Lingle*, 544 U.S.

70

at 543; *see also Coniston Corp. v. Vill. of Hoffman Estates*, 844 F.2d 461, 464 (7th Cir. 1988).  As "[a] purely private taking," the December 30 Decision "serve[s] no legitimate purpose of government" and is therefore "void." *Haw. Housing Auth. v. Midkiff*, 467 U.S., 229, 245 (1984). Accordingly, it must be set aside pursuant to the APA as "contrary to constitutional right."  5 U.S.C. § 706(2)(B).

218.    Nor can the December 30 Decision be justified if only considered prospectively. Even if the December 30 Decision applies only to sales made in 2021 and afterward, it would still raise serious constitutional concerns given the sheer magnitude of Medicaid and Medicare Part B, participation in which Congress has made contingent on participation in the 340B Program (and thus on offering covered outpatient drugs to all covered entities at no more than the ceiling price established pursuant to the 340B statute). *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality op.) ("The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly.").

219.    The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up" to obtain a benefit, such as the ability to participate in a government program.  *Koontz*, 570 U.S. at 604; *see also Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("The 'unconstitutional conditions' doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce.").  This includes the rights to retain one's own personal (or business) property unless properly taken by the government.  *See Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *Nollan*, 483 U.S. at 837.  The doctrine accordingly "forbid[s] the government from engaging in 'out-and-out … extortion' that would thwart the Fifth Amendment" by coercing private parties, on

pain of losing a government benefit, into relinquishing their property without proper compensation. *Koontz*, 570 U.S. at 606 (alteration in original) (quoting *Nollan*, 483 U.S. at 837).

220.    The December 30 Decision effectively forces manufacturers to provide steep discounts to an endless number of for-profit contract pharmacies—even though the latter rarely, if ever, pass along the 340B discounts to the patients whom the Program is designed to serve—or else forego billions of dollars in revenues pursuant to Medicaid and Medicare Part B.

221.    The December 30 Decision thus imposes a previously nonexistent condition that directly contravenes the unconstitutional conditions doctrine.  Indeed, it has all the hallmarks of an "[e]xtortionate demand[]." *Id.* at 605.  If Lilly wishes to continue participating in Medicaid, it must forfeit its constitutional "right not to have property taken without just compensation," *id.* at 607, and agree to provide 340B prices to limitless contract pharmacies.  If it refuses, Lilly would become unable to contract with one of the largest insurance programs in the country, under which approximately 70 million Americans receive insurance. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 581 (2012) (striking down use of Spending Power because "the financial 'inducement' Congress [ ] chose[] is much more than 'relatively mild encouragement'—it is a gun to the head").

222.    At the very least, the broad reading of the 340B statute that is required in order for the December 30 Decision to be within Defendants' statutory authority raises serious constitutional concerns.  In effect, by eviscerating the "covered entity" requirement, it would give Defendants the ability to confiscate property from private drug manufacturers whenever it sees fit, and to grant rights to that property to whomever it sees fit.  The canon of constitutional avoidance weighs heavily against such a reading. *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001).

II.    **Claims Regarding The ADR Rule**

**COUNT V**
**(Violation of the Administrative Procedure Act**
**Contrary to Article II of the U.S. Constitution)**

223.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

224.    The APA provides that a reviewing court shall "hold unlawful and set aside agency action, found to be … contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

225.    The Appointments Clause of the U.S. Constitution provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

226.    The Appointments Clause "is among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  "By vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches."  *Id.*  Although it may be administratively convenient for Congress to permit other persons to appoint officers, "that convenience was deemed to outweigh the benefits of the more cumbersome procedure only with respect to the appointment of 'inferior Officers.'"  *Id.* at 661.

227.    The Appointments Clause applies to "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  To be an "officer," an individual must have "continuing and permanent" duties

73

and must "exercise[e] significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). In the agency adjudication context, an individual is an officer when she can "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.* at 2052 (quoting *Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868, 881-82 (1991)).

228. That description fits ADR panel members to a T. Just like the administrative law judges in *Lucia* and the special tax judges in *Freytag*, 340B ADR panelists have "significant discretion" to "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Lucia*, 138 S. Ct. at 2051 (quoting *Freytag*, 501 U.S. at 881-82); *see* 42 C.F.R. § 10.23 (permitting ADR panel to "conduct an evidentiary hearing when there are material facts in dispute"); *id.* § 10.22(b)-(c) (permitting ADR panel to "request additional information from either party" and sanction noncompliance); *see also* 85 Fed. Reg. at 80,641 (noting that the ADR Rule "allow[s] the 340B ADR Panel discretion in admitting evidence and testimony during the course of a proceeding"). Furthermore, the ADR Rule does not place any time limitation on panelists' service, with the result that their duties are "continuing and permanent." *Lucia*, 138 S. Ct. at 2051. And ADR panel decisions are "final agency decisions, binding on the parties, and precedential." 85 Fed. Reg. at 80,642; *see* 42 C.F.R. § 10.24(d). ADR panelists are thus Article II officers under a straightforward application of Supreme Court caselaw.

229. They are just as clearly ***principal*** officers. Once an individual has been identified as an officer, "the starting place for assessing the constitutionality of an officer's appointment is determining to which class the officer belongs." *Ass'n of Am. R.R. v. U.S. Dep't of Transp.*, 821 F.3d 19, 38 (D.C. Cir. 2016). If the officer is principal, but was not appointed by the President with advice and consent of the Senate, her appointment violates the Constitution. *Id.* So it is here.

230.    The Supreme Court has ***never*** found an agency adjudicative officer to be inferior when—as here—her decisions were not reviewable by a superior executive officer.  *See generally Edmond*, 520 U.S. at 662-63 (Because "[w]hether one is an 'inferior' officer depends on whether he has a superior," it is "evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.").  And unlike the (inferior-officer) judges of the Court of Criminal Appeals in *Edmond* or the (inferior-officer) members of the Public Company Accounting Oversight Board in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), ADR panel decisions ***are not subject to review by any superior executive official***. Indeed, ADR panelists—***and only ADR panelists***—have authority to "make precedential and binding final agency decisions regarding claims filed by covered entities and manufacturers."  42 C.F.R. § 10.20.  *Compare id.*, *with Free Enter. Fund*, 561 U.S. at 486 (Board members are inferior officers because their actions are "subject to [SEC] approval and alteration"), *and Edmond*, 520 U.S. at 664-65 (CCA judges are inferior officers because they have no power to render final decisions on behalf of the U.S. "unless permitted to do so by other Executive officers").  ADR panel members are thus principal executive officers under a straightforward application of Supreme Court caselaw.

231.    And because the ADR Rule permits these principal-officer panelists to hold office without nomination by the President and approval by the Senate, their appointment is unconstitutional under the Appointments Clause.  Indeed, the lack of "any procedure by which [an agency] arbitrator's decision is reviewable by the [relevant agency]" ***is alone sufficient*** to render the arbitrator unconstitutionally appointed.  *Ass'n of Am R.R*, 821 F.3d at 39.  "Without providing

for the arbitrator's direction or supervision by principal officers, [the challenged statute] impermissibly vests power to appoint an arbitrator in the [relevant agency]." *Id.*

232.    The ADR Rule's protection of ADR panelists from at-will removal only serves to confirm their status as superior officers.  The Supreme Court has placed great weight on whether the officer in question was removable at will, as "[t]he power to remove officers … is a powerful tool for control." *Edmond*, 520 U.S. at 664; *see also Free Enter. Fund*, 561 U.S. at 510 ("Given that the Commission is properly viewed … as possessing the power to remove Board members at will, and given the Commission's other oversight authority, we have no hesitation in concluding that under *Edmond* the Board members are inferior officers ….").  ADR panelists are not removable at will.  Under 42 C.F.R. § 10.20(a)(1)(ii), a panelist can be "[r]emove[d] … from a 340B ADR Panel" only "for cause."  Indeed, it is unclear whether members of the 340B ADR Board can be removed from that body ***at all***; no provision governs such a removal.  That HHS lacks this "powerful tool for control" over 340B ADR panelists illustrates the reality that their decisions are not "directed and supervised … by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663-64.

233.    Accordingly, because 340B ADR panelists are principal officers but were not appointed by the President with advice and consent of the Senate, the ADR Rule is unlawful as "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

234.    These very principles are currently under consideration by the United States Supreme Court on a writ of certiorari.  In *Arthrex, Inc. v. Smith & Nephew, Inc.*, the Federal Circuit concluded that "[t]he lack of any presidentially-appointed officer who can review, vacate, or correct decisions by APJs [administrative patent judges] combined with [a] limited removal power" makes those judges "principal officers."  941 F.3d 1320, 1335 (Fed. Cir. 2019), *pets. for*

*reh'g en banc denied*, 953 F.3d 760 (Fed. Cir. 2020).  Because APJs were not appointed by the President with the Senate's advice and consent, the Federal Circuit held their appointments were unconstitutional.  *See id.*  The Federal Circuit concluded, in the context of the specific statute at issue there, that the APJs could be converted into inferior officers (thus curing the constitutional defect), by severing the statute's removal provision.  *Id.* at 1338.  The Supreme Court granted certiorari on both conclusions.  *See Smith & Nephew, Inc. v. Arthrex, Inc.*, 2020 WL 6037207 (U.S. Oct. 13, 2020).  Oral argument is set for March 1, 2021.  While the conclusion that APJs as originally constituted were principal officers is undoubtedly correct, the remedial conclusion is not:  No Presidential appointee must (or even may) review APJ decisions even as severed, which means that APJs—like ADR panelists—remain principal officers.

### COUNT VI
### (Violation of the Administrative Procedure Act
### Contrary to Article III of the U.S. Constitution)

235.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

236.    The Constitution vests the judicial power of the United States "in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.  And "[w]hen a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts."  *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation and quotation marks omitted). Resolving "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law" is constitutionally assigned "to the Judiciary."  *Id.* (quotation marks omitted).  As a result, a statute or regulation violates Article III if it "confer[s] the Government's 'judicial Power' on entities outside Article III."  *Id.*

237.    Article III protects the rights of private litigants and the rule of law by ensuring that those who resolve their disputes do so without influence from the Executive.  It provides that judges "shall hold their Offices during good Behaviour, and [who] shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office."  U.S. Const. art. III, § 1.  This structural feature is an indispensable means by which the Constitution secures impartial adjudication and individual liberty, as it creates "in a body of judges insulated from majoritarian pressures and thus able to enforce [federal law] without fear of reprisal or public rebuke."  *United States v. Raddatz*, 447 U.S. 667, 704 (1980) (Marshall, J., dissenting).

238.    Since the earliest days of the Republic, the Supreme Court has understood that the adjudication of private rights must be overseen by Article III courts, and Article III courts alone.  *See, e.g.*, *Stern*, 564 U.S. at 484; *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856); *see also* Caleb Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. 559, 569 (2007).  Whether a statute or regulation conferring adjudicatory authority on a non–Article III tribunal is constitutional thus depends in considerable part on whether the adjudication involves "public rights" or "private rights":  Congress may "assign adjudication of public rights to entities other than Article III courts," *Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1374 (2018), but it may not do so with "private rights," *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70 (1982) (plurality op.).

239.    Rights to private property are a fundamental part of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in the judgment), and they therefore must be adjudicated by Article III courts.  Courts, commentators, and legislatures have always understood that "[t]he legislative power … cannot directly reach the property or vested rights of the citizen, by providing for their

forfeiture or transfer to another, without trial and judgment in the courts."  *Newland v. Marsh*, 19 Ill. 376, 382 (1857); *see also* Theodore Sedgwick, *A Treatise on the Rules Which Govern the Interpretation and Application of Statutory and Constitutional Law* 676 (N.Y., J.S. Voorhies ed., 1857) (all have "the right to judicial procedure, investigation, and determination, whenever life, liberty, or property is attacked"); Nelson, *supra*, at 601 (early-twentieth-century statutes "drew a sharp distinction between administrative orders calling for the payment of money (which could be enforced only through suits in district court that proceeded 'like other civil suits for damages' and in which [agencies'] underlying findings were simply '*prima facie* evidence'" and other administrative orders (as to which [such] underlying findings, 'if supported by substantial evidence,' were to be 'conclusive unless … clearly … arbitrary or capricious'" (citation omitted)).

240.    The ADR Rule flagrantly violates these basic principles.  By enabling panels to mandate that Lilly transfer its property in the form of its drugs to covered entities often at an extreme financial loss to Lilly (and others), and by enabling those panels to enforce such decisions through binding money judgments, the ADR Rule empowers ADR panels to determine "the liability of one individual to another under the law as defined."  *N. Pipeline*, 458 U.S. at 69-70 (quoting *Crowell v. Benson*, 285 U.S. 22, 51 (1932)); *see also Stern*, 564 U.S. at 494.  The ADR Rule therefore unconstitutionally permits Executive Branch employees not only to adjudicate claims for money damages or equitable relief brought by one private party to obtain another's property without paying for its value, but to issue ***self-executing judgments*** on those claims.

241.    Nor is this a case in which a non–Article III adjudication of private rights may be permissible because a federal court "retain[s] supervisory authority over the process."  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944 (2015); *see, e.g.*, *Peretz v. United States*, 501 U.S. 923, 937 (1991) (magistrate judges do not violate Article III because the district court can

remove a magistrate judge and "the entire process takes place under the district court's total control and jurisdiction" (citation omitted)); *Sharif*, 135 S. Ct. at 1944-45 (same with bankruptcy court judges). Judicial review is only available through the APA, 85 Fed. Reg. at 80,641, which provides for substantial evidence review of agency action, *see* 5 U.S.C. § 706(2)(E). This deferential review does not suffice. *See CFTC v. Schor*, 478 U.S. 833, 853 (1985) (noting that the "more deferential standard [of review] in *Northern Pipeline*" meant that the federal courts did not exert constitutionally sufficient control under that regime).

242.    Moreover, ADR panels "exercise[] the range of jurisdiction and powers normally vested only in Article III courts," which further undermines federal courts' control and further underscores the Article III violation. *See id.* at 850. As described above, ADR panels have authority to award money judgments, issue equitable remedies, take evidence and hear testimony, apply the Federal Rules of Civil Procedure and Evidence, impose sanctions, issue precedential and binding decisions, and decide ancillary legal issues. And, again, ADR panels' binding and precedential money judgments appear to be self-executing. That makes the ADR process quite unlike most other administrative review schemes, which require litigants to apply to a federal court for enforcement of an order. *See, e.g.*, 7 U.S.C. § 18(d)(1); 29 U.S.C. § 1401(b)(2); *see also Schor*, 478 U.S. at 753 ("CFTC orders, like those of the agency in *Crowell*, but unlike those of the bankruptcy courts under the 1978 Act, are enforceable only by order of the district court.").

243.    The ADR Rule accordingly violates Article III of the Constitution and should be set aside as contrary to law.

## COUNT VII
### (Violation of the Administrative Procedure Act
### Exceeding Statutory Authority)

244.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

245.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

246.     As explained above, the ADR Rule violates both Article II and Article III of the U.S. Constitution.  The Court can also invalidate the ADR Rule, however, as contrary to law under the APA, since Congress is presumed not to authorize violations of the Constitution.

247.     For example, the 340B statute itself does not authorize ADR panels to issue decrees concerning "money damages" or "equitable relief" between private parties.  It says only that the agency may "promulgate regulations to establish and implement an administrative process[,] … including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions."  42 U.S.C. § 256b(d)(3).  Yet the statutory term "appropriate procedures for the provision of remedies" is general and not self-defining; it does not specify *what* remedies are to be made available by the ADR regulations— only that they be "appropriate."  And an unconstitutional regulation cannot be an appropriate one.

248.     Accordingly, the ADR Rule is "in excess of statutory jurisdiction, authority, or limitations" and must be set aside.  5 U.S.C. § 706(2)(C).

249.     Or, at the very least, the Court should construe the statute not to authorize remedies, such as private money judgments or equitable relief between private parties, that would render the statutory scheme unconstitutional.  *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001); *United States v. Orona-Ibarra*, 831 F.3d 867, 875-76 (7th Cir. 2016).

## COUNT VIII
### (Violation of the Administrative Procedure Act
### Failure to Provide Notice and Comment)

250.     Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this complaint.

251.    The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

252.    The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law."  *Id.* § 706(2)(D).

253.    To issue a valid legislative rule (such as the ADR Rule), an agency must comply with the APA's rigorous notice-and-comment procedures.  *See id.* § 553(b).

254.    Defendants did not do so in promulgating the ADR Rule.

255.    That Defendants provided notice-and-comment through the 2016 NPRM does not absolve their failure to do so in 2020.  That is because Defendants ***withdrew the NPRM*** on August 1, 2017, and took no subsequent action on the rule before announcing that it was being resurrected with significant changes.  The decision to withdraw had black-letter consequences, as it put regulated parties on notice that, rather than intending on continuing with the rulemaking process, the agencies had "[chosen] the status quo" of non-regulation.  *Ctr. for Auto Safety v NHTSA*, 710 F.2d 842, 746 (D.C. Cir 1983); *cf. Cierco v. Lew*, 190 F. Supp. 3d 16, 25 (D.D.C. 2016) (withdrawal of NPRM left challenger to notice with no relief), *aff'd on other grounds sub nom. Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017).  Put another way, if the purpose of notice-and-comment is "to put interested parties on notice that Administrative rulemaking in certain areas is about to take place," *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 989 (D.C. Cir. 1978), the withdrawal put regulated parties on notice that rulemaking would ***not*** occur.  Thus, in order to promulgate an ADR rule, Defendants needed to engage in notice and comment again.

256.     That is all the more true given that, in the intervening four years, much changed about the 340B Program and stakeholder understandings and expectations, such that the comments provided and agency considerations would have been different in 2020 than they were in 2016. As the Pharmaceutical Research and Manufacturers of America ("PhRMA"), which represents the country's leading biopharmaceutical researchers and biotechnology companies, explained in its recent petition for rulemaking, the 340B Program has become increasingly and unsustainably plagued by material compliance issues over the past few years.  *See* Exh. O; *see also* GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, No. GAO-21-107 (Dec. 14, 2020) (admitting that HRSA lacks sufficient enforcement authority to deal with contract pharmacy abuses of the Program).  Yet defendants took precisely none of that into account when they dusted off the old NPRM and issued an altered version of it late last year.

257.     While Defendants stated in the ADR Rule that the NPRM was not actually withdrawn, that position is unpersuasive, inadequately explained, and nakedly pretextual. According to Defendants, they merely froze the proposal pursuant to President Trump's regulatory freeze memorandum.  But that argument is facially and fundamentally flawed:  On its face, the memorandum does not apply to rules promulgated to meet statutory deadlines, such as the ADR rule.  In any event, had Defendants believed (wrongly) that the memorandum did apply to their NPRM, they would have withdrawn that NPRM "immediately," as the memorandum directed; in reality, however, they did not.  That is the end of the matter:  Courts are not required to defer to agency explanations where "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2018).

258.     That Defendants' explanation is pretextual becomes all the more clear when it is juxtaposed with Defendants' own actions, which confirm beyond doubt that the NPRM was indeed

withdrawn.  Defendants withdrew the rule from the Unified Agenda in August 2017 and did not relist the NPRM on the agenda until the finalized rule appeared.  *See* Office of Info. & Reg. Affairs: Reginfo.gov, *Final Rule: RIN 0906-AB26* (Fall 2020), https://bit.ly/39cOomV.   Meanwhile, Defendants HRSA ***expressly told the public*** that it had no intention of publishing an ADR in the near future.   These actions not only underscore that the rule announced in the NRPM was withdrawn, but also confirm that Defendants' actions in the lead-up to the eleventh-hour promulgation put manufacturers on notice that no rulemaking would imminently take place.

259.    Finally, the agency's withdrawal is further evidenced by the fact that the NPRM and the final rule have different RINs.  The NPRM, published at 81 Fed. Reg. 53,381, has a RIN of 0906-AA90.  The final Rule, however, has a RIN of 0906-AB26.  A RIN is given to a regulatory action when that action is entered into the rulemaking database, and a regulatory action retains the same RIN throughout the entire rulemaking process so that interested parties can monitor its progress.  On information and belief, if the rule had not been withdrawn, then the ADR Rule and NPRM would have matching RINs.  But they do not, confirming that the NPRM was withdrawn.

260.    Because Defendants did not proceed through notice-and-comment rulemaking after the NPRM's withdrawal, as the APA required, the final ADR Rule must be set aside.

261.    In any event, the agency never provided affected parties with the opportunity to comment on several provisions that appear in the ADR Rule but that were absent from, and do not logically grow from, the original NPRM.  The NPRM did not mention, let alone elaborate upon, any suggestion that the agency intended to give ADR panels the authority to issue binding judgments for money damages, the as-yet-unspecified equitable relief mentioned in the Final Rule, or that their decisions would be "precedential."  Thus, even if the NPRM had not been withdrawn,

the ADR Rule would violate the APA's notice-and-comment requirement because the final rule is not a "logical outgrowth" of the NPRM.

262.    A final rule is a "logical outgrowth" of a proposed rule only if interested parties "'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004).  "If a 'final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal,'" and the agency accordingly must undergo notice-and-comment again.  *Public Citizen, Inc. v. Mineta*, 427 F. Supp. 2d 7 (D.D.C. 2006) (quoting *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985)).  For the reasons explained above, the addition of these provisions concerning ADR panels' power to issue money-judgment and equitable decrees, and the decision to ascribe them precedential force, raise important questions of constitutional and statutory interpretation about which the public had no opportunity to present its views.  None of these provisions grows out of the NPRM's original language—and indeed, the final Rule ***does not even acknowledge that this language is new***, much less provide a reasoned explanation for its inclusion.  Accordingly, because no manufacturer could "divine [the Agency's] unspoken thoughts" on this issue, *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000) (citation omitted), the Rule is not a logical outgrowth, and further invalid.

### COUNT IX
### (Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action)

263.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

264.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

265.    Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

266.    The ADR Rule is substantively arbitrary and capricious in several respects.

267.    As an initial matter, the Rule fails to account for changed legal circumstances in the years since it withdrew the rule (or, at the very least, since the notice-and-comment period ended).  Since notice and comment ended nearly four years ago, not only has the Supreme Court clarified its Appointments Clause jurisprudence, but it recently granted certiorari on an issue nearly identical to the one presented in this complaint, *i.e.*, whether Article II officers with a suite of powers and functions very similar to ADR panelists are principal officers whose non-Presidential appointment violates the Constitution.  *See United States v. Arthrex Inc.*, 141 S. Ct. 549, *cert. granted* (U.S. Oct. 13, 2020) (No. 19-1434).  If the Court answers that question in the affirmative, then the ADR Rule cannot stand.  But even without a definitive ruling from the Court, the ADR Rule still does not pass muster because it does not contain any explanation, let alone a reasoned one, as to how the ADR process comports with the changed legal landscape after *Lucia*.  *See, e.g.*,

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020) (an agency is "susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem" if its rules do not account for legal developments).

268.    The same is true with respect to the Article III concerns raised herein.  The ADR Rule does not even acknowledge, let alone attempt to justify, how a process that affords Executive Branch employees full adjudicative powers, including the ability to exercise common-law interpretive authority and the power to issue binding money judgments or equitable relief touching private property, without being subject to an Article III court's plenary control, could be constitutional.  Here, too, the agency has failed to grapple with an important aspect of the problem.

269.    These are hardly the only examples of the agency's reliance on a stale record. PhRMA's petition for rulemaking (Exh. O) raised a host of concerns with the Program that had come to the fore in the intervening four years.   Yet Defendants did not even acknowledge PhRMA's petition or the concerns PhRMA had raised.  That failure to consider new information shows the ADR Rule is not "based on a consideration of the relevant factors and [that] there has been a clear error of judgment."  *Nader v. FCC*, 520 F.2d 182, 192 (D.C. Cir. 1975) (quoting *Citizens to Preserve Overton Park v. Volpe*, 410 U.S. 402, 416 (1971)); *see NRDC v. Herrington*, 768 F.2d 1355, 1408 (D.C. Cir. 1985) ("Whether or not DOE acted reasonably in issuing rules in 1982 and 1983 based on 1980 information, we think it would be patently unreasonable for DOE to begin further proceedings in the last half of 1985 based on data half a decade old.").

270.    The Rule is likewise arbitrary and capricious because Defendants failed to explain the reasons for choosing the structure for administrative dispute resolution established by the Rule. As manufacturers explained in comment letters, the ADR panel would likely be staffed by many of the same individuals responsible for creation and implementation of HRSA policy.  Because

these individuals serve in other administrative functions, they are likely to hold biases, policy positions, or other objectives outside of the limited facts of the dispute at issue. There are virtually no safeguards under the Rule to limit these individuals from bringing their subjective views to bear in the ADR process. The ex-officio OPA member only compounds these risks with its potential to exert undue influence over the panel. Defendants' back-of-the-hand response that manufacturers should simply accept Defendants' say-so that no bias would exist falls far short of reasoned decisionmaking. *See, e.g.*, *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 333 (D.D.C. 2016) ("failing to respond to a comment rises to the level of arbitrariness if it 'demonstrates that the agency's decision was not based on a consideration of the relevant factors'" (citation omitted)); *see also* Kent H. Barnett, *Why Bias Challenges to Administrative Adjudication Should Succeed*, 81 Mo. L. Rev. 1023 (2016) (agency employees exhibit significant bias compared to ALJs).

271.    The agency's choice of ADR panelists instead of more independent ALJs is both unreasonable and unreasonably explained. The agency claims that the panel structure is reasonable because it allows relevant government officials to draw on their expertise. But the lion's share of what panelists do—*i.e.*, hearing evidence, making credibility determinations, applying and interpreting the Federal Rules of Evidence and Civil Procedure, and even imposing sanctions—is far more analogous to common-law judging and ***has nothing whatsoever to do*** with specialized agency expertise. The ADR Rule provides that ADR panels will "resolve all issues underlying any claim or defense, including, by way of example, those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales that the 340B ADR Panel deems relevant for resolving an overcharge, diversion, or duplicate discount claim." 85 Fed. Reg. at 80,636. They are the tasks of judges, familiar to ALJs who likely have the professional competence, experience, and independence to conduct an impartial adjudication. Besides that,

ADR panel rulings are "precedential" under the Rule, *see* 42 C.F.R. § 10.24(d), meaning that subsequent panels are supposed to uphold a body of existing administrative case law (again, a quintessentially judicial task) rather than adapt or alter decisionmaking based on accreted expertise.  There is, in short, no fit between the problem of whom to appoint as adjudicators and the agency's solution of appointing non-neutral agency employees instead of professional judges.

272.  In truth, the agency's evident reason for conferring vast adjudicatory power on non-neutral employees rather than professional judges is to come as close as possible to circumventing the agency's lack of any rulemaking authority under the 340B statute.  *See Orphan Drug I*, 43 F. Supp. 28.  Defendants have no statutory authority to define covered entities to include contract pharmacies, as they have recognized repeatedly over the course of two decades.  *See, e.g.*, Tom Mirga, *HRSA Says its 340B Contract Pharmacy Guidance Is Not Legally Enforceable*, 340B Report (July 9, 2020); 75 Fed. Reg. at 10,273; 61 Fed. Reg. at 43,550.  Indeed, it was this very lack of regulatory authority that, a mere eight months before issuing the Final Rule, led an HHS official to state that the agency could not promulgate an ADR rule.  Tom Mirga, *HRSA: 340B Dispute Resolution Will Stay on Hold Until We Get Broader Regulatory Authority*, 340B Report (Mar. 12, 2020), https://bit.ly/3651i5z.  Now, however, under the provisions of the ADR Rule, agency employees who ***cannot*** issue a rulemaking to effectuate their policy views can instead issue a "precedential" decision to set a prospective rule of decision for ADR panels.

273.  The rule is also arbitrary and capricious because it fails to address Lilly's (and other manufacturers') concerns regarding Defendants' outdated and burdensome auditing guidelines.  Though the Final Rule acknowledged that numerous commenters had raised this issue, it gave them short shrift, in a conclusory manner and without explanation that "updated manufacturer audit guidelines" are not "needed to finalize the ADR process" and that ADR panels can

"determine when there have been statutory violations concerning overcharges, diversion, and duplicate discounts." 85 Fed. Reg. at 80,633. This sort of *ipse dixit* response to serious comments striking at the heart of the fairness and unbiased nature of the ADR process does not satisfy arbitrary-and-capricious review. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."); *see also, e.g.*, *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 543-44 (D.C. Cir. 2010) (noting that an agency "must respond to objections and address contrary evidence in more than a cursory fashion."); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("[T]he Commission's dismissive treatment of [an] objection, which was hardly a response at all, was not the product of a reasoned decisionmaking process.").

274.    Finally, Defendants' failure to make any adjustments in the wake of their three-year silence renders the rule arbitrary and capricious. Both the NPRM and the ADR Rule provide that a covered entity has three years to bring a claim. So as things currently stand, a covered entity has the ability to seek redress for claims occurring throughout the entire three-year period that the Rule was withdrawn, during which time manufacturers ordered their businesses under the understanding that no formalized ADR process was imminent. At the very least, the Rule should have considered and implemented timeframes that reflect the manifest unfairness of subjecting parties to binding money judgments when they had no reason to expect that such liability would arise.

275.    For all of these reasons, the ADR Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and must be set aside. 5 U.S.C. § 706(2)(A).

### III.    Claims Regarding the May 17 Letter

### COUNT X
### (Violation of the Administrative Procedure Act
### Exceeding Statutory Authority)

276.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

277.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

278.    The 340B statute does not confer on Defendants the authority to require Lilly, on pain of penalty, to offer drugs to contract pharmacies at 340B prices, as contract pharmacies are not covered entities and Defendants have no authority to require manufacturers to offer discounts to any other type of entity.  *See Pharm. Research & Mfrs. of Am.*, 43 F. Supp. 3d at 31, 39-40. Indeed. the 340B statute is does not include a "broad, expansive rulemaking authority[,]" but rather is a "specific grant[] of authority" that simply does not extend so far as to allow HHS to require manufacturers to give discounts to any entity apart from a statutorily defined covered entity.  *See id.*

279.    The 340B statute obligates manufacturers to offer drugs to covered entities—a defined term that does not include contract pharmacies.  42 U.S.C. § 256b(a)(1).  And because Congress listed the entities intended to participate in the 340B Program in the definition of covered entity, the addition of contract pharmacies as a new category of recipients of covered outpatient drugs at 340B discount prices is prohibited.  *See, e.g.*, *Ethyl Corp.*, 51 F.3d at 1061 ("[M]ention of one thing implies exclusion of another thing.").

280.    Similarly, Defendants have no authority to create, through guidance and certainly not through an enforcement action, an exception to the prohibition on diversion to any entity that is not a patient of the 340B covered entity under the statute.

281.     Defendants likewise have no authority to broaden the scope of the 340B statute to effectively expand the statutory term "covered entities" and extend it to contract pharmacies or to transactions in which covered entities do not themselves "purchase" covered outpatient drugs, as they purport to do in the May 17 Letter.

282.     Accordingly, the May 17 Letter is "in excess of statutory jurisdiction, authority, or limitations" and must be set aside.  5 U.S.C. § 706(2)(C).

### COUNT XI
### (Violation of the Administrative Procedure Act
### Contrary to the Fifth Amendment to and Article I of the U.S. Constitution)

283.     Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

284.     The APA provides that a reviewing court shall "hold unlawful and set aside agency action, found to be … contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

285.     The Takings Clause of the Fifth Amendment provides:   "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend V.

286.     The Takings Clause is not limited to instances where the government physically appropriates property for its own use through eminent domain.  Rather, a taking can occur through legislation and regulation that sufficiently deprives a user of his property rights.  *Squires-Cannon*, 897 F.3d at 798.  As the Supreme Court has long recognized, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  *Penn. Coal Co.*, 260 U.S. at 415; *see also, e.g.*, *Lingle*, 544 U.S. at 537; *Squires-Cannon*, 897 F.3d at 798.

287.     The Takings Clause extends to both real and personal property.  "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."  *Horne*, 576 U.S. at 358.  Confiscatory regulations that mandate the transfer of personal

property from one private party to another private party therefore amount to an unconstitutional taking with or without just compensation.  *Id.*; *see E. Enters.*, 524 U.S. at 529.

288.    A taking may be found based on "several factors," including "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action."  *Kaiser Aetna*, 444 U.S. at 175.  However, takings claims are inherently fact-intensive, and the ultimate question is whether the government has "forc[ed] some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."  *Davon*, 75 F.3d at 1127 (quoting *Armstrong*, 364 U.S. at 49).

289.    Defendants' decision to mandate that Lilly provide contract pharmacies with 340B-priced drugs, or to require reimbursements for transactions in which covered outpatient drugs are not "purchased" by covered entities, is an exceedingly clear example of such a confiscatory regulation.  In no uncertain terms, it forces Lilly to transfer its property, in the form of the drugs it manufactures, to contract pharmacies at a devastating financial loss.  *See E. Enters.*, 524 U.S. at 529 (plurality op.) (evaluating economic impact as a prime factor for assessing whether a taking has occurred); *Penn Central Transp. Co.*, 438 U.S. at 124 (similar).

290.    Under the May 17 Letter, which forces Lilly to offer discounts to an ever-growing number of contract pharmacies, Lilly stands to lose significant sums of money in both the short and long terms.  The requirement reflected in the Letter that Lilly offer discounts to contract pharmacies, on pain of severe penalty, is therefore unconstitutional, as "the 'power to regulate is not a power to destroy.'"  *In re Permian Basin Area Rate Cases*, 390 U.S. at 769 (quoting *Stone*, 116 U.S. at 331); *accord, e.g.*, *Ames*, 64 F. at 186-89 (Brewer, J.).

291.    The May 17 Letter is especially galling—and constitutionally suspect—because it does not seek to use the confiscated property for a public use, as required by the Fifth Amendment.

*See Horne*, 576 U.S. at 371.  Rather, it forces Lilly and other manufacturers to transfer their property ***to other private entities***, many (if not most) of which are large and lucrative corporate pharmacies such as Walgreens and CVS, so that such entities can maximize their profits.  The conclusion that manufacturers must offer discounts on all covered outpatient drugs to an unlimited number of contract pharmacies thus amounts to no more than "a naked transfer of property from private party *A* to *B* solely for *B*'s private use and benefit."  *Carole Media*, 550 F.3d at 311.

292.    Such a regulation cannot be reconciled with the Fifth Amendment.  "[I]t has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation."  *Kelo*, 545 U.S. at 477; *see also Calder*, 3 U.S. (3 Dall.) at 388 (op. of Chase, J.) (the legislature has no power to enact "a law that takes property from A. and gives it to B"); *Reagan*, 154 U.S. at 399, 410 (similar).  Indeed, such private takings are always unconstitutional, "since [n]o amount of compensation can authorize such action."  *Lingle*, 544 U.S. at 543; *see also Coniston Corp.*, 844 F.2d at 464.  As "[a] purely private taking," the May 17 Letter "serve[s] no legitimate purpose of government" and is therefore "void."  *Midkiff*, 467 U.S. at 245.  Accordingly, it must be set aside pursuant to the APA as "contrary to constitutional right."  5 U.S.C. § 706(2)(B).

293.    Nor can the May 17 Letter be justified if only considered prospectively.  Even if the Letter applies only to sales made in 2021 and afterward, it would still raise serious constitutional concerns given the sheer magnitude of Medicaid and Medicare Part B, participation in which Congress has made contingent on participation in the 340B Program (and thus on offering covered outpatient drugs to all covered entities at no more than the ceiling price established pursuant to the 340B statute).  *See Elrod*, 427 U.S. at 361 (plurality op.) ("The denial of a public

benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly.").

294.    The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up" to obtain a benefit, such as the ability to participate in a government program.  *Koontz*, 570 U.S. at 604; *see also Packard*, 741 F.2d at 988 ("The 'unconstitutional conditions' doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce.").  This includes the rights to retain one's own personal (or business) property unless properly taken by the government.  *See Dolan*, 512 U.S. at 385; *Nollan*, 483 U.S. at 837.  The doctrine accordingly "forbid[s] the government from engaging in 'out-and-out … extortion' that would thwart the Fifth Amendment" by coercing private parties, on pain of losing a government benefit, into relinquishing their property without proper compensation.  *Koontz*, 570 U.S. at 606 (alteration in original) (quoting *Nollan*, 483 U.S. at 837).

295.    The May 17 Letter effectively forces Lilly to provide steep discounts to an endless number of for-profit contract pharmacies—even though the latter rarely, if ever, pass along the 340B discounts to the patients whom the Program is designed to serve—or else forego huge amounts of revenue pursuant to Medicaid and Medicare Part B.

296.    The May 17 Letter thus imposes a previously nonexistent condition that directly contravenes the unconstitutional conditions doctrine.  Indeed, it has all the hallmarks of an "[e]xtortionate demand[]."  *Id.* at 605.  If Lilly wishes to continue participating in Medicaid, it must forfeit its constitutional "right not to have property taken without just compensation," *id.* at 607, and agree to provide 340B prices to limitless contract pharmacies.  If it refuses, Lilly would become unable to contract with one of the largest insurance programs in the country, under which

approximately 70 million Americans receive insurance. *Cf. NFIB*, 567 U.S. at 581 (striking down use of Spending Power because "the financial 'inducement' Congress [ ] chose[] is much more than 'relatively mild encouragement'—it is a gun to the head").

297.    At the very least, the broad reading of the 340B statute that is required in order for the May 17 Letter to be within Defendants' statutory authority raises serious constitutional concerns. In effect, by eviscerating the "covered entity" requirement, it would give Defendants the ability to confiscate property from private drug manufacturers whenever it sees fit, and to grant rights to that property to whomever it sees fit. The canon of constitutional avoidance weighs heavily against such a reading. *See, e.g.*, *St. Cyr*, 533 U.S. at 299-300.

## COUNT XII
### (Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action)

298.    Lilly re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

299.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

300.    The May 17 Letter is arbitrary and capricious for all of the same reasons that the December 30 Decision is arbitrary and capricious. The letter does not even attempt to reconcile this newfound obligation with the text of the statute; does not acknowledge, let alone sufficiently address, the myriad and far-ranging abuses contract pharmacy arrangements have facilitated; and is fundamentally incompatible with the government's earlier pronouncements that manufacturers were under no legally enforceable obligation to offer 340B prices to contract pharmacies

301.    But the May 17 letter is arbitrary and capricious in several additional ways. First, Defendants did not even attempt to reconcile its reasoning—and its extension of the purported

obligations it imposes beyond contract pharmacies allegedly acting as "agents" of covered entities—with the December 30 Decision.  The May 17 Letter conspicuously makes no mention of the "agency" theory the government had defended and relied on in its brief before this Court filed only 28 days before HRSA sent the May 17 Letter.  This violates the fundamental premise of administrative law that an administrative agency must at least demonstrate awareness that it is changing its position.  *See Fox Television Stations, Inc.*, 556 U.S. at 515; *Encino Motorcars,* 136 S. Ct. at 2126. HRSA failed to even acknowledge that it had previously advanced an "agency" theory justifying Lilly's purported obligations to provide 340B discounts to contract pharmacy transactions or that the May 17 Letter drops the previously announced "agency" limitation, much less explain the reasoning behind this change.   The May 17 Letter therefore arbitrarily and capriciously fails to explain Defendants' change in policy.

302.    The May 17 Letter is also arbitrary and capricious because it was not "both reasonable and reasonably explained."  *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 937 (D.C. Cir. 2017).  The May 17 Letter, like the December 30 Decision, relies on the statutory provision stating that a manufacturer "shall … offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  Exh. P at 1 (quoting section 340B(a)(1) of the Public Health Service Act, Pub. L. No. 102-585, Title VI, § 602(a), 106 Stat. 4943, 4967 (1992)).  It also claims that manufacturers have been under this obligation since the agency first issued its 1996 guidance on contract pharmacies.  *Id.*  Yet Defendants **never** explain how the statutory "must offer" language could have created this obligation when it was not added to the statute until 2010.   Nor does the Letter account for Defendants' multiple prior pronouncements that they lack authority to impose any such obligation on manufacturers.  Such a

failure to offer even a plausible explanation of its statutory construction, or to explain (let alone account for) Defendants' abrupt change in position, is arbitrary and capricious.

**COUNT XIII**
**(Violation of the Administrative Procedure Act**
**Failure to Provide Notice and Comment)**

303.    Lilly re-alleges and incorporates the allegations in all of the preceding paragraphs of this Complaint.

304.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

305.    The May 17 Letter constitutes "final agency action for which there is no other adequate remedy," *id.* § 704, and Lilly has exhausted all of its available administrative remedies and/or pursuit of any further administrative remedies would be futile.  *See Sackett*, 566 U.S. at 125–27.

306.    The May 17 Letter definitively "determine[s]" that Lilly "must immediately begin offering its covered outpatient drugs at the 340B ceiling price" to contract pharmacy purchases, and not just covered entity purchases.  Exh. P at 1-2.  It plainly embodies a legislative rule under the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law."  5 U.S.C. § 706(2)(C).  It therefore constitutes a legislative rule under the APA, because it creates and announces obligations with which Lilly must comply, on pain of "CMP[s] not to exceed $5,000 for each instance of overcharging" and expulsion from the 340B Program.  Exh. P at 2.

307.    To determine whether an agency has issued a legislative rule, courts inquire into the effect of the rule on the agency itself and on regulated parties.  No matter how labeled, agency action is a legislative rule if it has binding effect—*i.e.*, it has not "genuinely [left] the agency … free to exercise discretion" and instead binds the agency to a particular legal policy position.

*Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017); *see also, e.g., U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994).  Where "[a]n agency action … purports to impose legally binding obligations or prohibitions on regulated parties" and "violations of those obligations or requirements" "would be the basis for an enforcement action," it "is a legislative rule."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

308.    HHS and HRSA insisted throughout 2020 in multiple public statements that neither the 1996 nor 2010 contract pharmacy guidance created enforceable obligations that could form the basis of an enforcement action against a manufacturer that declined to provide 340B discounts on contract pharmacy sales.  The May 17 Letter, by contrast, clearly creates enforceable obligations under the 340B statute—either comply by June 1 or risk CMPs and other sanctions—and it clearly operates from the premise that Lilly is bound to comply with the position announced in this letter.

309.    Defendants needed to comply with the APA's notice-and-comment procedures in order to (attempt to) enshrine these new obligations.  Because they did not do so before issuing either the December 30 Decision or the May 17 Letter, the May 17 Letter was improperly promulgated, as Defendants nevertheless failed to provide public notice of their proposed action before issuing the May 17 Letter, and failed to provide the public any opportunity to comment on that proposed action.

310.    The May 17 Letter was accordingly issued "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## **PRAYER FOR RELIEF**

Lilly respectfully prays that this Court:

a.      issue an order and judgment declaring that Defendants violated the APA in issuing the December 30 Decision and May 17 Letter because the December 30 Decision and May 17 Letter were issued without following proper procedure; are in excess of statutory authority; violate

the Constitution; and are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

b.      issue an order and judgment declaring that Defendants lack the authority to require Lilly to offer or give 340B discounts to contract pharmacies or on purchases made by contract pharmacies;

c.      preliminarily and permanently enjoin implementation and/or enforcement of the December 30 Decision and May 17 Letter;

d.      issue an order and judgment declaring that Defendants violated the APA in issuing the ADR Rule because the ADR Rule was issued without following proper procedure; is in excess of statutory authority; violates the Constitution; and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

e.      preliminarily and permanently enjoin implementation and/or enforcement of the ADR Rule;

f.      award Lilly costs and reasonable attorneys' fees, as appropriate; and

g.      grant any other relief the Court deems just and appropriate.

Dated:  May 27, 2021

Respectfully submitted,

_s/ John C. O'Quinn_
John C. O'Quinn, P.C.*
Matthew Owen*
Matthew D. Rowen*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com
matt.owen@kirkland.com
matthew.rowen@kirkland.com

Andrew A. Kassof, P.C.*
Diana M. Watral*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
andrew.kassof@kirkland.com
diana.watral@kirkland.com

* Admitted _pro hac vice_

Andrea Roberts Pierson
Brian J. Paul
Nicholas B. Alford
FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
(317) 237-0300
andrea.pierson@faegredrinker.com
brian.paul@faegredrinker.com
nicholas.alford@faegredrinker.com

_Attorneys for Plaintiffs_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **May 27, 2021,** a copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the court's

electronic filing system.  Parties may access this filing through the court's system.

*/s/ John C. O'Quinn*
John C. O'Quinn

102